Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Juli E. Farris (CA Bar No. 141716)
jfarris@kellerrohrback.com
Elizabeth A. Leland
bleland@kellerrohrback.com
Tyler L. Farmer (CA Bar No. 212038)
tfarner@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA  98101
(206) 623-1900
(206)623-3384
*Attorneys for Lead Plaintiff Gerald del Rosario*

*Additional Counsel on Signature Page

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE ZORAN CORPORATION DERIVATIVE LITIGATION | ) ) ) |
|  | ) ) |
| This Document Relates to: | ) ) |
| All Actions | ) ) ) ) ) ) ) | 

Civil Action No. 06-05503-WHA

**CONSOLIDATED VERIFIED DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................................1

II.     PARTIES ............................................................................................................6

        A.      Plaintiff ...............................................................................................6

        B.      Nominal Defendant.............................................................................6

        C.      Officer Defendants.............................................................................7

        D.      Compensation Committee and Audit Committee Defendants..............11

        E.      Non-Defendant Directors ...................................................................13

III.    JURISDICTION AND VENUE ...........................................................................14

IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES OWED TO
        ZORAN..............................................................................................................15

V.      SUBSTANTIVE ALLEGATIONS .....................................................................18

        A.      Background ..........................................................................................18

        B.      Revelation of Backdating at Zoran ....................................................23

        C.      Zoran's Stock Option Plans ...............................................................29

        D.      The Zoran Compensation Committee ..................................................32

        E.      The Zoran Audit Committee ...............................................................35

        F.      Stock Option Grants to the Individual Defendants .............................39

        G.      Backdating and Tax Consequences for the Company and Employees..................67

        H.      Disqualification of Incentive Stock Option Treatment & Resultant
                Liabilities ............................................................................................69

        I.      Taxes Arising Under Section 409A Due to Exercise of Backdated
                Options.................................................................................................70

        J.      Individual Defendants' Backdating Scheme Resulted in the Company's
                Violation of GAAP and Rendered the Company's Financial Statements
                Materially Inaccurate and Unreliable...................................................71

        K.      Additional Standards of Conduct Breached By The Individual
                Defendants............................................................................................75

        L.      Dissemination of Materially False and Misleading Financial Statements
                and Reports ..........................................................................................80

        M.      Dissemination of Materially False and Misleading Proxy Statements .................88

        N.      Insider Sales by Insider Selling Defendants. .....................................110

VI.    DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS ....................115

    A.    Defendant Gerzberg...........................................................................117

    B.    Defendant Meindl .............................................................................119

    C.    Defendant Stabenow .........................................................................120

    D.    Defendant Galil.................................................................................123

    E.    Defendant Owens .............................................................................125

    F.    Defendant Burgess ...........................................................................126

    G.    Director Rynne..................................................................................129

    H.    Director Young .................................................................................130

VII.    TOLLING OF THE STATUTE OF LIMITATIONS.....................................134

VIII.    CAUSES OF ACTION..............................................................................135

    A.    COUNT I: BREACH OF FIDUCIARY DUTY – OPTIONS BACKDATING (Against the Individual Defendants) .........................135

    B.    COUNT II: BREACH OF FIDUCIARY DUTY – INSIDER SELLING (Against the Insider Selling Defendants) ...........................137

    C.    COUNT III: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against the Audit and Compensation Committee Defendants) ............138

    D.    COUNT IV: UNJUST ENRICHMENT (Against the Officer Defendants and Insider Selling Defendants)........................................139

    E.    COUNT V: CONSTRUCTIVE FRAUD (Against the Individual Defendants)........................................................................................140

    F.    COUNT VI: ABUSE OF CONTROL (Against the Individual Defendants)........................................................................................140

    G.    COUNT VII: CORPORATE WASTE AND GIFT (Against the Individual Defendants).................................................................141

    H.    COUNT VIII: GROSS MISMANAGEMENT (Against the Individual Defendants).................................................................142

    I.    COUNT IX: RESCISSION (Against the Officer Defendants)........................143

    J.    COUNT X: VIOLATION OF § 14(a) OF THE EXCHANGE ACT (Against the Audit and Compensation Committee Defendants)........................143

    K.    COUNT XI: VIOLATION OF § 10(b) OF THE EXCHANGE ACT (Against Defendants Gerzberg and Schneider)....................................145

    L.    COUNT XII: VIOLATION OF § 20(a) OF THE EXCHANGE ACT (Against Defendants Gerzberg and Schneider)....................................146

IX.     PRAYER FOR RELIEF ................................................................................147

X.      JURY TRIAL DEMANDED ......................................................................148

CERTIFICATION OF INTERESTED ENTITIES OR PERSONS ...........................................148

# I.    NATURE OF THE ACTION

1.    This is a shareholder's derivative suit brought by Plaintiff Gerald Del Rosario, a shareholder of Zoran Corporation ("Zoran" or the "Company"), on behalf of nominal Defendant Zoran against certain current and former Zoran officers, as well as members of the Zoran Board of Directors for breaches of fiduciary duty, unjust enrichment, constructive fraud, abuse of control, corporate waste, gross mismanagement, rescission, and violations of federal securities laws.

2.    The practice of backdating involves a company issuing stock options to an executive or Director on one date while providing documentation asserting that the options were actually issued earlier.  For nearly ten years, between 1997 and 2005 (the "backdating period"), the Individual Defendants (as identified in Sections II.C and D below) abused their positions as fiduciaries of the Company and perpetrated a backdating scheme that diverted tens of millions of dollars from the Company coffers to certain Zoran officers and Directors by purposefully backdating stock option grants, that is, selecting false grant dates which coincided with the lowest stock trading points during a respective period.

3.    In furtherance of the scheme, the Individual Defendants filed materially false and misleading disclosures with the Securities and Exchange Commission ("SEC") and Internal Revenue Service ("IRS"), concealing their backdating practices over the course of nearly ten years, and subjecting the company to potential civil and criminal liability under applicable state and federal laws, including the Internal Revenue Code ("IRC") and Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq. (the "Exchange Act").

4.    The Individual Defendants' scheme continued until May 2006, when a research report by the Center for Financial Research and Analysis ("CFRA") research report dated

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 1

May 16, 2006, identified Zoran as a company considered to be among those with the "highest risk for having backdated option grants."

5.      In a May 23, 2006 press release, Zoran assured its shareholders and the public that "[u]nder the direction of the Audit Committee, the Company's management, assisted by outside counsel, conducted an internal compliance review and concluded that each of the option grants identified by the CFRA report had been properly made at a regularly-scheduled meeting of the Board of Directors or its Compensation Committee and that none of these grants had involved any 'backdating.'"  In fact, in the Company's view, as of May 23, 2006, "all other grants made to the Company's officers since Zoran's initial public offering in 1995 … have also been properly made."  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Responds to Report Regarding Option Grants (May 23, 2006), available at www.zoran.com.

6.      This "internal compliance review" was managed by the very Defendants who for years had perpetrated and benefited from the wrongdoing.

7.      On July 3, 2006, the Company disclosed that the SEC and the U.S. Attorney for the Northern District of California had initiated investigations into Individual Defendants' backdating scheme.  In response, the Company undertook another investigation into the backdating of its stock options.  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Announces Creation of Special Committee To Continue Review of Stock Option Practices (July 3, 2006), available at www.zoran.com.

8.      On February 20, 2007, the Company issued a press release in which the Company admitted that "the appropriate measurement dates for financial accounting purposes of certain stock option grants differ from the recorded grant dates of those awards."  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Announces Completion of Stock Option Review

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 2

And Expected restatement of historical Financial Statements (February 20, 2007), available at www.zoran.com.

9.      The next day, on February 21, 2007, the Company filed a Form 8-K with the SEC disclosing the same information that had been included in the February 20, 2007 press release, but adding that:

> The Company will restate previously issued historical financial statements to correct its past accounting for certain stock option grants. It will record additional stock-based compensation expense and related tax impacts, and will also evaluate any other unrecorded adjustments previously determined to be immaterial. Accordingly, the financial statements and related notes, financial press releases and similar communications issued by the Company, relating to fiscal periods beginning on or after January 1, 1997 should no longer be relied upon.

10.     The Company also stated that "Zoran expects the aggregate amount of the additional non-cash compensation and other charges to be in the range of $12 million to $15 million, recognized in various amounts over the years 1997 through 2005."

11.     Despite this admission, the Board of Directors has failed to take any remedial action against the Individual Defendants to recoup the Company's losses and prevent the exercise of backdated grants in the future. In fact, in the midst of government investigations and the Company's ongoing attempt to restate its materially false and misleading financial statements, the Board of Directors approved raises for the current executives, including those who perpetrated the backdating scheme.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 3

12.     As of the date of this Complaint, the Company is delinquent in its regulatory filings and subject to delisting from the NASDAQ securities exchange.  The government's investigation is continuing.[1]

13.     Furthermore, while the CFRA Report initially identified three grant dates as being "at risk for backdating," Plaintiff's statistical analysis reveals that a substantial number of the Company's option grants between 1997 and 2005 were likely backdated.

14.     From at least 1997 through 2005, the Company granted more than five million stock options to various Zoran officers and Directors (including to every current Zoran Director), a significant number of which Plaintiff's statistical analysis indicates were backdated.  The Individual Defendants received grants of stock options from the Company on unusually favorable dates, when Zoran stock was trading at or near the lowest price for any given period.  When analyzed, it becomes clear that the timing and pattern of these option grants could not be a mere coincidence.  A substantial number of the grants were backdated, in violation of applicable stock option plans, in order to provide the Individual Defendants with the largest possible return on their stock, at the expense of Zoran and its public shareholders.  By their actions, the Individual Defendants, as officers and/or Directors of Zoran, breached the fiduciary duties of good faith, due care and loyalty that they owed to the Company and its public shareholders.

15.     In furtherance of the backdating scheme, the Individual Defendants improperly reported and accounted for the stock option grants, in violation of Generally Accepted Accounting Principles ("GAAP") and SEC Rules.  As a result, Zoran's financial statements, as

---

[1] According to Zoran's Form 12b-25, Notification of Late Filing, filed March 2, 2007, the Company intends to file its Form 10-K for fiscal 2006 on March 15, 2007, the day after Plaintiff is required to file this Complaint.  For this reason, it may become necessary for Plaintiff to amend his Complaint following a review of the Company's 2006 Form 10-K.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 4

reported and filed with the SEC between at least fiscal years 1997 and 2005, including quarterly and annual reports disseminated to Zoran's shareholders and the public, among others, violated GAAP and SEC Rules, and contained materially false and misleading statements regarding the backdated option grants at issue here.

16. In addition, Zoran's Proxy Statements, which contained materially false and misleading information, were not only filed with the SEC, but also disseminated to Zoran's shareholders as proxy solicitations within the meaning of Exchange Act § 14, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

17. As a result of the Individual Defendants' stock option backdating scheme and related misconduct, the Individual Defendants have diverted millions of dollars of corporate assets to senior Zoran executives and Directors, caused Zoran to incur additional compensation expenses and tax liabilities, as well as loss of funds paid to Zoran upon the exercise of the options, and subjected Zoran to potential liability from regulators and other federal authorities, including the SEC and IRS.

18. Moreover, according to Zoran Proxy Statements issued for fiscal years 1997 to 2005, which are discussed in more detail below, the overwhelming majority of the options granted to the Officer Defendants have yet to expire. Thus, the Officer Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Officer Defendants continues.

19. The Officer Defendants continue to hold more than two million options grants, the majority of which were awarded as part of the backdating scheme and during the time period in which the Company has admitted that backdating did occur. Thus, the Officer Defendants

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 5

have not yet completed their backdating scheme and may continue to deprive the Company and its shareholders by extracting compensation that exceeds the fair value of the exercised options.

## II.   **PARTIES**

**A.   Plaintiff**

20.   Plaintiff Gerald del Rosario is a resident of the District of Columbia and a Zoran shareholder.  During the relevant time period in which the Individual Defendants' breaches and manipulative conduct injured the Company and its shareholders, Plaintiff held, and continues to hold, shares of Zoran stock.  Plaintiff acquired his shares in connection with the merger of Zoran and Oak Technology, Inc. in August 2003, during the course of the Individual Defendants' backdating scheme.

**B.   Nominal Defendant**

21.   Nominal Defendant Zoran was incorporated in California in December 1981 and reincorporated in Delaware in 1996.  Zoran is headquartered in Sunnyvale, California.  The Company's stock is publicly traded on NASDAQ under the ticker symbol "ZRAN."  According to its recent press releases and SEC filings, Zoran "is a leading provider of digital solutions for applications in the growing digital entertainment and digital imaging markets.  With two decades of expertise developing and delivering digital signal processing technologies, Zoran has pioneered high performance digital audio and video, imaging applications, and Connect and Share technologies for the digital home."  *See, e.g.* Press Release, Zoran Corporation, Zoran Corporation Announces Creation of Special Committee to Continue Review of Stock Option Practices (July 3, 2006), available at www.zoran.com.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 6

## C.   Officer Defendants

22.   Defendant Aharon Aharon was Zoran's Senior Vice President and Chief Operating Officer from October 1998 to October 2001; Vice President of Engineering from August 1997 to October 1998; and Vice President, Engineering-Haifa Operations from February 1997 to August 1997.  During his tenure, Aharon exercised at least 126,041 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred.  Since the beginning of the backdating period alleged herein, Aharon sold at least 130,886 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $4.9 million.

23.   Defendant Levy Gerzberg was a co-founder of Zoran in 1981 and has been Zoran's President and Chief Executive Officer since December 1988 and a Director since 1981. Dr. Gerzberg was also Zoran's President from 1981 to 1984 and Zoran's Executive Vice President and Chief Technical Officer from 1985 to 1988.  As a member of the Board, during his tenure, Gerzberg reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.  As Zoran's CEO, he was intimately and directly involved in the granting and approval of stock options under all of the Stock Option Plans in place at Zoran, including the 1993 Stock Option Plan, 1995 Outside Directors Stock Option Plan, 2005 Equity Incentive Stock Option Plan, and the 2005 Outside Directors Equity Plan.[2]  During his tenure, Gerzberg has exercised at least 698,057 stock options, many of which

---

[2] Plaintiff interviewed a confidential witness ("CW #1"), who worked in human resources as a benefits administrator during 2006 and attests that all stock options had to be pre-approved by Gerzberg before they were granted.  First, Gerzberg would determine the estimated number of grants each employee was entitled to, and then, once the specific number of grants had been determined, he would authorize the final number of grants to be awarded.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 7

were initially granted on dates within the time period in which the Company has admitted that backdating occurred. Since the beginning of the backdating period alleged herein, Gerzberg sold at least 760,637 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $24 million. Gerzberg received a base salary of $437,500 in 2006. On February 15, 2007, the Compensation Committee of the Company's Board of Directors approved a raise for Gerzberg, setting his 2007 base salary at $455,000 with a target bonus of 100%.

24.      Defendant Paul R. Goldberg was Zoran's Vice President of Audio Products and Intellectual Properties from October 1998 to approximately January 2001, and Vice President, Systems Solutions from June 1996 to October 1998. During his tenure, Goldberg exercised at least 23,750 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred. Since the beginning of the backdating period alleged herein, Goldberg sold at least 53,427 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $2 million.

25.      Defendant Camillo Martino was Zoran's Executive Vice President and Chief Operating Officer from August 2001 until July 2005. During his tenure, Martino exercised at least 65,022 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred. Since the beginning of the backdating period alleged herein, Martino sold at least 32,601 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $840,000.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 8

26.     Defendant Karl Schneider is Zoran's Vice President, Finance and Chief Financial Officer, a position he has held since July 1998.   He was also the Company's Corporate Controller from January 1998 to July 1998.  As CFO, Schneider was intimately involved in all aspects of the stock option approval process at Zoran.[3]   Schneider actively participated in the preparation, review, and approval of all of the Company's financial statements, earnings releases and/or other filings with the SEC for at least fiscal years 1998 through 2005.   In particular, Schneider certified the accuracy of the Company's financial statements pursuant to § 302 of the Sarbanes-Oxley Act of 2002 (also referred to herein as "SOX"), despite knowing that the backdating scheme necessarily resulted in the Company's violation of GAAP and rendered its financial statements dating back to 1997 materially misleading and unreliable.   During his tenure, Schneider exercised at least 113,200 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred. Since the beginning of the backdating period alleged herein, Schneider has sold at least 135,339 shares of Zoran stock, including shares obtained by exercising options, for proceeds of more than $4 million.  Schneider received a base salary of $210,000 in 2006.  On February 15, 2007, the Compensation Committee of the Company's Board of Directors approved a raise for Schneider, setting his 2007 base salary at $287,000.

27.     Defendant Isaac Shenberg is Zoran's Senior Vice President, Business and Strategic Development, a position he has held since October 1998.   He was also the Company's

---

[3] Plaintiff's second confidential witness ("CW #2") worked at Zoran between 2000 and 2003 as an executive assistant.  CW #2 attests that, during her tenure the CFO, Defendant Schneider, was integral in every aspect of the options grant process at the Company.  CW #2 also attests that Defendant Gerzberg, Zoran's CEO, was integral in the options process, along with the Chief Operating Officers, Defendants Aharon and Martino, and the Board of Directors itself.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 9

Vice President, Sales and Marketing from January 1995 through October 1998 and Product Line Business Manager from August 1990 until January 1995.  During his tenure, Shenberg exercised at least 188,625 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred.  Since the beginning of the backdating period alleged herein, Shenberg has sold at least 195,625 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $5 million.  Shenberg received a base salary of $210,000 in 2006.  On February 15, 2007, the Compensation Committee of the Board of Directors approved a raise for Shenberg, setting his 2007 base salary at $218,400.

28.     Defendant Alex Sinar was Zoran's Vice President of Operations from February 1997 to February 1999 and the Company's Director of Manufacturing from January 1995 to February 1997.  Sinar also supervised the Company's Quality Assurance and Technology groups from 1990 to 1992 and the Company's Product Engineering group from 1990 to 1992.  He also held positions with the Company in the areas of process development, product and test engineering, reliability and quality.  During his tenure, Sinar exercised at least 24,000 stock options, many of which were initially granted on dates within the time period in which the Company has admitted that backdating occurred.  Since the beginning of the backdating period alleged herein, Sinar has sold at least 23,625 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $1.2 million.

29.     The Defendants identified in Paragraphs 22 to 28 are collectively referred to as the "Officer Defendants."

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 10

**D.**   **Compensation Committee and Audit Committee Defendants**

30.     Defendant Uzia Galil is a member of the Zoran Board of Directors, a position he has held since 1983.  He has been Chairman of the Board since October 1993.  Galil was a member of the Board's Audit Committee from 2001 until he was replaced by David Rynne in April 2006.  While on the Audit Committee, he was one of the Company's two designated "financial experts" under SEC Regulation S-K, meaning, among other things, that Galil purported to have an understanding of GAAP and financial statements as well of internal controls and procedures.  He has been a member of the Compensation Committee since at least 1996 and has been the Chairman of the Compensation Committee since at least 2004.  The Compensation Committee approved the award of stock options to Zoran employees, officers, and Directors from 1997 through 2005.  As a member of the Board, during his tenure, Galil reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.

31.     Defendant James A. Meindl is a member of Zoran's Board of Directors, a position he has held since March 1986.  He was a member of the Audit Committee from at least 1996 until April 2005 when he was replaced by Defendant James B. Owens, Jr.  Meindl has been a member of the Compensation Committee since April 2004, when he replaced Owens, and was a member of the Nominating and Corporate Governance Committee in 2001.  As a member of the Board, during his tenure, Meindl reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.  Since the beginning of the backdating period alleged herein, Meindl has sold at least 128,166 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $4.6 million.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 11

32.     Defendant Arthur B. Stabenow is a member of Zoran's Board of Directors, a position he has held since November 1990. Stabenow has been a member of the Company's Audit Committee since at least 1996 and has acted as the Audit Committee Chairman since at least 2004. While on the Audit Committee, he was one of the Company's two designated "financial experts" under SEC Regulation S-K, meaning, among other things, that Stabenow purportedly has an understanding of GAAP and financial statements as well as internal controls and procedures. Stabenow also has been a member of the Compensation Committee since at least 1996 and a member of the Nominating and Corporate Governance Committee since the Committee was established in January 2001. The Compensation Committee approved the award of stock options to Zoran employees, officers, and Directors for the fiscal years 1997 through 2005. As a member of the Board, during his tenure, Stabenow reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports. Since the beginning of the backdating period alleged herein, Stabenow has sold at least 29,166 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $1.3 million.

33.     Defendant James B. Owens, Jr. has been a member of Zoran's Board of Directors since May 2003. He was a member of the Compensation Committee from 2003 until April 2004, when he was replaced by Defendant Meindl. Owens has been a member of the Audit Committee since April 2005 when he replaced Defendant Meindl. He has been a member of the Nominating and Corporate Governance Committee since 2002. As a member of the Board, during his tenure, Owens reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 12

34.   Defendant Raymond A. Burgess has been a member of Zoran's Board of Directors since April 2005 and a member of the Audit Committee since April 26, 2005.  As a member of the Board, during his tenure, Burgess reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.

35.   Defendants Galil, Meindl, Stabenow, and Owens are referred to collectively as the "Compensation Committee Defendants."

36.   Defendants Galil, Meindl, Stabenow, Owens, and Burgess are referred to collectively as the "Audit Committee Defendants."

37.   Defendants Gerzberg, Galil, Meindl, Stabenow, Owens, and Burgess are also referred to collectively as the "Director Defendants."

38.   While identified collectively, and while all participated in the ongoing backdating scheme during the relevant period, Plaintiff alleges that the Defendants identified in Paragraphs 30 through 34 above are liable only for the misconduct during their tenure on the Audit and/or Compensation Committees, and not for those backdated grants issued before or after they were on a committee.

39.   Defendants Aharon, Gerzberg, Goldberg, Schneider, Shenberg, Sinar, Meindl, and Stabenow are referred to collectively herein as the "Insider Selling Defendants."

40.   The Defendants identified in Paragraphs 22 through 34 are referred to collectively herein as the "Individual Defendants."

**E.    Non-Defendant Directors**

41.   David Rynne has been a Director of the Company since August 2003, and he replaced Galil as a member of the Compensation Committee on April 19, 2006.  As a member of

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 13

the Board, during his tenure, Rynne reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.

42.     Philip Young has been a Director of the Company since 1986.  Young is currently on the Nominating and Corporate Governance Committee.  The Nominating and Corporate Governance Committee is responsible for identifying and considering qualified candidates for appointment and nomination to the Zoran Board and recommending corporate governance principles, codes of conduct and compliance mechanisms, and evaluation of the Board for the Company.  As a member of the Board, during his tenure, Young reviewed, signed and approved the filing and dissemination of all of the Company's annual financial statements and reports.

### III.     JURISDICTION AND VENUE

43.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff asserts claims under that Act and the Rules promulgated thereunder.  Alternatively, this Court has jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1332 as the Parties are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

44.     The claims asserted herein arise under §§ 10(b) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(a), and under applicable state law for breaches of fiduciary duty, constructive fraud, abuse of control, corporate waste, gross mismanagement, rescission, and unjust enrichment.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of the national securities market.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 14

45.     Venue is proper in this District because one or more Defendants either resides or maintains offices in this District, and a substantial portion of the alleged wrongdoing occurred in this District.  Moreover, the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES OWED TO ZORAN

46.     Zoran's Directors, officers, and/or fiduciaries, and because of their ability to control Zoran's business, corporate and financial affairs, each of the Individual Defendants, owed Zoran and public shareholders the following fiduciary duties in their management and administration of the affairs of the Company and in the use and preservation of corporate assets:

a.     <u>Good Faith</u>.  The duty to act at all times in good faith and in the best interests of the company and its shareholders, and to avoid action that results in a waste of corporate assets.

b.     <u>Due Care</u>.  The duty to take all reasonable steps to be informed with respect to the decision in question and operate in a manner reasonably believed to be in the best interests of the company, with the care of ordinarily prudent persons in a like position and under similar circumstances.

c.     <u>Loyalty</u>.  Defined by courts in broad and unyielding terms, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a Director, officer, or controlling shareholder and not shared by the shareholders generally.

47.     In order to satisfy these fiduciary obligations, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 15

and controls of the Company and to exercise their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner, in the best interests of Zoran and its shareholders. The Individual Defendants' fiduciary obligations did not allow them to act in furtherance of their own self-interest, to the detriment of the Company and its shareholders.

48.     The Individual Defendants owed a duty to Zoran and its shareholders to ensure that Zoran and its Directors, officers and agents operated in compliance with all applicable federal and state laws, rules and regulations, and that Zoran did not engage in any unsafe, unsound, or illegal business practices.

49.     The Individual Defendants were further required to remain informed of Zoran's operations and, upon receiving notice or information of unsafe, imprudent, unsound or illegal practices, to make a reasonable investigation into and take steps to correct the practices. The Individual Defendants' duties included, but were not limited to, maintaining and implementing an adequate system of internal accounting, as well as other financial controls and reporting, and gathering and reporting information internally, to allow the Individual Defendants to perform their oversight function properly and to prevent the use of corporate assets and non-public corporate information for personal profit.

50.     The Individual Defendants were also required to supervise the preparation, filing, and/or dissemination of Zoran's SEC filings, press releases, audits, reports, and other publicly disseminated communications and information, and to examine and monitor the practices, products or conduct of Zoran's officers, and to accurately disclose all material facts concerning the Company set forth herein.

51.     In addition, the Individual Defendants were required to preserve and enhance Zoran's reputation as a publicly-traded company, and to maintain public trust and confidence in

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 16

Zoran as a prudently managed corporate entity fully capable of meeting its duties and obligations, including its public reporting obligations.

52.    In violation of these duties, as well as GAAP and applicable SEC rules and regulations, the Individual Defendants failed to accurately record, process, summarize, and report the Company's financial data.

53.    Specifically, the Officer Defendants and Compensation Committee Defendants breached their fiduciary duties by backdating the option grants in violation of applicable shareholder approved stock option plans and applicable federal and state laws, rules and regulations as described more fully in the Counts below.

54.    Similarly, all Individual Defendants, including the Officer Defendants, Compensation Committee Defendants and Audit Committee Defendants, breached their fiduciary duties by: (a) failing to account for and report the options backdating; (b) filing and disseminating to Zoran shareholders and the public false financial statements that improperly reported the backdated option grants and concealed the improper backdating of stock options; and (c) filing and disseminating to Zoran shareholders and the public false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

55.    As a direct and proximate result of the Individual Defendants' fiduciary breaches, the Company has sustained millions of dollars in damages.  The Individual Defendants have diverted millions of dollars of corporate assets to senior Zoran officers and Directors, caused Zoran to incur additional compensation expenses and tax liabilities, as well as loss of funds paid to Zoran upon the exercise of the options, and subjected Zoran to potential liability from regulators, including the SEC and IRS.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 17

56.     The vast majority of the options granted to the Individual Defendants have not expired.  Thus the Individual Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment exists to this day.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

57.     Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long as the options' strike price was at or above the market's closing price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted, known as an "in the money" options grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in their financial statements.  *See, e.g.*, APB 25, superseded in 2004 by FAS 123(R).  Accounting rules also required that companies recognize the same compensation expense if "in the money" options were granted to non-employees.  Thus while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

58.     Stock options granted to company insiders must be approved in advance by the Company's Board of Directors and disclosed in order to comply with SEC regulations and reporting requirements.  *See, e.g.,* Regulation S-K.  Such approval can be extended through pre-approval of a prescribed option grant plan or through discretionary grants that are individually reviewed and approved.

59.     In order to maximize remuneration to its officers and employees, and to attract non-employee executives to the Company's ranks without impacting its reported income, the

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 18

Individual Defendants engaged in a practice of backdating the issue date of stock options to certain key personnel.

60.     On information and belief, the Compensation Committee Defendants issuing the grants and the Officer Defendants receiving each grant would review historical stock prices before issuing stock options to determine the date upon which stock prices were significantly below the current market price.  They would then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

61.     As a result, the executive to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

62.     This practice of backdating stock, though widespread, remained virtually undetected until academic research revealed patterns of stock option grants that could not be explained by chance.  These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year.  Such timing could not be statistically explained by random selection of grant dates.  One study hypothesized that the dates of the grants had been selected retroactively.  Such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.  Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers

and employees that was not detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

63.    The academic research did not identify specific companies that had engaged in these practices, although it apparently triggered increased scrutiny by the SEC and other government officials.

64.    The practice was publicly disclosed on March 18, 2006, when The Wall Street Journal published *The Perfect Payday,* in which it described stock option backdating practices by a number of companies at which executives had achieved stock paydays the likelihood of which far exceeded that of winning the lottery, which defied random chance.  The Wall Street Journal, together with finance professors Eric Lie, of the Tippie College of Business at the University of Iowa, David Yermack, of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that the odds were improbable.  The Journal reported, for example, that all six of the stock options granted by ACS to its former CEO Jeffrey Rich displayed a pattern of profitability that could not be explained by chance:

> In a striking pattern all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky?  A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some options carry favorable grant dates for a different reason:  They were backdated.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 20

Charles Forelle and James Bandler, *The Perfect Payday*, The Wall Street Journal, March 18, 2006.

65. Since the date of The Wall Street Journal article, more than 130 companies have reported internal and/or governmental investigations of their backdating practices. Charles Forelle and Nick Wingfield, *Zoran Spots More Options Missteps*, The Wall Street Journal, Aug. 4, 2006; *Perfect Payday Options Scorecard,* The Wall Street Journal (updated regularly, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html). Additional research by Professor Lie suggests that between the period 1996-2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or manipulated, by nearly one-third of the companies investigated.

66. Revelations of backdated stock options have been made by companies across several business sectors and geographic regions. A disproportionate number of these revelations, however, have come from technology companies in Silicon Valley, where stock options are frequently used to attract employees and increasingly lavished upon executives. Rank and file employees who received backdated options have now found themselves subject to unforeseen tax liabilities and, in some instances, barred from exercising their own vested securities. As reported by the San Jose Mercury News:

> Across Silicon Valley and the nation, hundreds of thousands of workers who played no role in manipulating options nonetheless could pay a price, from lost stock options and lost investment opportunities to looming tax bills. And dozens of companies have imposed indefinite "blackout" periods .... While companies struggle to restate past earnings and report current financial results.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 21

Mark Schwanhausser, *Average Worker Takes A Hit: Tax Bill Headaches Looming For Rank-and-File*, San Jose Mercury News, January 29, 2007; online at http://www.mercurynews.com/search/ci_5110094.

67.    As the scrutiny intensifies, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, *SEC: Backdating done to avoid paying more taxes*, San Jose Mercury News, December 13, 2006; online at http://www.mercurynews.com/search/ci_4831931.

68.    Assessing the practice of backdating stock options, former SEC Commissioner Harvey Pitt recently wrote in an opinion column for Forbes:

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair--at least not from the vantage point of the company and its shareholders.
>
> More fundamentally, the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect. These factors would require a restatement, with class action litigation in the offing.
>
> More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?
>
> Those who backdate options grants violate federal and state law. And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 22

unlawful conduct. If they didn't know about the backdating, the question will be: Should they have done more to discover it?"

Harvey Pitt, *The Next Big Scandal*, Forbes Magazine, May 26, 2006; online at http://www.forbes.com/2006/05/25/hpitt-column-stockoption-cx_hp_0526nextbigscandal.html.

69.     Like the stock options examined by The Wall Street Journal, the pattern of option grants to Zoran executives is more than randomly fortuitous.  The more likely reason for the extraordinary pattern exhibited by Zoran is that the Officer Defendants' stock options were improperly backdated, as alleged herein.

**B.     Revelation of Backdating at Zoran**

70.     On May 16, 2006, CFRA issued a report in which it announced that it considered Zoran to be among those companies with the "highest risk for having backdated option grants." CFRA identified three sets of Zoran's options grants in particular, made in August 1998, August 1999 and September 2001.

71.     On May 23, 2006, Zoran disclosed the CFRA report and stated that the Company had initiated an internal investigation of all grants made since its initial public offering in 1995. The Company's press release, issued through the Audit Committee and Company management, stated in part:

> Zoran Corporation responded today to a report by the Center for Financial Research and Analysis ("CFRA") that identified Zoran as one of 17% of the companies in a survey conducted by CFRA that they considered to be "at risk for having backdated option grants."  The CFRA report, which was issued on May 16, 2006, uses statistical data and draws inferences based on the timing of stock option grants to officers.  The report cited three specific sets of Zoran option grants, in August 1998, August 1999, and September 2001.
>
> Upon learning of the CFRA report, the Company referred the matter to the Audit Committee of its Board of Directors for

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 23

review.    Under the direction of the Audit Committee, the Company's management, assisted by outside counsel, conducted an internal compliance review and concluded that each of the option grants identified by the CFRA report had been properly made at a regularly-scheduled meeting of the Board of Directors or its Compensation Committee and that none of these grants had involved any "backdating."    Management has also conducted a broader review of all other option grants made to the Company's officers since Zoran's initial public offering in 1995 and has reported to the Audit Committee that, in the opinion of management, all such grants have also been properly made. Management's conclusion with respect to these additional option grants is still under review by counsel and the Audit Committee.

*See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Responds to Report Regarding Option Grants (May 23, 2006), available at www.zoran.com.

72.    There are several inescapable problems with the Company's investigation.    The investigation, which only lasted seven days, was conducted by Company "management," presumably including Defendants Gerzberg, Schneider, and Shenberg, ***who were the recipients of the options identified and questioned by CFRA in its report***, and the same Audit Committee that shares fault for having allowed the grants to be made in the first place.    Nevertheless, at the behest of these Defendants, the Directors acquiesced to the report – essentially ratifying the misconduct of the Individual Defendants, who were tasked by the Board to investigate their own self-dealing – adopted and made public these "findings," and failed to object to the patent conflict of interest inherent in the management's investigation of itself.    Even assuming that any member of the Board lacked actual knowledge of the longstanding manipulation of grant dates, the Directors' response to the CFRA report demonstrates its unyielding bond with management and its willful abdication of its role, prescribed by the Company's own Corporate Governance Guidelines, to monitor the activities and performance of senior management and to serve the interests of the shareholders.    *See* http://www.zoran.com/Corporate-Governance.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 24

73.     A short time later, however, on July 3, 2006, the Company announced that it had received an informal inquiry of the SEC and a grand jury subpoena from the U.S. Attorney for the Northern District of California "requesting documents from 1995 to the present referring to, relating to, or involving stock options."  Only then did the Company make a dramatic about-face from its position as stated in the May 23, 2006 press release.  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Announces Creation of Special Committee To Continue Review of Stock Option Practices (July 3, 2006), available at www.zoran.com.

74.     In the same July 3, 2006 press release, Zoran reported that, on the recommendation of its Audit Committee, the Board had created a special committee of independent members of the Board "to conduct a further review of the Company's historical stock option practices," and was conducting an internal review of the Company's practices and all options granted since its initial public offering in 1995, including those referenced in the May 23 press release.  *Id.*

75.     On July 24, 2006, Zoran issued another press release disclosing only selected financial results for Second Quarter 2006, stating that its full report on financial results for the second quarter of 2006 would be delayed until "the conclusion of a previously announced review of its historical stock option practices being conducted by a special committee of its Board of Directors."  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Reports Selected Results For Its Second Quarter 2006 (July 24, 2006), available at www.zoran.com.  As explained in detail below, Plaintiff's statistical analysis indicates that most, if not all, of the Directors were likely recipients of suspiciously timed options, or face other liability that renders them incapable of making an independent analysis of the misconduct and making the Board's conclusions inherently suspect.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 25

76.     Zoran issued only selected financial results for its Third Quarter 2006 as well, and announced that it would "release complete financial results upon completion of a review of its historical stock option practices."  *See, e.g.,* Press Release, Zoran Corporation Reports Selected Results For Its Third Quarter 2006 (October 24, 2006), available at www.zoran.com.

77.     As a result of these delays, the Company received at least two NASDAQ Staff Determination Letters, the most recent one on November 15, 2006, stating that it is subject to delisting for failure to timely file its 10-Q for both the second and third quarters of 2006, although it will remain listed pending a decision of the Listing Qualifications Panel on its hearing request and/or submission of its filing.  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Receives NASDAQ Notice Regarding Delayed Filing of Form 10-Q (November 20, 2006), available at www.zoran.com.

78.     On February 20, 2007, the Company issued a press release announcing that it had completed its investigation.  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Announces Completion of Stock Option Review And Expected restatement of historical Financial Statements (February 20, 2007), available at www.zoran.com.  The next day, on February 21, 2007, the Company filed a Form 8-K regarding the investigation and incorporating the press release issued the previous day.  Importantly, in both the press release and the 8-K, the Board ***acknowledged*** that certain option grants had been backdated, as Plaintiff alleges herein, stating:

> Zoran has determined that the appropriate measurement dates for financial accounting purposes of certain stock option grants differ from the recorded grant dates of those awards.  Zoran has also determined that the dates of a small number of stock option grants to non-executives were established retrospectively….[A]dditional charges for stock-based compensation expense will be required, and that those charges will be material with respect to certain prior

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 26

fiscal periods. Zoran expects the aggregate amount of the additional non-cash compensation and other charges to be in the range of $12 million - $15 million, recognized in various amounts over the years 1997 through 2005.

The Company will restate previously issued historical financial statements to correct its past accounting for certain stock option grants. It will record additional stock-based compensation expense and related tax impacts, and will also evaluate any other unrecorded adjustments previously determined to be immaterial. Accordingly, the financial statements and related notes, financial press releases and similar communications issued by the Company, relating to fiscal periods beginning on or after January 1, 1997 should no longer be relied on.

Current Report, Form 8-K (filed February 21, 2007).

79. However, despite the evidence of backdating revealed in its own investigation, which violated the clear terms of the shareholder-approved stock option plans described below, the Board again, unreasonably chose not to take action against the Individual Defendants, not to recoup the losses suffered by the Company as a result of Individual Defendants' actions, and not to cancel the outstanding backdated options. Instead, the Board simply stated that it "has concluded that there was no intentional misconduct by Zoran's current senior management." *Id.*

80. The Company's February 21, 2007 Form 8-K omitted to disclose the fact that, on December 22, 2006, Defendants Gerzberg and Schneider filed Form 4s that confirm their receipt of backdated stock as alleged herein. Gerzberg's filing discloses that a portion of the August 9, 2002 grant issued to him was canceled and replaced with a grant of the same number of shares at an exercise price matching the fair market value of the stock at closing on August 22, 2002, *almost two weeks after the initial purported grant date*.

81. Schneider's December 22, 2006 Form 4 discloses the same transaction for a portion of the shares he received on August 9, 2002. Notably, although the Company appears to

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 27

have determined that August 22, 2002 is the actual grant date for those backdated stock options, the Company only required Schneider and Gerzberg to re-price a fraction of the backdated options they received.  The Company re-priced only 178,125 of the 427,500 backdated options Gerzberg received and re-priced only 31,250 of the 75,000 backdated options Schneider received.  Defendant Shenberg, who also received 82,500 options purportedly granted on August 9, 2002, did not participate in the re-pricing.  Thus, although the Company has recognized the executives' receipt of a massive backdated option grant, it has corrected only a small portion of the 585,000 backdated options that the Officer Defendants received.

82.     Schneider's Form 4 also discloses the re-pricing of a stock option grant that he received on September 19, 2001.[4]  According to the Form 4, the Company has re-set the exercise price for those options to $15.47, the closing price of the Company's stock on September 26, 2001 and almost four dollars per share higher than the backdated amount.  Thus, it appears that, after the Company's stock dipped to below $12, presumably in the aftermath of the September 11 terrorist attacks, the Officer Defendants took advantage of the price drop by granting themselves over 100,000 backdated options.  *See* Charles Forelle, James Bandler and Mark Maremont, *Executive Pay: The 9/11 Factor*, The Wall Street Journal, July 15, 2006.  Schneider's Form 4 indicates his return and the Company's re-pricing of only 8,437 of the 45,000 backdated options he received.  Despite the Company's determination that a portion of Schneider's September 2001 backdated options must be re-priced, the Company took no action to correct the

---

[4] The September 19, 2001 grant was one of the three grants highlighted in the CFRA report as suspicious for backdating and cleared by the Audit Committee and Zoran management in the May 2006 investigation.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 28

dates of 75,000 backdated options received by Gerzberg or the 55,000 backdated options received by Shenberg.

## C.    Zoran's Stock Option Plans

83.    From fiscal years 1997 through 2005, Zoran maintained several stock option plans.  The 1993 Stock Option Plan (the "Plan" or the "1993 Plan") was created "to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentives to Employees, Non-Employee Directors and Consultants of the Company and its Subsidiaries, and to promote the success of the Company's business."  1993 Plan, § 1.[5]

84.    The 1993 Plan permitted grants of stock options, up to a specified maximum, at the discretion of the administrator, each fiscal year to the employees, Directors and consultants of Zoran and/or its subsidiaries.

85.    Zoran's stock option plans, including the 1993 Plan, were to be administered by the Zoran Board of Directors or a committee designated for that purpose.  During the relevant time period, the Zoran stock option plans, including the 1993 Plan, were administered by the Compensation Committee of the Zoran Board of Directors.

86.    The Plan gave broad powers to the Compensation Committee.  The Plan provided that the option price was to be determined by the Compensation Committee, but could not be less

---

[5] Unless otherwise specified, references are to the Zoran Corporation 1993 Stock Option Plan (as amended through May 11, 1998), attached as an exhibit to the Company's 1998 Proxy Statement, Form DEF-14A (filed April 30, 1999).  Plaintiff believes that, except where indicated, the relevant provisions of the 1993 Plan remained the same until it was replaced by the 2005 Equity Incentive Plan (the "2005 Plan").  During the relevant time period, the Company also maintained the 2000 Nonstatutory Stock Option Plan (the "2000 Nonstatutory Plan"), to provide additional options for employees and certain executives, and the 1995 Outside Directors Stock Option Plan (the "1995 Directors Plan"), which provided for formula-based grants of options to non-employee directors.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 29

than "the fair market value of such Shares on the date the Option is granted" in the case of Incentive Stock Options, or 85% of fair market value for Nonstatutory Stock Options. 1993 Plan, § 8(a).  The Plan stated that Fair Market Value was also to be determined by the Committee, but "if there is a public market for the Common Stock, the fair market value per Share shall be the average of the last reported bid and asked price of the Common Stock on the date of the grant." *Id.*

87.     The Plan further mandated that "[u]nless otherwise specified by the Committee, the date of grant of an Option under the Plan shall be the date on which the Committee makes the determination granting such Option.  Notice of the determination shall be given to each Optionee to whom an Option is so granted within a reasonable time after the date of such grant."  1993 Plan, § 12.

88.     Thus, by establishing a stock option grant date that preceded the date upon which the stock option was actually granted, without so specifying, the Company violated the terms of the Plan.

89.     Indeed, as of June 2000, the Plan was amended to include a provision specifying that "[n]o Option shall be repriced without the approval of a majority of the shares of Common Stock present or represented by proxy and voting at a meeting of the stockholders of the Company at which a quorum representing a majority of all outstanding shares of Common Stock is present or represented by proxy."  1993 Plan (as amended through June 18, 2000), § 5(e), attached to the Proxy Statement, Form DEF-14A for fiscal year 1999 (filed June 26, 2000) (the "1999 Proxy Statement").

90.     The 1993 Plan and 2000 Nonstatutory Plan were eliminated and replaced by the 2005 Plan.  This new Plan increased the equity incentive options to include stock appreciation

rights, restricted stock, restricted stock unit awards, performance share and performance unit awards, deferred compensation awards and other stock-based or cash-based awards, noting in particular the recent FASB changes governing the accounting treatment of share-based payments.   In the proxy materials recommending that shareholders approve the 2005 Plan, Zoran's Board of Directors acknowledged that it was

> well aware of the criticism that has been leveled generally against the misuse of stock-based compensation by some companies.  The Board believes that the 2005 Plan takes steps to address possible concerns of our stockholders.  Under the 2005 Plan:  Stock options and stock appreciation rights may not be repriced without the approval of our stockholders; No discount from fair market value is permitted in setting the exercise price of stock options and stock appreciation rights;….

Proxy Statement, Form DEF-14A for fiscal year 2005 (filed May 1, 2006) (the "2005 Proxy Statement").

91.     The Company also maintained a stock option plan for its non-employee Directors. The 1995 Directors Plan provided for formula-based grants of options to non-employee Directors.   Under the Directors Plan, each non-employee Director of the Company was automatically granted a nonstatutory option to purchase a certain number of shares on the date on which such person first became a non-employee Director of the Company and thereafter on the date immediately following each annual stockholders' meeting, if on such date the non-employee Director had served on the Board for at least six months.  The 1995 Directors Plan provided that each initial option became exercisable in installments of one-fourth of the total number of shares on first, second, third, and fourth anniversaries of the grant, and each annual option became exercisable in full one year after the date of the grant, subject to the Director's continuous

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 31

service.  The exercise price per share of all options granted under the Directors Plan was to equal the fair market value of the share on the date of the grant.

92.  The 1995 Directors Plan was eliminated and replaced by the 2005 Directors Plan. According to the Company's 2005 Proxy Statement, the Board requested that the shareholders authorize the 2005 Directors Plan in order "to attract and retain highly qualified individuals to serve as independent Directors of Zoran and to provide an incentive toward increasing the value of Zoran for its stockholders."

93.  Unlike the 1995 Directors Plan, the 2005 Directors Plan was *not* a formula-based plan.  Instead, it was akin to the 1993 Plan and the 2005 Equity Incentive Plan in that it gave the Board of Directors and the Compensation Committee discretion with regard to the date and amount of any options grant.

94.  The 2005 Directors Plan made clear, however, that "[t]he exercise price for each Option shall be the Fair Market Value of a share of Stock on the effective date of the grant of the Option."

**D.   The Zoran Compensation Committee**

95.  From at least the beginning of the backdating period, the Compensation Committee of the Zoran Board of Directors was responsible for the administration and granting of stock options.

96.  From the beginning of the backdating period to the present, Defendants Galil and Stabenow have served on the Compensation Committee.  Defendant Owens was on the Compensation Committee from 2003 through April 2004, at which point he was replaced by Defendant Meindl.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 32

97.     The Compensation Committee was to consist of not less than two members of the Board and was responsible for discharging the Board's responsibilities relating to the compensation of Zoran's executive officers, including reviewing the performance of Zoran's executive officers, and approving salaries and incentive compensation for such officers. Specifically, subject to the terms of the 1993 Plan, the Compensation Committee:

> determines the persons to whom options are to be granted, the number of shares to be covered by each option, whether an option is to be an incentive stock option or a nonstatutory stock option, the timing and terms of exercisability and vesting of each option, the exercise price and the type of consideration to be paid to the Company for shares acquired pursuant to an option, the time of expiration of each option, and all other terms and conditions of options granted under the Option Plan.

Proxy Statement, Form DEF-14A for fiscal year 1998 (filed April 30, 1999) (the "1998 Proxy Statement").

98.     The 1993 Plan defined the Compensation Committee's role and responsibility with respect to the Plan as follows:

> (c)     POWERS OF THE COMMITTEE.  Subject to the provisions of the Plan, the Committee shall have the authority:  (i) to determine, upon review of relevant information, the fair market value of the Common Stock; (ii) to determine the exercise price of Options to be granted, the Employees, Directors or Consultants to whom and the time or times at which Options shall be granted, and the number of Shares to be represented by each Option; (iii) to interpret the Plan; (iv) to prescribe, amend and rescind rules and regulations relating to the Plan; (v) to determine the terms and provisions of each Option granted under the Plan (which need not be identical) and, with the consent of the holder thereof, to modify or amend any Option; (vi) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an Option previously granted by the Committee; (vii) to accelerate or (with the consent of the Optionee) defer an exercise date of any Option, subject to the provisions of Section 9(a) of the Plan; (viii) to determine whether Options granted under the Plan will be Incentive Stock Options or Nonstatutory Stock Options; (ix) to make all other determinations deemed necessary or advisable for the administration of the Plan; and (x) to

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 33

designate which options granted under the Plan will be issued in reliance on Rule 701.

(d)   EFFECT OF COMMITTEE'S DECISION.   All decisions, determinations and interpretations of the Committee shall be final and binding on all potential or actual Optionees, any other holder of an Option or other equity security of the Company and all other persons.

1993 Plan, §§ 4(c)-(d).

99.   Pursuant to this Plan, the Compensation Committee was responsible for awarding the stock options that are the subject of this litigation, in the amounts set forth below.

100.   The Compensation Committee was given certain administrative authority under the 2005 Equity Incentive Plan.   The 2005 Plan assigned to the Compensation Committee the following duties, among others:

3.5 **Powers of the Committee.**  In addition to any other powers set forth in the Plan and subject to the provisions of the Plan, the Committee shall have the full and final power and authority, in its discretion:

(a) to determine the persons to whom, and the time or times at which, Awards shall be granted and the number of shares of Stock, units or monetary value to each Award;

(b)   to determine the type of Award granted;

(c)   to determine the Fair Market Value of shares of Stock or other property;

(d)   to determine the terms, conditions and restrictions applicable to each Award (which need not be identical) and any shares acquired pursuant thereto, including, without limitation, (i) the exercise or purchase price of shares pursuant to any Award, … (viii) all other terms, conditions and restrictions applicable to any Award or shares acquired pursuant thereto not inconsistent with the terms of the Plan;

(2005 Equity Incentive Plan, attached to 2005 Proxy Statement as Appendix A)

101.    Likewise, the 2005 Directors Plan gives the Board and the Compensation Committee the authority to set the amount of any grant issued to the Outside Directors.  (2005 Directors Plan, § 6, attached to 2005 Proxy Statement as Appendix B).

102.    With respect to the backdated stock option awards, the Compensation Committee was certainly aware or should have known that the purported grant dates did not correspond to the dates on which the Compensation Committee actually granted the stock options. Nevertheless, the Compensation Committee granted stock options to the Officer Defendants using exercise prices that reflected a price at which the stock had closed days or even weeks earlier than the actual grant date.

**E.    The Zoran Audit Committee**

103.    During the relevant period, Defendants Galil, Meindl, and Stabenow served on the Audit Committee, which was to be comprised of at least three Directors who satisfied the independence and experience requirements of the Company and applicable NASDAQ rules.

104.    The Board's Audit Committee was responsible for monitoring the Company's financial reporting, including compensation reporting.  Indeed, the stated purpose of the Audit Committee is as follows:

> The primary function of the Committee is to assist the Board of Directors in fulfilling its financial oversight responsibilities by reviewing and reporting to the Board upon (i) the financial reports and other financial information provided by the Company to any governmental body or to the public, (ii) the Company's systems of internal and external controls regarding finance, accounting, legal compliance and ethics that management and the Board have established and (iii) the Company's auditing, accounting and financial reporting processes in general. Consistent with this function, the Committee should encourage continuous improvement of, and should foster adherence to, the Company's financial policies, procedures and practices at all levels. The Committee's primary duties and responsibilities are to:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 35

- Serve as an independent and objective party to monitor the Company's financial reporting process and internal control systems.

- Review and appraise the audit efforts and independence of the Company's auditors.

- Provide an open avenue of communication among the independent auditors, financial and senior management, and the Board.

Zoran Corporation Charter of the Audit Committee of the Board of Directors ("2001 Audit Committee Charter"), § I, attached as Appendix A to Proxy Statement, Form DEF-14A for fiscal year 2000 (filed April 30, 2001) (the "2000 Proxy Statement"); *see also* subsequent Audit Committee Charters, attached as Appendix A to Proxy Statement, Form DEF-14A for fiscal year 2001 (filed April 30, 2002) (the "2001 Proxy Statement"), and as Annex G to Zoran's 2002 Proxy Statement, which contain nearly identical provisions.

105.    The Audit Committee Charter provides the Audit Committee with broad authority and responsibility for the Company's financial reporting, including the following:

A.    Oversight of the Company's Independent Auditor

The Committee shall be directly and solely responsible for the engagement of any independent auditor employed by the Company for the purpose of preparing or issuing an audit report or related work and shall be directly involved in the oversight of such engagement. Each independent auditor shall report directly to the Committee. The Committee shall:

*       *       *

10.    Review with the independent auditor the critical accounting policies and practices used by the Company, all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that the independent auditor has discussed with management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor.

B.    Review of Financial Reporting, Policies and Processes

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 36

To fulfill its responsibilities and duties the Committee shall, to the extent that it deems necessary or appropriate, and in addition to the items described above:

1.      Review and discuss with management and the independent auditor the Company's annual audited financial statements, any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

2.      Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in connection with the Company's annual report on Form 10-K.

3.      Review and discuss with management and the independent auditor the Company's quarterly financial statements and the Company's disclosure under "Management's Discussion and Analysis of Results of Operation".

4.      Review and discuss press releases regarding the Company's financial results and other information provided to securities analysts and rating agencies, including any "pro forma" or adjusted financial information.

*       *       *

6.      Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

7.      Review annually with management its assessment of the effectiveness of the Company's internal control structure and procedures for financial reporting ("Internal Controls"), and review annually with the independent auditor the attestation to and report on, the assessment made by management, and consider whether any changes to the Internal Controls are appropriate in light of management's assessment or the independent auditor's report.

8.      Review quarterly with management its evaluation of the Company's procedures and controls ("Disclosure Controls") designed to assure that information required to be disclosed in its periodic public reports is recorded, processed, summarized and reported in such reports within the time periods specified by the Securities and Exchange Commission for the filing of such reports, and consider whether any

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 37

changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

\*       \*       \*

12.    Review analyses prepared by management and/or the independent or internal auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements including the effects of alternative GAAP methods on the financial statements.

C.    Risk Management, Related Party Transactions, Legal Compliance and Ethics

To further fulfill its responsibilities and duties, the Committee shall, to the extent that it deems necessary or appropriate, and in addition to the items described above:

1.    Review with the Chief Executive Officer and Chief Financial Officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls which could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's Internal Controls.

2.    Consider and approve related-party transactions, after reviewing each such transaction for potential conflicts of interests and other improprieties.

\*       \*       \*

4.    Adopt a Code of Ethics for senior financial officers and provide for and review prompt disclosure to the public of any change in, or waiver of, such Code of Ethics. Review conduct alleged to be in violation of such Code of Ethics and adopt as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct. Take such actions, including review of conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adoption of remedial, disciplinary, or other measures with regard to such actions, as may be necessary or appropriate under the Code of Business Conduct and Ethics.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 38

5.      Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

*      *      *

7.      Discuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

8.      Prepare the Committee's report required by the rules of the Securities Exchange Commission to be included in the Company's annual proxy statement.

Audit Committee Charter, § IV, attached as Appendix A to Zoran's 2005 Proxy Statement, (the "2006 Audit Committee Charter"); *See also* 2001, 2002, and 2003 Audit Committee Charters, which contain virtually identical provisions.

## F.      **Stock Option Grants to the Individual Defendants**

106.    From 1997 to 2005, the Compensation Committee granted Zoran stock options to the Officer Defendants, as follows:

| Defendant | Purported Date of Grant | Exercise Price[6] | Number of Options | Subsequent 10-Day Increase > 5% |
|---|---|---|---|---|
| Aharon, Aharon | 1/2/1997 | $17.50 | 60,000 | 31.43% |
| | 1/26/98 | $13.38 | 30,000 | 27.15% |
| | 8/4/1998 | $5.94 | 20,000 | 36.70% |
| | 8/4/1998 | $5.94 | 90,000 | 36.70% |
| | 8/4/1999 | $20.38 | 30,000 | 49.36% |
| | 7/28/2000 | $41.00 | 50,000 | 11.12% |
| | 2/7/2001 | $15.50 | 35,000 | |

---

[6] The exercise price for each grant represents the actual closing price on the purported date of grant and is not adjusted for splits or dividends.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 39

| Defendant | Purported Date of Grant | Exercise Price[6] | Number of Options | Subsequent 10-Day Increase > 5% |
|---|---|---|---|---|
| Gerzberg, Levy | 7/23/1997 | $19.75 | 75,000 | |
| | 8/4/1998 | $5.94 | 40,000 | 36.70% |
| | 8/4/1998 | $5.94 | 191,666 | 36.70% |
| | 8/4/1999 | $20.38 | 55,000 | 49.36% |
| | 7/28/2000 | $41.00 | 90,000 | 11.12% |
| | 2/7/2001 | $15.50 | 50,000 | |
| | 9/19/2001 | $17.28 | 75,000 | 32.41% |
| | 8/9/2002 | $12.36 | 427,500 | 15.53% |
| | 7/15/2003 | $24.78 | 304,679 | 5.33% |
| | 7/15/2003 | $24.78 | 304,679 | 5.33% |
| | 8/19/2005 | $13.59 | 180,000 | 14.28% |
| Goldberg, Paul | 7/23/1997 | $19.75 | 10,000 | |
| | 8/4/1998 | $5.94 | 15,000 | 36.70% |
| | 8/4/1998 | $5.94 | 40,000 | 36.70% |
| | 8/4/1999 | $20.38 | 15,000 | 49.36% |
| Martino, Camillo | 8/21/2001 | $32.00 | 150,000 | |
| | 10/31/2001 | $25.29 | 50,000 | 26.06% |
| | 8/21/2002 | $14.93 | 75,000 | |
| | 10/17/2002 | $13.60 | 75,000 | 10.22% |
| | 7/15/2003 | $24.78 | 130,000 | 5.33% |
| | 7/15/2003 | $24.78 | 130,000 | 5.33% |
| Schneider, Karl | 1/26/1998 | $13.38 | 10,000 | 27.15% |
| | 8/4/1999 | $20.38 | 15,000 | 49.36% |
| | 7/28/2000 | $41.00 | 30,000 | 11.12% |
| | 2/7/2001 | $15.50 | 25,000 | |
| | 9/19/2001 | $17.28 | 45,000 | 32.41% |
| | 8/9/2002 | $12.36 | 75,000 | 15.53% |
| | 7/15/2003 | $24.78 | 100,000 | 5.33% |
| | 7/15/2003 | $24.78 | 100,000 | 5.33% |
| | 8/19/2005 | $13.59 | 60,000 | 14.28% |
| Shenberg, Isaac | 7/23/1997 | $19.75 | 40,000 | |
| | 8/4/1998 | $5.94 | 15,000 | 36.70% |
| | 8/4/1998 | $5.94 | 40,000 | 36.70% |
| | 8/4/1999 | $20.38 | 20,000 | 49.36% |
| | 7/28/2000 | $41.00 | 40,000 | 11.12% |
| | 2/7/2001 | $15.50 | 30,000 | |
| | 9/19/2001 | $17.28 | 55,000 | 32.41% |
| | 8/9/2002 | $12.36 | 82,500 | 15.53% |
| | 7/15/2003 | $24.78 | 100,000 | 5.33% |
| | 7/15/2003 | $24.78 | 100,000 | 5.33% |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 40

| Defendant | Purported Date of Grant | Exercise Price[6] | Number of Options | Subsequent 10-Day Increase > 5% |
|---|---|---|---|---|
| | 8/19/2005 | $13.59 | 54,000 | 14.28% |
| Sinar, Alex | 7/23/1997 | $19.75 | 30,000 | |
| | 8/4/1998 | $5.94 | 10,000 | 36.70% |
| | 8/4/1998 | $5.94 | 30,000 | 36.70% |

107.    As noted above, the 1993 Plan, the 2005 Plan, and the 2005 Directors Plan all required that, absent specific approval by the Administrator, or a merger or acquisition, the exercise price for any stock option issued under the Plan must be at least 100% of the Fair Market Value on the date of the grant.

108.    As recognized by Professor Lie, "in the absence of opportunistic grant timing or opportunistic timing of information flows around grants, the returns before and after grant dates should be similar.   Consequently, if opportunistic timing is absent, the distribution of the difference between the returns for a given number of days after the grants and the returns for the same number of days should be centered roughly at zero."  Randall A. Heron and Erik Lie, *What Fraction of Stock Option Grants to Top Executives Have Been Backdated or Manipulated* (July 14, 2006); online at http://www.issproxy.com/pdf/OptionsBackdatingStudy071406.pdf.

109.    With respect to Zoran, the stock option grant dates follow a striking pattern that could not have been the result of chance.  The table above shows that each of the Individual Defendants received a substantial number of option shares that increased in value immediately after they were granted, by significant amounts.

110.    Indeed, nearly half of the foregoing stock option grants were dated just after a sharp drop and just before a substantial rise in Zoran's stock price (low point) and seventy-five

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 41

percent were granted on dates when the option values increased immediately after they were granted (low point and upward trend), as the following charts demonstrate:

| Relative Stock Price | # of Dates | Total # Options |
|---|---|---|
| Low Point | 17 | 3,121,495 |
| Upward Trend | 7 | 1,550,722 |
| Downward Trend | 6 | 623,800 |
| High Point | 2 | 95,000 |
| Totals: | 32 | 5,391,017 |





CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 42

111.    As described above, CFRA, in its independent study, identified three suspicious sets of grants, in August 1998, August 1999, and September 2001, which it concluded were at risk for backdating.  In fact, however, between 1997 and 2005, a substantial majority of the Company's stock option grants were awarded at or near the lows for the period in which they were granted, with the stock price consistently increasing significantly shortly thereafter.

112.    Statistical analysis of all of Zoran's option grants from 1996 through 2005 reveals that the timing of Zoran's suspicious option grants could not have been the result of mere chance.  Between 1996 and 2005, the Company granted options on thirty-two different dates.  The probability of these thirty-two grants occurring when they did, on or near the low point for the month nearly one-third of the time, without manipulation in the grant process, was approximately one in 1,235 (a probability of 0.08094%).[7]

113.    The chart below matches the option grant dates with historical prices for Zoran's common stock.  Each option grant date was then ranked against the other days for the calendar month in which the grant occurred, with a "1" rank corresponding to the date with the lowest share price within the month-long period, a "2" rank being the date with second-lowest share price in the month, and so forth.  These findings are set out in the table below:

| Option Rankings Within Calendar Months | |
| --- | --- |
| Grant Date | Rank in Month |
| 1/31/1996 | 22 |
| 6/7/1996 | 14 |
| 7/24/1996 | 3 |
| 1/2/1997 | **1** |

[7] The statistical analysis discussed herein was performed by an expert retained by Plaintiff.  In addition to the expert analysis, Plaintiff relies upon his own investigation and analysis and disclosures and admissions issued by the Company and Board of Directors.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 43

| Option Rankings Within Calendar Months | |
| --- | --- |
| Grant Date | Rank in Month |
| 5/6/1997 | **2** |
| 7/23/1997 | 12 |
| 1/26/1998 | 6 |
| 6/11/1998 | 7 |
| 8/4/1998 | **2** |
| 1/20/1999 | 13 |
| 8/4/1999 | **1** |
| 10/11/1999 | **1** |
| 1/26/2000 | 4 |
| 7/28/2000 | **1** |
| 2/7/2001 | 9 |
| 3/16/2001 | **1** |
| 6/29/2001 | 21 |
| 8/21/2001 | **1** |
| 9/19/2001 | **2** |
| 10/31/2001 | 11 |
| 6/21/2002 | 11 |
| 8/9/2002 | 4 |
| 8/21/2002 | 19 |
| 10/17/2002 | 16 |
| 4/29/2003 | 19 |
| 7/15/2003 | 17 |
| 7/17/2003 | 14 |
| 8/11/2003 | 6 |
| 6/21/2004 | **1** |
| 4/26/2005 | 3 |
| 8/19/2005 | 4 |
| 11/23/2005 | 16 |

114.    As the above table indicates, of the thirty-two option grant dates, seven were ranked as a "1" for the month in which the grant was made, meaning that they were granted on the date with the lowest share price in the period.  Ten of the option grants were ranked "1" or "2," meaning that they fell on one of the two dates with the lowest share prices in the period.

115.    After identifying the monthly rank of each of the option grants, the probability of the number of grant dates ranking "1" or "2" was calculated using a binomial distribution

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 44

probability function, where the number of occurrences was the number of grant dates ranking "1" (or "1" and "2"), the number of observations was the total number of grant dates, and the probability was calculated by assuming twenty trading days per month.   (The binomial distribution probability function is used in problems, such as this one, with a fixed number of tests or trials, when the outcomes of any trial produce only one of two results, when the trials are independent, and when the probability producing one of the two results is constant throughout the problem.  For example, the function can calculate the probability that two out of three coin tosses will turn up heads or how many out of 100 people will contract a certain disease.)

116.    The probability of a one in 1,235 occurrence (or a 0.08094% likelihood), as noted above, is the probability of ten or more of the thirty-two grants being ranked 1 or 2 in their respective month-long periods.  The odds are one in 1,151 (or a 0.08685%) that the grants would be ranked "1" in their respective month-long periods.

117.    With regard to the options granted prior to the enactment of the Sarbanes Oxley Act,  when the Company was not required to file Form 4s for each option grant by the end of the second business day following the option grant date, the odds are one in 1,327 (or a 0.07535% likelihood) that six or more of the twenty-three grants in this period would be ranked "1" in their respective calendar months, and a one in 4,539 chance (or a 0.02203% likelihood) that nine or more of the twenty-three grants would be ranked "1" or "2" in their respective month-long periods.  These statistically significant results indicate manipulation of the option grants, and are supported by the Company's February 21, 2007 Form 8-K filing, wherein the Company admitted that it must restate its financial statements dating back to 1997 "to correct its past accounting for . . . stock option grants."

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 45

118.    The improbability of these grant dates being mere coincidence is also statistically significant when looking at a subset of Zoran grants between 1997 and 2001, the period focused on by CFRA, and the period during which many public companies, including Zoran, have admitted to backdating.   During that period, six of seventeen grants were ranked "1" in their respective calendar months.   The probability of such an outcome is one in 8,353 (or a 0.01197% likelihood) and a one in 87,226 (or 0.00115% likelihood) chance that nine of the seventeen grants would rank either "1" or "2" for the period.   These results are statistically significant and indicate intentional manipulation of the option grants.   For these reasons, Plaintiff alleges that most, if not all, of these grants were backdated.

119.    What follows are charts documenting specific examples of the extraordinary pattern of Zoran's stock grants issued between fiscal year 1997 and 2005.   On information and belief, Plaintiff alleges that all of these stock option grants were backdated.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 46

1

120.    The first chart represents the Compensation Committee's grant of 60,000 shares

2  to Defendant Aharon on January 2, 1997.  This grant ranked as a "1" for that month.  In the two

3  trading weeks following this grant, the value of Zoran stock increased $10 per share, from

4  $17.50 on January 2, 1997, to $27.50 on January 22, 1997, making the timing of the grant a

5  likely suspect for having been backdated.

6

7                          **December 3, 1996 - January 30, 1997**



1

2

3

4

5

6

    121.   Likewise, as illustrated in the below chart, the Compensation Committee purportedly made a suspicious grant to Zoran's Director of Marketing for the JPEG product line, Shmuel Farkash, on May 6, 1997.   This grant was made in a trough with the price of the Company's stock increasing $6 per share, from $14 to $20, by May 13, 1997, five trading days later.



7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 48

122.   The purported January 26, 1998 grant illustrated below is similarly suspicious. The recipients of this grant were Defendant Schneider and Mr. Farkash.  The price of Zoran's stock rose sharply, from $13.37 on the purported date of the grant, to $17.87 on February 3, 1998, eight days later.



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 49

123.    The chart below illustrates the timing the grant of options to purchase more than 491,000 Zoran shares to Defendants Aharon, Gerzberg, Goldberg, Shenberg, and Sinar on August 4, 1998, which Plaintiff's statistical analysis ranked as a "2" for its period.  In the ten trading days following this grant, the Company's shares increased in value an astounding 36.70%.  This grant was one identified by the CFRA as being at "risk for backdating."

124.    Notably, on August 4, 1998, Zoran's stock had dropped significantly, from a $7.63 high, to close at $5.94 per share.  This price was significantly lower than the July 24, 1998 high of $9.13, and two dollars below the $7.94 closing price just two trading days before, on July 31, 1998.  A portion of these August 4, 1998 grants were made pursuant to a re-pricing plan formulated by the Compensation Committee Defendants and other Individual Defendants to take advantage in the sharp decline in the price of Zoran stock.  The offer had the effect of swapping options that would have been less profitable to those holding them, for options that were more advantageous.  In short, the Individual Defendants ensured that Zoran's officers and employees benefited, at a cost to the Company, not only when the backdating stock practices worked to their advantage, but also when they didn't.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 51

125.    The next chart identifies another grant date called into question by the CFRA report.    The Company awarded Defendants Aharon, Gerzberg, Goldberg, Schneider, and Shenberg options for 135,000 shares, purportedly on August 4, 1999.   The Company's stock increased in value by more than 50% over the following two weeks, from $20.38 per share on August 4, 1999 to $33.50 per share on August 20, 1999.



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 52

126.   The Company purportedly authorized a grant of 17,938 shares to Zoran's Vice-President of Worldwide Sales, Bruce Renouard, on October 11, 1999.  The timing of this grant is also suspicious.  This grant not only corresponded to the lowest trading price within the month of October but also the lowest closing price of any day in the first three calendar months of Mr. Renouard's employment at Zoran.  Furthermore, in the three trading days preceding the grant date, the value of the Company's shares had plummeted more than $8 per share, to $21 per share on October 11, 1999.  In the three days immediately after the grant, Zoran's stock rebounded, increasing by more than $5 per share, to $26.25 per share on October 14, 1999.



1

2

3

4

5

6

7

127.   The Compensation Committee again purported to issue the Officer Defendants option grants on the lowest ranked date for a calendar month, on July 28, 2000.   The Compensation Committee caused the Company to issue the Officer Defendants options for 210,000 Zoran shares, purportedly on July 28, 2000, the value of which increased by $11 per share in the two trading weeks thereafter, from $41 per share on July 28, 2000, to $52 per share on August 17, 2000.

8

9

10

11

12

13

14

15

16

17

18

19



20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 54

128.    The Compensation Committee awarded Defendant Stabenow 2,500 options, purportedly on March 16, 2001.  This date corresponded with Zoran stock's lowest value for the month.  Furthermore, this grant is suspect in that Stabenow was the only Director to receive this grant and it was seemingly not made pursuant to the 1995 Directors Plan.  Zoran stock rose nearly three dollars per share in the days immediately following this grant, from $13 per share on March 16, 2001, to $15.87 per share on March 23, 2001.



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 55

1

2

3

4

5

6

7

129.    The following chart illustrates a grant purportedly awarded by the Compensation Committee on August 21, 2001, which consisted of options for 150,000 Zoran shares.  These stock options were awarded to Defendant Martino.  That date was the lowest ranked date in the calendar month.  As one can see from the chart, the timing of this grant is suspicious because of the severity of the trough in which it was granted.  Within four days, Zoran's stock price increased by $3.90, to $35.90 per share on August 27, 2001.

8

9

10

11

12

13

14

15

16

17

18

19



20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 56

130.    The grant illustrated below purportedly occurred on September 19, 2001.  On that date, the Compensation Committee purportedly granted Defendants Gerzberg, Schneider, and Shenberg a total of 117,000 options.  This grant occurred in the aftermath of 9/11, when the Company's stock had been seriously depressed.  As the Wall Street Journal reported in an article dated March 7, 2007, many post-9/11 options were backdated by a number of companies in order to take advantage of the market's plunge to its lowest point in 60 years:

> Harvey Pitt, who was chairman of the SEC at the time of the attacks, said it was "offensive" for companies to capitalize on the market panic caused by 9/11. The terror attacks "created many pressures, difficulties and dislocations," said Mr. Pitt. "The one thing it cannot be used to justify is the fraudulent backdating of documents."
>
> In the wake of the attacks, the nation's stock markets were closed from Sept. 11 to Sept. 14. When they reopened the following week, the Dow Jones Industrial Average skidded more than 14%, in the worst full week for the blue-chip average since Germany invaded France in May 1940.
>
> Scores of companies rushed to grant options during the market's trough; a Wall Street Journal analysis published in July found that among a set of 1,800 leading companies the frequency of option grants more than doubled in late September 2001, compared with other years.

Mark Maremont, Charles Forelle, and James Bandler, *Companies Say Backdating Used in Days After 9/11*, The Wall Street Journal, March 7, 2007.  The market rebounded sharply in the fourth quarter of 2001, after these grants were made.

131.    The Defendants have implicitly admitted that this grant was backdated.  On December 22, 2006, more than five years after this purported grant date, Defendant Schneider filed a Form 4 disclosing the re-pricing of his options from this grant from the share price from $11.52 on September 19, 2001 to the share price of the Company's stock on September 26, 2001, *seven days later*, when the price of the Company's stock was $15.47 per share.  (Schneider's

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 57

1

2

3

4

5

6

7

8

9

10

Form 4 reflects the closing prices after adjustments for splits and dividends.  The actual (unadjusted) closing prices of the stock were $17.28 on September 19, 2001 and $23.20 on September 26, 2001, when the grants were actually made).  This is the same grant brought to the Company's attention in May 2006 by the CFRA report, which management concluded "had been properly made at a regularly scheduled meeting of the Board of Directors or its Compensation Committee and that none of these grants had involved any 'backdating.'"  *See, e.g.,* Press Release, Zoran Corporation, Zoran Corporation Responds to Report Regarding Option Grants (May 23, 2006), available at www.zoran.com.



11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 58

132.   The Compensation Committee's grant of 585,000 options to Defendants Gerzberg, Schneider, and Shenberg purportedly occurred on August 9, 2002, immediately after a dramatic drop in the price of Zoran stock.  Just as in the examples above, the stock rebounded immediately after the grant, increasing dramatically in value over the ten days immediately following the grant date, from $12.36 per share on August 9, 2002 to $16.96 per share on August 19, 2002, seven days later.

133.   In fact, on December 22, 2006, Defendants Gerzberg and Schneider, two of the recipients of the purported August 9, 2002 grant, filed Form 4s re-pricing these option grants to correspond to the price of Zoran's stock on August 22, 2002, when the stock was trading at a much higher price.  These re-pricings indicate that the options purportedly granted on August 9, 2002 were in fact backdated by nearly two weeks.  While Schneider and Gerzberg filed Form 4s disclosing the re-pricing, they only re-priced a portion of the grants they were purportedly granted on August 9, 2002.  Defendant Shenberg did not participate in the re-pricing.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 60

1

134.    The purported July 17, 2003 grant of 60,000 options to Zoran's Board of

2  Directors is also suspicious, given that the share price increased substantially immediately after

3  the purported grant date, from $24.16 on July 17, 2003 to $27.28 on July 25, 2003.  These option

4  grants are also uniquely suspect because they were awarded to the Directors under the

5  discretionary 1993 Plan, instead of the formula-based 1995 Directors Plan, which was in place at

6  the time.

7



135.    The Compensation Committee purportedly authorized the grant of 90,000 options for the benefit of the Board of Directors on June 21, 2004.  On the date of these grants, the Company's stock was trading at its lowest point for the month of June 2004.  Immediately after the grant, the price of Zoran's stock increased sharply, to $18.40 per share on June 29, 2004.



CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 62

136.    Likewise, the purported April 26, 2005 grant of 30,000 stock options by the Compensation Committee Defendants to Defendant Burgess is suspicious, given the sharp increase in the Zoran's stock's value immediately after the grant.   The value of the stock increased more than two dollars per share, to $11.07 on May 9, 2005.



1

2

3

4

5

6

7

137.   As illustrated below, the Compensation Committee awarded Defendants Gerzberg, Schneider, and Shenberg 294,000 stock options with a purported grant date of August 19, 2005.  Once again, the timing of this grant appears to be more than mere coincidence.  The grant was made in a trough, at nearly the lowest point for the month.  From the date of the grant forward the value of Zoran's stock shot up dramatically, increasing by more than three dollars per share over the next two trading weeks, to $17.19 per share on September 13, 2005.

8

9

10

11

12

13

14

15

16

17

18

19



20

21

22

23

24

25

26

27

28

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 64

138.    The following chart, which compares the option grants made under the 1993 Plan, on discretionary dates, to the options grants under the 1995 Directors Plan, on pre-determined dates, for a subset of the period complained of, further demonstrates the extraordinary, non-coincidental pattern of Zoran's stock grants.  As stated above, the 1995 Directors Plan provides for annual grants to non-employee Directors on the day following the date of the Company's annual meeting of shareholders.  The chart reveals that the options granted on pre-set dates under the 1995 Directors Plan are not nearly as fortuitous in timing as the options granted on dates selected under the 1993 Plan.



139.    As the research by Professor Lie and others demonstrates, while positive returns for a single grant might be innocently explained, a consistent pattern of frequent and well-timed grants makes backdating the most plausible–if not the only plausible–explanation.  *See, e.g.,*

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 65

Charles Forelle, *How the Journal analyzed Stock-Option Grants*, The Wall Street Journal, March 18, 2006 ("It is very unlikely that several grants spread over a number of years would all fall on high-ranked days [i.e. most favorable to the recipient].").

140.    Thus, Plaintiff alleges that the reason for the pattern of frequent and well-timed grants of Zoran options set forth in the table above can only be that the options were backdated by the Individual Defendants, and not actually granted on the dates reported in the Company's proxy statements.  This allegation is confirmed by Zoran's admissions that "the appropriate measurement dates for financial accounting purposes of certain stock option grants differ from the recorded grant dates of those awards," that "the dates of a small number of stock option grants to non-executives were established retrospectively," and that, as a result, the Company needs to restate approximately ten years of financial statements in order to correct materially underreported charges for the Company's stock-based compensation expense.  Zoran Form 8-K (filed Feb. 21, 2007)

141.    This improper backdating, which violated the terms of the Company's Stock Option Plans under which each of the grants were purportedly authorized, resulted in grants of "in the money" options to the Individual Defendants, which they failed to disclose or for which they failed to properly account.

142.    According to the Zoran Proxy Statements issued during fiscal years 1997 through 2005, which are discussed in more detail in Subsection F below, each of the options granted to the Individual Defendants was for a term of ten years.  Thus, the overwhelming majority of the options granted to the Officer Defendants from 1997 through 2005 have yet to expire.  Consequently, the Individual Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Officer Defendants exists to this day.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 66

143.    At all times relevant hereto, through their fiduciary duties of care, good faith, and loyalty, the Individual Defendants owed to Zoran and its shareholders a duty to ensure that the Company's assets were not misappropriated or otherwise diverted.  Consistent with their fiduciary duties, the Individual Defendants had a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  As discussed below, the Individual Defendants knowingly caused the Company's persistent violations of GAAP and IRC provisions of both the Securities Act of 1933 and the Exchange Act.

## G.    Backdating and Tax Consequences for the Company and Employees

144.    The backdating scheme perpetrated by the Individual Defendants subjected the Company to significant federal tax liability.  By concealing their backdating practices for ten years, a number of the Individual Defendants identified above, not only received discounted stock options, but delayed or entirely avoided personal tax liabilities triggered by the exercise of those options.

145.    As a consequence of the backdating scheme, the Individual Defendants also caused the Company not only to file materially misleading financial statements and proxy statements with the SEC, but also to mischaracterize its stock option grants over several years, potentially to include the Company's filing of false tax returns with the IRS, and create for the Company potential civil liability for option related taxes that will extend for the life of the backdated option grants.

146.    In furtherance of the backdating scheme, the Individual Defendants caused the Company to violate numerous federal tax laws, exposing both the Company and its employees to undisclosed tax, interest and penalty liabilities under applicable IRC sections.

147.    Specifically, the backdating scheme resulted in the Company's improper deduction of executive compensation under IRC § 162(m), 26 U.S.C. § 162(m).  IRC § 162(m) generally limits the deductibility of executive compensation to $1 million per year.  Excepted from this amount is "performance based" compensation, including stock option compensation issued at an exercise price no less than fair market value on the date of the grant.

148.    To qualify as performance based compensation, a stock option grant must also be (1) approved by a compensation committee comprised solely of two or more outside Directors; and (2) issued pursuant to a plan approved by the Company's shareholders.

149.    As alleged herein, the Individual Defendants caused Zoran to violate IRC § 162(m) by backdating option grants in order to fix their exercise prices at below market value on the actual grant date.  The backdating scheme thus not only violated the express terms of the Company's Stock Option Plans but also rendered any and all backdated options ineligible for deduction from executive compensation amounts under IRC § 162(m).

150.    Consequently, all of the Individual Defendants' income resulting from the exercise of the options must have been included in the amount of executive compensation calculated for purposes of determining whether the Company exceeded the $1 million cap on deductible executive compensation expenses.  Moreover, as discussed below, backdated options also fail to qualify for treatment as Incentive Stock Options ("ISO").  Backdated options must be treated as non-statutory stock options ("NSO") and require the Company to withhold federal income and employment taxes on the executives' gains as measured between the grant date and the exercise date.

151.    With respect to Zoran's highest paid executives, the Individual Defendants' concealment of the backdating scheme facilitated their avoidance of federal taxes while causing

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 68

the Company to file inaccurate federal tax returns with the IRS and to fail to withhold the amounts required by federal law.

**H.      Disqualification of Incentive Stock Option Treatment & Resultant Liabilities**

152.    As discussed above, ISO grants entitle recipients to preferential tax treatment in certain instances.  ISOs generally are not taxable upon exercise if certain requirements are satisfied.  However, in order to qualify as an ISO, an option must be granted at no less than fair market value on the grant date.  This statutory requirement is reflected in the Company's various stock option plans, all of which require that an ISO exercise price be the stock's fair market value on the date of the grant.

153.    A backdated ISO that is granted "in-the-money" loses its favorable treatment and instead is considered an NSO and becomes subject to additional taxes, including ordinary income recognition by the recipient, on any gain at exercise, and triggers the Company's obligation to withhold employment and income taxes on the corresponding gain.

154.    The Individual Defendants' backdating scheme caused the Company to improperly treat NSOs as ISOs, resulting in the Company's failure to withhold appropriate income taxes and properly to report employees' deferred compensation in violation of IRC §§ 3041, 6041 and 6051.

155.    Additionally, the failed ISOs issued as a consequence of the Individual Defendants' backdating scheme have caused and will continue to cause the non-defendant recipients of the options substantial and previously undisclosed tax liabilities, for which the Company may be liable on a continuing basis.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 69

**I.      Taxes Arising Under Section 409A Due to Exercise of Backdated Options**

156.    Enacted in 2004, IRC § 409A, 26 U.S.C. § 409A, imposes additional taxes on certain deferred compensation arrangements, including stock options with exercise prices below the fair market value on the date of the grant.  The considerable tax consequences triggered by § 409A include immediate income inclusion upon exercise, an additional 20% income tax on the amount to be included, and certain additional interest charges.

157.    In response to the revelation of widespread backdating abuses, such as those perpetrated by the Individual Defendants at Zoran, the IRS has initiated a special compliance program in order to mitigate the tax liabilities of non-corporate insider employees who received backdated options that now subject them to additional taxes under § 409A.  The Compliance Program does not diminish the tax liability, but instead allows the respective companies to pay in full the applicable § 409A taxes triggered by exercise of backdated options during 2006.  *See* IRS, Announcement 2007-18, Compliance Resolution Program for Employees Other than Corporate Insiders for Additional 2006 Taxes Arising Under § 409A due to the Exercise of Stock Rights.

158.    Announcing this program, IRS Commissioner Mark W. Everson stated:

> This shameful practice was widespread.  We are allowing employers to satisfy the tax obligations of employees who did not knowingly participate in these schemes. This initiative does not extend to the executives and insiders who were the principal beneficiaries of the backdating schemes. We continue to pursue these cases and work closely with the Securities and Exchange Commission and the Justice Department as appropriate.

159.    Companies had until February 28, 2007 to notify the IRS of their intent to participate in the compliance program.  Regardless of whether Zoran participates in the program, the backdating alleged herein subjects the Company to substantial civil liability to non-corporate

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 70

insider employees who received backdated options and may be subject to the significant tax

liabilities caused by the Individual Defendants' misconduct.

**J.      Individual Defendants' Backdating Scheme Resulted in the Company's Violation of GAAP and Rendered the Company's Financial Statements Materially Inaccurate and Unreliable**

160.    The Exchange Act explicitly requires that financial statements filed with the

commission be prepared in conformity with GAAP and that financial statements filed with the

SEC that are not prepared in compliance with GAAP are presumed to be misleading and

inaccurate, despite footnote or other disclosure.  As such, Zoran's financial statements, including

disclosures, issued during the relevant period were false and misleading when filed because they

constituted a distinct failure to apply the then-prevailing guidance for recording the cost of stock

options issued.  Specifically, as a consequence of the Individual Defendants' backdating scheme,

the Company's financial statements since 1997 failed to recognize the compensation charge in

the amount of the discount resulting from the Individual Defendants' manipulation of the grant

date multiplied by the number of discounted backdated options granted, thus materially

misstating compensation charges and tax consequences while materially overstating the

Company's net income for each of those periods.

161.    Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-11, require

the Company to file accurate periodic and current financial reports containing all material

information needed to make the report not misleading.

162.    Zoran's quarterly financial statements filed on Forms 10-Q for the relevant period

were materially misstated in violation of GAAP, as set forth in detail in Paragraphs 163-170,

below.  Regulation S-X further requires that interim financial statements also comply with

GAAP with the exception that interim financial statements need not include disclosures that

would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. § 210.10-01(a).

163.   The Company failed to adhere to at least the following general accounting principles:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASB Statement of Concepts No. 1, ¶42);

- The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

- The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and,

- The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASB Statement of Concepts No. 2, ¶81).

164.    As noted above, on February 21, 2007, Zoran filed a Form 8-K that stated that its financial statements relating to fiscal periods after 1997 should no longer be relied upon and that it would restate its financial statements for the years 1997 through 2005.  The filing stated, in relevant part as follows:

> The Company will restate previously issued historical financial statements to correct its past accounting for certain stock option grants. It will record additional stock-based compensation expense and related tax impacts, and will also evaluate any other unrecorded adjustments previously determined to be immaterial. Accordingly, the financial statements and related notes, financial press releases and similar communications issued by the Company, relating to fiscal periods beginning on or after January 1, 1997 should no longer be relied upon.

165.    The announced restatement constitutes Zoran's admission that its previously filed financial statements were materially misstated when issued. Accounting Principles Board Opinion ("APB") No. 20:  Accounting Changes, provides the guidance for when a Company is required to restate its previously issued financial statements.  APB No. 20 states, in relevant part, as follows:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 73

Restating financial statements of prior periods may dilute public confidence in financial statements and may confuse those who use them. Financial statements previously prepared on the basis of accounting principles generally accepted at the time the statements were issued should therefore be considered final except for changes in the reporting entity or corrections of errors. (¶ 14, emphasis added)

166.   Further, APB No. 20 defines an error in financial statements as follows:

Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.

167.   Still further, APB No. 20 specifically states that it applies to material corrections of errors as follows:

If a change or correction has a material effect on income before extraordinary items or on net income of the current period before the effect of the change, the treatments and disclosures described in this Opinion should be followed.  Furthermore, if a change or correction has a material effect on the trend of earnings, the same treatments and disclosures are required. (¶ 38, emphasis added)

168.   As noted above, the February 20, 2007 press release explained the reason for the restatement as primarily relating to the backdating of stock options.  Specifically, the Company announced the following:

Zoran has determined that the appropriate measurement dates for financial accounting purposes of certain stock option grants differ from the recorded grant dates of those awards. Zoran has also determined that the dates of a small number of stock option grants to non-executives were established retrospectively.  Zoran has substantially completed its assessment of the accounting impacts of the change in measurement dates for certain stock option grants and based on that assessment, Zoran and the Audit Committee concluded, on February 15, 2007, after consultations with management and independent advisors, that additional charges for stock-based compensation expense will be required, and that those charges will be material with respect to certain prior fiscal periods.  Zoran expects the aggregate amount of the additional non-cash compensation and other charges to be in the range of $12 million - $15 million, recognized in various amounts over the years 1997 through 2005.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 74

169.    Zoran's original accounting treatment of "in the money" stock options grants reflected in its financial statements violated GAAP, primarily through the failure to record stock-based compensation expense relating to the grants, resulting in material overstatements of operating and net income.  GAAP, Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), which was effective for all periods starting after December 31, 1972 prior to the adoption of FAS 123(R), specifically explains how and when a company is to measure and record stock-based compensation.  APB 25 requires a company to record compensation expense, measured as the difference between the exercise price and the market price of the stock on the measurement date, on "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any."  APB 25, ¶ 10(b).

170.    Zoran violated APB No 25 by measuring compensation cost based on the low market price of the falsified, i.e. backdated, measurement dates, instead of the market price of the stock on the actual measurement date.  This resulted in the Company's material misstatement of its financial results starting from at least January 1, 1997, despite the Individual Defendants' repeated misrepresentations to the shareholders that the Company had complied with APB 25.  These misrepresentations included false certifications by Defendants Gerzberg and Schneider, the Company's CEO and CFO, respectively, in which they attested to the accuracy and completeness of the Company's financial statements.

**K.    Additional Standards of Conduct Breached By The Individual Defendants**

171.    The Sarbanes-Oxley Act requires that Defendants Gerzberg and Schneider certify the accuracy of the Company's financial statements.   Similarly, Defendants Gerzberg and

Schneider were required publicly to certify that they had evaluated the Company's internal controls and did not detect any significant deficiencies in those controls.

172.    Specifically, both Defendants Gerzberg and Schneider certified that:

1.    I have reviewed this quarterly report on Form 10-Q of Zoran Corporation;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with a respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

(a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 76

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of Directors:

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*See* Certification of Chief Executive Officer, attached as Exhibit 31.1 to Quarterly Report, Form 10-Q for the quarter ended September 30, 2003 (filed November 14, 2003) (the "3Q 2003 10-Q") and Certification of Chief Financial Officer, attached as Exhibit 31.2 to 3Q 2003 10-Q.[8]

173.    As a consequence of the Individual Defendants' protracted backdating scheme, all of the SOX certifications, attesting to the accuracy of the Company's financial statements and certifying that they evaluated the Company's internal controls and did not detect any deficiencies in those controls, were materially false and misleading.

174.    As a consequence of the restatement of Zoran's financial statements, Defendants Gerzberg and Schneider may be required to disgorge bonuses or other compensation awarded to them during periods proximate to the restatement.  *See* SOX § 304, 15 U.S.C. § 7243.  Despite

---

[8] The Certifications attached to the Company's quarterly reports for the first, second, and third quarters of 2003 and 2004 contain similar language.  In addition, the Certificates attached to the Company's Quarterly Reports for 2005 and first quarter 2006 also certify that Defendants Gerzberg and Schneider have "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  *See, e.g.*, Certification of Chief Executive Officer attached as Exhibit 31.1 to 10-Q for the quarter ended September 30, 2005 (filed November 9, 2005) (the "3Q 2005 10-Q").

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 77

the record of protracted manipulation of the Company's stock option grants and related accounting, the Zoran Board of Directors has taken no action on behalf of the Company to recover this excess compensation.  To the contrary, in its latest Form 8-K the Company disclosed the Compensation Committee's approval of *raises* and target bonuses for Defendants Gerzberg, Schneider, and Shenberg.  *See* Current Report, Form 8-K (filed February 21, 2007).

175.    In addition to the fiduciary duties arising from state law, the Company's Directors, including those Directors named as Defendants herein, had the duty to ensure the accuracy and completeness of the Company's public filings.  In order to adequately carry out these duties, it is necessary for the Directors to know and understand the material non-public information to be disclosed or omitted from the Company's public statements.  This material non-public information included problems Zoran faced because of its deficient internal controls, of which the Directors were aware or should have been aware.  Indeed, in 2005, the Company restated certain financial results due to management's discovery that the Company had recognized stock compensation expenses relating to the Company's acquisition of a subsidiary company.  *See* Quarterly Report, Form 10-Q for the quarter ended March 31, 2005 (filed May 10, 2005) (the "Q1 2005 10-Q").  Thus, the Directors knew or should have known of the specific accounting area of weakness but ignored or concealed the (then) eight-year course of backdating stock options.

176.    Furthermore, Defendants Galil, Meindl and Stabenow, as members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings announcements and with respect to

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 78

financial information and earnings guidance provided to analysts and rating agencies.  The Officer Defendants -- particularly Defendants Gerzberg, Schneider and Shenberg -- had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, the Directors, including those named as Defendants herein, had ample opportunity to discuss this material information with fellow Directors at any of the scores of Board meetings that occurred during the relevant period, as well as at Board committee meetings.  Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the materially false and misleading statements alleged herein to be disseminated by Zoran to the investing public and the Company's shareholders during the relevant period.

177.  Even after the Individual Defendants' failed attempt to minimize the backdating controversy and later the revelation of a protracted backdating practice, the Audit Committee Defendants failed to enforce the Company's Code of Ethics, which in pertinent part provides:

> Any violation of applicable law or any deviation from the standards embodied in this Code will result in disciplinary action, up to and including termination of employment. Any employee engaged in the exercise of substantial discretionary authority, including any Senior Financial Officer, who is found to have engaged in a violation of law (other than a minor technical violation) or unethical conduct in connection with the performance of his or her duties for the Company shall be removed from his or her position and not assigned to any other position involving the exercise of substantial discretionary authority.

178.  Compliance with the Company's Code of Ethics at the very least would have required the Audit Committee to relieve Defendant Schneider of his duties as CFO, in light of his unabated and prolonged failure to fulfill his duty of ensuring that the Company's fair and timely reporting of its results of operations, financial condition and other information.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 79

179.    Indeed, the Zoran Board, including those Directors named as Defendants herein, are incapable of taking any action because, as alleged herein, they themselves have indisputably violated securities laws as set forth in the Counts below, as well as § 11 of the Securities Act, under which they are strictly liable for their issuance of the false and misleading June 17, 2005 Registration Statement.  *See* Paragraphs 189-192, *infra*.

180.    Hence, the Audit Committee has effectively waived the Company's Code of Ethics.  Had it not, the entire Board would itself be subject to disciplinary action for approving and publishing the false and misleading Registration Statement in violation of the federal securities regulations.

## L.    Dissemination of Materially False and Misleading Financial Statements and Reports

181.    As a result of the Individual Defendants' backdating of stock options, the Company issued materially false and misleading financial statements and reports, including but not limited to annual reports, filed with the SEC and disseminated to shareholders and the public as Forms 10-K; proxy statements, filed with the SEC and disseminated to shareholders and the public as Forms DEF-14A; and other quarterly and interim reports.  Each of the Individual Defendants knew or should have known that these statements were false and either knowingly participated in their dissemination or failed to prevent or correct them.

182.    As discussed above, these financial statements and reports were prepared and presented in violation of GAAP.  Due to the improper backdating of the stock options alleged herein, these financial statements and reports overstated Zoran's net income and earnings and understated Zoran's compensation expense.

183.   For instance, with respect to accounting for stock-based compensation, Zoran stated the following, which was materially false and misleading due to the options backdating alleged herein:

*Stock compensation*

The Company accounts for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees" and related interpretations. Under APB 25, compensation expense is recognized based on the difference, if any, on the date of grant between the fair value of the Company's stock and the amount an employee must pay to acquire the stock.   The compensation expense is recognized over the periods the employee performs the related services, generally the vesting period of four years, consistent with the multiple option method described in FASB Interpretation No. 28 ("FIN 28").

Annual Report, Form 10-K for fiscal year 2002 (filed March 31, 2003) (the "2002 10-K") (incorporated by reference into Zoran's Proxy Statement, Form DEF-14A for fiscal year 2002 (filed July 7, 2003) (the "2002 Proxy Statement").[9]

_____

[9] Zoran's prior 10-Ks contained virtually identical language.  *See, e.g.,* Annual Report, Form 10-K for fiscal year 1997 (filed March 31, 1998) (the "1997 10-K"); Annual Report, Form 10-K for fiscal year 1998 (field March 31, 1999) (the "1998 10-K") ("The Company accounts for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 ('APB 25'), 'Accounting for Stock Issued to Employees' and related interpretations. The Company provides additional pro forma disclosures as required under Statement of Financial Accounting Standards No. 123 ('SFAS 123'), 'Accounting for Stock-Based Compensation.'"); *see also* Annual Report, Form 10-K for fiscal year 1999 (filed March 30, 2000) (the "1999 10-K"); Annual Report, Form 10-K for fiscal year 2000 (filed April 2, 2001) (the "2000 10-K"); Annual Report, Form 10-K for fiscal year 2001 (filed April 1, 2002) (the "2001 10-K") ("The Company accounts for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 ('APB 25'), 'Accounting for Stock Issued to Employees' and related interpretations. Under APB 25, compensation expense is recognized based on the difference, if any, on the date of grant between the fair value of the Company's stock and the amount an employee must pay to acquire the stock. The compensation expense is recognized over the periods the employee performs the related services, generally the vesting period of four years, consistent with the multiple option method described in FASB Interpretation No. 28 ('FIN28'). The Company

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 81

184.    In its Form 10-K for fiscal year 2003, Zoran similarly stated:

Stock compensation

The Company accounts for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees" and related interpretations. Under APB 25, compensation expense is recognized based on the difference, if any, on the date of grant between the fair value of the Company's stock and the amount an employee must pay to acquire the stock. The compensation expense is recognized over the periods the employee performs the related services, generally the vesting period of four years, consistent with the multiple option method described in FASB Interpretation No. 28 ("FIN 28").

Annual Report, Form 10-K for fiscal year 2003 (filed March 15, 2004) (the "2003 10-K"), incorporated by reference into Proxy Statement, Form DEF-14A for fiscal year 2003 (filed May 6, 2004) (the "2003 Proxy Statement").[10]

185.    Each of the Company's 10-Ks identified above was signed by the Zoran Board of Directors serving at the time.  This includes Directors Gerzberg (FY 1997-2005), Burgess (FY 2005), Galil (FY 1997-2005), Meindl (FY 1997-2005), Owens (FY 2003-2005), Rynne (FY 2003-2005), Stabenow (FY 1997-2005), and Young (FY 1997-2005).

186.    Similarly, in furtherance of the backdating scheme, the Individual Defendants caused the Company to repeatedly issue false and misleading quarterly reports, each of which

---

provides additional pro forma disclosures as required under Statement of Financial Accounting Standards No. 123 ('SFAS 123'), 'Accounting for Stock-Based Compensation.'").

[10] Like the Company's 2003 10-K, Zoran's 10-Ks for 2004 and 2005 contain substantively similar language regarding stock based compensation.  Annual Report, Form 10-K for fiscal year 2004 (filed March 31, 2005) (the "2004 10-K") and Annual Report, Form 10-K for fiscal year 2005 (filed March 14, 2006) (the "2005 10-K").

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 82

falsely stated that the Company's "[s]tock options are generally granted with exercise prices equivalent to fair market value of the underlying common stock on the date of the grant, and no compensation cost is recognized."  *See* Quarterly Report, Form 10-Q for quarter ended September 30, 2003 (filed November 13, 2003) (the "Q3 2003 10-Q"); Quarterly Report, Form 10-Q for quarter ended June 30, 2003, (filed August 13, 2003) (the "Q2 2003 10-Q"); Q1 2003 10-Q, Quarterly Report, Form 10-Q for quarter ended September 30, 2004 (filed November 9, 2004) (the "Q3 2004 10-Q"); Quarterly Report, Form 10-Q for quarter ended June 30, 2004 (filed August 9, 2004) (the "Q2 2004 10-Q"); Quarterly Report, Form 10-Q for quarter ended March 31, 2004 (filed May 10, 2004) (the "Q1 2004 10-Q); Quarterly Report, Form 10-Q for quarter ended September 30, 2005 (filed November 9, 2005) (the "Q3 2005 10-Q"); Quarterly Report, Form 10-Q for quarter ended June 30, 2005 (filed August 9, 2005) (the "Q2 2005 10-Q"), Q1 2005 10-Q.

187.  As the Company has now admitted, the Individual Defendants' backdating scheme resulted in the Company's regular granting of stock options with exercise prices below fair market value, which required the Company to recognize certain compensation costs.  Due to the backdating of option grants as alleged herein, the Company failed to recognize appropriate compensation costs, resulting in the material misstatement of the Company's financial condition in each of these quarterly and annual reports, as set out in detail in Paragraphs 194-195, below.

188.  Despite their knowledge of the longstanding practice of backdating stock option grants and in order to continue the scheme so that they could exercise the previously granted backdated options to detriment of the Company, beginning in September 2003, Defendants Gerzberg and Schneider executed materially false and misleading SOX certifications, in which

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 83

they falsely certified the accuracy of the financial disclosures made in each quarterly report and falsely certified the adequacy of the internal controls of the Company.

189.   On June 17, 2005, the Company filed a Form S-1 Registration Statement, in which the Individual Defendants caused it to again misrepresent its accounting treatment for stock options and materially understated the Company's stock compensation expenses.

190.   With regard to the Company's accounting treatment, the Registration Statement falsely represented that:

> The Company accounts for stock-based compensation using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees" and related interpretations. Under APB 25, compensation expense is recognized based on the difference, if any, on the date of grant between the fair value of the Company's stock and the amount an employee must pay to acquire the stock. The compensation expense is recognized over the periods the employee performs the related services, generally the vesting period of four years, consistent with the multiple option method described in FASB Interpretation No. 28 ("FIN 28").

191.   The Registration Statement also included the Company's financial results for 2002, 2003, and 2004, each of which materially understated the Company's total cost and expenses and materially misstated the Company's operating loss for each respective period, and all of which are admittedly unreliable and are in the process of being restated by the Company.

192.   The 2005 Registration Statement and the false statements therein were approved and signed by Defendants CEO Gerzberg and CFO Schneider and the entire current Board of Directors of Zoran: Defendants Galil, Burgess, Meindl, Stabenow and Owens, as well as non-Defendants Rynne and Young.

193.   As officers or Directors, and signatories of the Registration Statement, all of the individuals listed in the preceding paragraph are strictly liable for violating § 11(a) of the

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 84

1    Securities Act of 1933 because of the false and misleading statement of the Company's financial

2    results and its accounting treatment for stock option compensation.

3         194.    In addition, between fiscal year 1997 and the present, the Company, with the

4    effect of concealing the options backdating scheme, filed with the SEC numerous annual and

5    other reports, which were materially false and misleading.  Specifically, the reports overstated

6    net income and earnings per share and understated the Company's compensation expense, as a

7    result of the backdating alleged herein.   The annual reports included and misstated, at a

8    minimum, the following reported results:

| Form 10-K Filed March 14, 2006 | |
|---|---|
| Total Cost and Expenses | $422,858,000 |
| Operating Loss | ($27,100,000) |
| Net Loss | ($26,971,000) |

| Form 10-K Filed March 31, 2005 | |
|---|---|
| Total Cost and Expenses | $425,721,000 |
| Operating Income (loss) | ($46,857,000) |
| Net Income (loss) | ($47,354,000) |

| Form 10-K Filed March 15, 2004 | |
|---|---|
| Total Cost and Expenses | $288,532,000 |
| Operating Income (loss) | ($72,004,000) |
| Net Income (loss) | ($67,978,000) |

| Form 10-K Filed March 31, 2003 | |
|---|---|
| Total Cost and Expenses | $142,286,000 |
| Operating Income (loss) | $6,831,000 |
| Net Income (loss) | $5,698,000 |

| Form 10-K Filed April 1, 2002 | |
|---|---|
| Total Cost and Expenses | $152,513,000 |
| Operating Income (loss) | ($44,804,000) |
| Net Income (loss) | ($36,065,000) |

| Form 10-K Filed April 1, 2001 | |
|---|---|
| Total Cost and Expenses | $107,538,000 |
| Operating Income (loss) | ($27,867,000) |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 85

| Net Income (loss) | ($20,608,000) |

| **Form 10-K Filed March 30, 2000** | |
|---|---|
| Total Cost and Expenses | $55,425,000 |
| Operating Income | $6,249,000 |
| Net Income | $6,659,000 |

| **Form 10-K Filed 1999** | |
|---|---|
| Total Cost and Expenses | $44,135,000 |
| Operating Income (loss) | $90,000 |
| Net Income (loss) | $929,000 |

| **Form 10-K Filed March 31, 1998** | |
|---|---|
| Total Cost and Expenses | $41,028,000 |
| Operating Income (loss) | $3,899,000 |
| Net Income (loss) | $4,229,000 |

| **Form 10-K Filed March 31, 1997** | |
|---|---|
| Total Cost and Expenses | $42,108,000 |
| Operating Income (loss) | $2,001,000 |
| Net Income (loss) | $2,363,000 |

195.    Similarly, the backdating scheme resulted in the Company's repeated filing of materially false and misleading quarterly reports, which understated the Company's compensation expense while overstating net income.  For years 2001-2005, these included, at a minimum, the following misstated reported financial results:

| **Form 10-Q September 30, 2005** | |
|---|---|
| Total Cost and Expenses | $112,047,000 |
| Operating Income (Loss) | $5,437,000 |
| Net Income (Loss) | $4,958,000 |

| **Form 10-Q March 31, 2005** | |
|---|---|
| Total Cost and Expenses | $93,085,000 |
| Operating Loss | ($19,201,000) |
| Net Loss | ($18,796,000) |

| **Form 10-Q June 30, 2005** | |
|---|---|
| Total Cost and Expenses | $106,413,000 |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 86

| Operating Loss | ($11,334,000) |
| Net Loss | ($11,055,000) |

| **Form 10-Q March 31, 2004** | |
| Total Cost and Expenses | $91,665,000 |
| Operating Loss | ($11,028,000) |
| Net Income (Loss) | ($10,689,000) |

| **Form 10-Q June 30, 2004** | |
| Total Cost and Expenses | $108,919,000 |
| Operating Income (Loss) | ($5,203,000) |
| Net Income (Loss) | ($6,145,000) |

| **Form 10-Q September 30, 2004** | |
| Total Cost and Expenses | $121,128,000 |
| Operating Loss | ($1,381,000) |
| Net Loss | ($3,519,000) |

| **Form 10-Q March 31,  2003** | |
| Total Cost and Expenses | $39,084,000 |
| Operating Loss | ($1,251,000) |
| Net Income (Loss) | $193,000 |

| **Form 10-Q June 30, 2003** | |
| Total Cost and Expenses | $41,208,000 |
| Operating Income (Loss) | $3,523,000 |
| Net Income | $4,233,000 |

| **Form 10-Q September 30, 2003** | |
| Total Cost and Expenses | $122,908,000 |
| Operating Income (Loss) | ($55,488,000) |
| Net Income (Loss) | ($54,484,000) |

| **Form 10-Q March 31, 2002** | |
| Total Cost and Expenses | $32,538,000 |
| Operating Loss | $(1,448,000) |
| Net Loss | ($235,000) |

| **Form 10-Q June 30, 2002** | |
| Total Cost and Expenses | $34,430,000 |
| Operating Loss | $(436,000) |
| Net Income (Loss) | $1,030,000 |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 87

| Form 10-Q September 30, 2002 | |
|---|---|
| Total Cost and Expenses | $40,245,000 |
| Operating Income (Loss) | $3,812,000 |
| Net Income (Loss) | $4,707,000 |

| Form 10-Q March 31, 2001 | |
|---|---|
| Total Cost and Expenses | $32,985,000 |
| Operating Income (Loss) | ($13,302,000) |
| Net Income (Loss) | ($10,600,000) |

| Form 10-Q June 30, 2001 | |
|---|---|
| Total Cost and Expenses | $35,119,000 |
| Operating Loss | ($13,195,000) |
| Net Loss | ($10,617,000) |

| Form 10-Q September 30, 2001 | |
|---|---|
| Total Cost and Expenses | $40,405,000 |
| Operating Income (Loss) | ($9,981,000) |
| Net Income (Loss) | ($8,055,000) |

## M.   Dissemination of Materially False and Misleading Proxy Statements

196.   As a result of the Individual Defendants' backdating of stock options, the Company also issued materially false and misleading financial statements and reports in the form of proxy statements, filed with the SEC and disseminated to shareholders and the public as Forms DEF-14A and DEFR-14A.  Each of the Individual Defendants knew or should have known that these statements were false and either knowingly participated in their dissemination or knowingly failed to prevent or correct them.

197.   As discussed above, the financial statements and reports contained in or incorporated by reference into Zoran's proxy statements were prepared and presented in violation of GAAP and SEC rules.  Due to the improper backdating of the stock options alleged herein, these financial statements and reports overstated Zoran's net income and earnings and understated Zoran's compensation expense.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 88

198.    On June 10, 1998, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's proxy statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 10, 1998.  Proxy Statement, Form DEF-14A for fiscal year 1997 (filed April 30, 1998) (the "1997 Proxy Statement").

199.    The 1997 Proxy Statement reported the following stock option grants to the following Individual Defendants:[11]

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 1/2/1997 | Aharon, Aharon | $17.50 | 60,000 |
| 5/6/1997 | Farkash, Shmuel | $14.00 | 14,000 |
| 7/23/1997 | Shenberg, Isaac | $19.75 | 40,000 |
| 7/23/1997 | Goldberg, Paul | $19.75 | 10,000 |
| 7/23/1997 | Gerzberg, Levy | $19.75 | 75,000 |
| 7/23/1997 | Sinar, Alex | $19.75 | 30,000 |
| Total | | | 229,000 |

200.    The 1997 Proxy Statement also reported that "Stock options are granted at market price of the Company's Common Stock on the date of grant and will provide value to the executive officers only when the price of the Common Stock increases over the exercise price" and that "[a]ll options were granted at an exercise price equal to the fair market value of the Common Stock on the date of grant."

201.    These statements were materially false and misleading in light of the backdating alleged herein.  The 1997 Proxy Statement failed to report the true value of the compensation

---

[11] The grant dates utilized for the tables in this section of Plaintiff's Complaint are based on the exercise prices and expiration dates as reported by the Company in its annual Proxy Statements, filed and disseminated to its shareholders on Form DEF-14A, and in some cases Form 4s filed by various Defendants.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 89

paid to the Individual Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

202.    In the 1997 Proxy Statement, the Directors also recommended that Zoran's stockholders "approve an amendment to the Company's 1993 Stock Option Plan to increase the number of shares of Common Stock reserved for issuance thereunder by 450,000 shares."

203.    On April 30, 1999, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's 1998 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 18, 1999.

204.    The 1998 Proxy Statement reported the dates of stock option grants to following Individual Defendants:

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 1/26/1998 | Schneider, Karl | $13.38 | 10,000 |
| 1/26/1998 | Farkash, Shmuel | $13.38 | 1,000 |
| 8/4/1998 | Aharon, Aharon | $5.94 | 20,000 |
| 8/4/1998 | Aharon, Aharon | $5.94 | 90,000 |
| 8/4/1998 | Gerzberg, Levy | $5.94 | 40,000 |
| 8/4/1998 | Gerzberg, Levy | $5.94 | 191,666 |
| 8/4/1998 | Goldberg, Paul | $5.94 | 15,000 |
| 8/4/1998 | Goldberg, Paul | $5.94 | 40,000 |
| 8/4/1998 | Shenberg, Isaac | $5.94 | 15,000 |
| 8/4/1998 | Shenberg, Isaac | $5.94 | 40,000 |
| 8/4/1998 | Sinar, Alex | $5.94 | 10,000 |
| 8/4/1998 | Sinar, Alex | $5.94 | 30,000 |
| **Total** | | | **502,666** |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 90

205.     As illustrated in Section V.E above, both the January 26, 1998 grant and the August 4, 1998 grant are suspect for having been backdated, given the subsequent increase in the value of Zoran's stock immediately after these purported grant dates.

206.     The 1998 Proxy Statement also stated that "[s]tock options are granted at market price of the Company's common stock on the date of grant and will provide value to the executive officers only when the price of Common Stock increases over the exercise price," which was materially false and misleading in light of the backdating alleged herein.

207.     The 1998 Proxy Statement failed to report the true value of the compensation paid to the Individual Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

208.     In the 1998 Proxy Statement, the Directors also recommended that Zoran's stockholders "approve an amendment to the Company's 1993 Stock Option Plan to increase the number of shares of Common Stock reserved for issuance thereunder by 350,000 shares."

209.     The Compensation Committee, in its report included in the 1998 Proxy Statement, touted the benefits of the Plan, stating in part that "[l]onger term incentives are provided through the 1993 Stock Option Plan, which rewards executives and other employees through the growth in value of the Company's stock."  The Compensation Committee thereafter reported that it had approved "an offer to all officers and other employees of the Company to exchange outstanding options with exercise prices above the then-current trading price for options with an exercise price equal to the then-current trading price, August 4, 1998 (the "Effective Date")."  As noted

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 91

above, the August 4, 1998 grants have been identified by CFRA and by Plaintiff as having likely been backdated.

210.    The Individual Defendants knew or reasonably should have known of these misstatements and omissions and failed to prevent or correct them.

211.    On June 26, 2000, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's 1999 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held July 18, 2000.

212.    The 1999 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 8/4/1999 | Aharon, Aharon | $20.38 | 30,000 |
| 8/4/1999 | Gerzberg, Levy | $20.38 | 55,000 |
| 8/4/1999 | Goldberg, Paul | $20.38 | 15,000 |
| 8/4/1999 | Schneider, Karl | $20.38 | 15,000 |
| 8/4/1999 | Shenberg, Isaac | $20.38 | 20,000 |
| **Total** | | | **135,000** |

213.    As illustrated in Section V.E above, the purported option grants on August 4, 1999 are suspicious and were identified in the CFRA report as being at "risk for backdating."

214.    The 1999 Proxy Statement stated further that "[a]ll options were granted at an exercise price equal to the fair market value of the Common Stock on the date of the grant," which was materially false and misleading in light of the backdating alleged herein.[12]    The

---

[12] The 1999 Proxy Statement attached as an Exhibit the 1993 Stock Option Plan (As Amended Through June 18, 2000), which stated, "12.   TIME OF GRANTING OPTIONS.   Unless otherwise specified by the Committee, the date of grant of an Option under the Plan shall be the date on which the Committee makes the determination granting such Option."

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 92

Individual Defendants knew or reasonably should have known of these misstatements and failed to prevent or correct them.

215.   In the 1999 Proxy Statement, the Directors also recommended that Zoran's stockholders approve an amendment to the Company's 1993 Stock Option Plan to increase the number of shares of Common Stock reserved for issuance thereunder by 980,000 shares.

216.   The Compensation Committee, in its report included in the 1999 Proxy Statement, continued to tout the benefits of the Plan, stating in part that "[l]onger term incentives are provided through the 1993 Stock Option Plan, which rewards executives and other employees through the growth in value of the Company's stock. . . . Stock options are granted at an exercise price equal to the market price of our common stock on the date of the grant and will provide value to the executive officers only when the price of our common stock increases over the exercise price," which was materially false and misleading in light of the backdating alleged herein.  The 1999 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

217.   On April 30, 2001, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's 2000 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 29, 2001.

218.   The 2000 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 93

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 7/28/2000 | Aharon, Aharon | $41.00 | 50,000 |
| 7/28/2000 | Gerzberg, Levy | $41.00 | 90,000 |
| 7/28/2000 | Schneider, Karl | $41.00 | 30,000 |
| 7/28/2000 | Shenberg, Isaac | $41.00 | 40,000 |
| **Total** | | | 210,000 |

219.    As illustrated in Section V.E above, the value of the Company's shares rose more than 10% immediately after this grant.

220.    The 2000 Proxy Statement stated that "[a]ll options were granted at an exercise price equal to the fair market value of the Common Stock on the date of the grant," which was materially false and misleading in light of the backdating alleged herein. The Individual Defendants knew or reasonably should have known of these misstatements and failed to prevent or correct them.

221.    The Compensation Committee, in its report included in the 2000 Proxy Statement, continued to tout the benefits of the Plan, stating in part that "[l]onger term incentives are provided through the 1993 Stock Option Plan, which rewards executives and other employees through the growth in value of the Company's stock. . . . Stock options are granted at an exercise price equal to the market price of our common stock on the date of the grant and will provide value to the executive officers only when the price of our common stock increases over the exercise price," which was materially false and misleading in light of the backdating alleged herein.

222.    The 2000 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement. Thus,

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 94

backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

223.    In addition, in the Report of the Audit Committee included in the 2000 Proxy Statement, the Audit Committee "recommended to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2000."  The Audit Committee Defendants knew or reasonably should have known that these financial statements were materially false and misleading due to the backdating alleged herein.

224.    On April 30, 2002, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's 2001 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 21, 2002.

225.    The 2001 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 2/7/2001 | Aharon, Aharon | $15.50 | 35,000 |
| 2/7/2001 | Gerzberg, Levy | $15.50 | 50,000 |
| 2/7/2001 | Schneider, Karl | $15.50 | 25,000 |
| 2/7/2001 | Shenberg, Isaac | $15.50 | 30,000 |
| 3/16/2001 | Stabenow, Arthur | $13.00 | 2,500 |
| 8/21/2001 | Martino, Camillo | $32.00 | 150,000 |
| 9/19/2001 | Gerzberg, Levy | $17.28 | 75,000 |
| 9/19/2001 | Schneider, Karl | $17.28 | 45,000 |
| 9/19/2001 | Shenberg, Isaac | $17.28 | 55,000 |
| 10/31/2001 | Martino, Camillo | $25.29 | 50,000 |
| **Total** | | | **517,500** |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 95

226.    The 2001 Proxy Statement stated that "[a]ll options were granted at an exercise price equal to the fair market value of our common stock on the date of the grant," which was materially false and misleading in light of the backdating alleged herein.[13]    Specifically, the Individual Defendants have essentially admitted that the purported September 19, 2001 option grant was backdated.  Defendant Schneider filed a Form 4 on December 22, 2006 disclosing that the his options tied to that date had been re-priced to reflect the exercise price of Zoran's stock on September 26, 2001, seven days later than the original purported grant date.  The Individual Defendants knew or reasonably should have known of these misstatements and failed to prevent or correct them.

227.    In the 2001 Proxy Statement, the Directors also recommended that Zoran's stockholders approve "an amendment to the Company's 1993 Stock Option Plan to increase the number of shares of common stock reserved for issuance thereunder by 750,000 shares," as well as "an amendment to Zoran's 1995 Outside Directors Stock Option Plan (a) to increase the number of shares of common stock authorized for issuance thereunder by 50,000 shares, and (b) to increase the size of the option granted annually to each outside Director from 4,800 shares to 10,000 shares."

228.    The Compensation Committee, in its report included in the 2001 Proxy Statement, continued to tout the benefits of the Plan, stating in part that "[l]onger term incentives are provided through the 1993 Stock Option Plan, which rewards executives and other employees through the growth in value of the Company's stock. . . . Stock options are granted at an exercise

---

[13] The 2001 Proxy Statement attached as Appendix B the 1993 Stock Option Plan, which stated, "12.  TIME OF GRANTING OPTIONS.  Unless otherwise specified by the Committee, the date of grant of an Option under the Plan shall be the date on which the Committee makes the determination granting such Option."

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 96

price equal to the market price of our common stock on the date of the grant and will provide value to the executive officers only when the price of our common stock increases over the exercise price," which was materially false and misleading in light of the backdating alleged herein.

229.   The 2001 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

230.   In addition, the Report of the Audit Committee included in the 2001 Proxy Statement states that "the audit committee recommended to the board of Directors that [the Company's] audited financial statements be included in [the Company's] annual report on Form 10-K for the year ended December 31, 2001."  The Audit Committee Defendants knew or reasonably should have known that these financial statements were materially false and misleading due to the backdating alleged herein.

231.   On July 7, 2003, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Zoran's shareholders the Company's 2002 Proxy Statement, which provided information concerning a merger proposal whereby Zoran would acquire Oak Technology, Inc. and provided, among other things, notice of and information for Zoran's shareholders' meeting to be held August 8, 2003.

232.   The 2002 Proxy Statement reported the dates of stock option grants to the following Director Defendants:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 97

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 8/9/2002 | Gerzberg, Levy | $12.36 | 427,500 |
| 8/9/2002 | Schneider, Karl | $12.36 | 75,000 |
| 8/9/2002 | Shenberg, Isaac | $12.36 | 82,500 |
| 8/21/2002 | Martino, Camillo | $14.93 | 75,000 |
| 10/17/2002 | Martino, Camillo | $13.60 | 75,000 |
| **Total** | | | **735,000** |

233.    The 2002 Proxy Statement stated that "[a]ll options were granted at an exercise price equal to the fair market value of Zoran common stock on the date of the grant," which was materially false and misleading in light of the backdating alleged herein.  Specifically, the Individual Defendants have essentially admitted that the purported August 9, 2001 option grant was backdated.  Defendants Schneider and Gerzberg filed Form 4s on December 22, 2006 disclosing that their options tied to that date had been re-priced to reflect the exercise price of Zoran's stock on August 22, 2001, nearly two weeks after the original purported grant date. The Individual Defendants knew or reasonably should have known of these misstatements and failed to prevent or correct them.

234.    The Compensation Committee, in its report included in the 2002 Proxy Statement, continued to tout the benefits of the Plan, stating in part that "[l]onger term incentives are provided through the 1993 Stock Option Plan, which rewards executives and other employees through the growth in value of the Company's stock. . . . Stock options are granted at an exercise price equal to the market price of Zoran common stock on the date of the grant and will provide value to the executive officers only when the price of our common stock increases over the exercise price," which was materially false and misleading in light of the backdating alleged herein.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 98

235.    The 2002 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

236.    With respect to compliance with IRC § 162(m), the 2002 Proxy Statement provides:

> Section 162(m) of the Internal Revenue Code restricts federal income tax deductibility by Zoran of executive compensation paid to Zoran's chief executive officer and each of the four other most highly compensated executive officers holding office at the end of any year to the extent such compensation exceeds $1,000,000 for any of such officers in any year and does not qualify for an exemption under Section 162(m) or related regulations. The Compensation Committee's policy is to qualify its executive compensation for deductibility under applicable tax laws to the extent practicable and consistent with Zoran's compensation objectives. Income related to stock options granted under Zoran's 1993 Stock Option Plan, generally qualifies as performance-based compensation exempt from these restrictions imposed by Section 162(m). Other compensation paid to the executive officers for 2002 did not approach the $1,000,000 limit per executive officer and is unlikely to do so in the foreseeable future. The Compensation Committee will consider appropriate actions should the individual non-performance-based compensation of any executive officer ever approach the $1,000,000 level.

As demonstrated above, this statement was materially false and misleading in light of the options backdating alleged herein. The options backdating scheme resulted in Zoran's violation of IRC § 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals, and therefore violated the terms of applicable stock option plans.

237.    In addition, the Report of the Audit Committee included in the 2002 Proxy Statement states that "the Audit Committee recommended to the board of Directors that [the

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 99

Company's] audited financial statements be included in [the Company's] annual report on Form 10-K for the year ended December 31, 2002." The Audit Committee Defendants knew or reasonably should have known that these financial statements were materially false and misleading due to the backdating alleged herein.

238. Management's Discussion and Analysis of Financial Condition and Results of Operation of Zoran, contained in the 2002 Proxy Statement, likewise misrepresented that "Zoran's consolidated financial statements . . . ha[d] been prepared in accordance with accounting principles generally accepted in the United States of America."

239. The 2002 Proxy Statement section titled "Selected Historical Consolidated Financial Data of Zoran," includes consolidated income sheet and balance sheet data for years 1998 through 2002, as well as purported results for the first fiscal quarters of 2002 and 2003.

**SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA OF ZORAN**

| | Three Months Ended March 31, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2002 | 2001 | 2000 | 1999 | 1998 |
| | | | (in thousands, except per share data) | | | | |
| **Consolidated Statement of Operations Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Product sales | $ 37,097 | $ 29,105 | $ 141,314 | $ 100,012 | $ 67,782 | $ 52,887 | $ 33,465 |
| Software, licensing and development | 736 | 1,985 | 7,803 | 7,697 | 11,889 | 8,787 | 10,760 |
| Total revenues | 37,833 | 31,090 | 149,117 | 107,709 | 79,671 | 61,674 | 44,225 |
| Costs and expenses: | | | | | | | |
| Cost of product sales | 26,710 | 18,832 | 86,904 | 64,740 | 37,993 | 28,523 | 19,036 |
| Research and development | 4,479 | 5,521 | 22,083 | 23,210 | 18,628 | 12,651 | 13,548 |
| Selling, general and administrative | 6,942 | 5,740 | 24,856 | 21,330 | 19,148 | 14,251 | 11,551 |
| Merger and related | 953 | 2,445 | 8,443(1) | 43,233 | 31,769(3) | — | — |
| Total costs and expenses | 39,084 | 32,538 | 142,286 | 152,513 | 107,538 | 55,425 | 44,135 |
| Operating income (loss) | (1,251) | (1,448) | 6,831 | (44,804) | (27,867) | 6,249 | 90 |
| Interest and other income (expense), net | 1,571 | 1,459 | 439(4) | 10,004 | 9,229 | 1,585 | 1,071 |
| Income (loss) before income taxes | 320 | 11 | 7,270 | (34,800) | (18,638) | 7,834 | 1,161 |
| Provision for income taxes | 127 | 246 | 1,572 | 1,265 | 1,970 | 1,175 | 232 |
| Net income (loss) | $ 193 | $ (235) | $ 5,698 | $ (36,065) | $ (20,608) | $ 6,659 | $ 929 |
| Basic net income (loss) per share | $ 0.01 | $ (0.01) | $ 0.21 | $ (1.38) | $ (0.91) | $ 0.41 | $ 0.06 |
| Diluted net income (loss) per share | $ 0.01 | $ (0.01) | $ 0.20 | $ (1.38) | $ (0.91) | $ 0.36 | $ 0.06 |
| Shares used to compute basic net income (loss) per share | 27,396 | 26,774 | 27,095 | 26,190 | 22,605 | 16,266 | 15,063 |
| Shares used to compute diluted net income (loss) per share | 28,096 | 26,774 | 28,629 | 26,190 | 22,605 | 18,374 | 16,679 |

| | As of March 31, 2003 | December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2002 | 2001 | 2000 | 1999 | 1998 |
| | | (in thousands) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash, cash equivalents and short-term investments | $ 136,897 | $ 137,075 | $ 110,105 | $ 175,638 | $ 145,632(2) | $ 19,175 |
| Working capital | 165,295 | 159,288 | 130,777 | 197,719 | 157,583 | 30,830 |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 101

| | | | | | |
|---|---|---|---|---|---|
| Total assets | 344,594 | 342,616 | 331,344 | 359,466(3) | 182,468 | 49,170 |
| Accumulated deficit | (88,299) | (88,492) | (94,190) | (58,125) | (37,517) | (44,176) |
| Total stockholders' equity | 311,448 | 311,012 | 297,838 | 331,454(3) | 163,445 | 36,186 |

240. The financial information contained in the 2002 Proxy Statement's Historical Consolidated Financial Data was prepared and presented in violation of GAAP. Due to the improper backdating alleged herein, these financial results overstated Zoran's net income and earnings and understated Zoran's compensation expense.

241. In addition, the 2002 Proxy Statement incorporated by reference Zoran's Quarterly Report, Form 10-Q for the quarter ended March 31, 2003 (filed May 5, 2003) (the "Q1 2003 10-Q"), signed by Defendant Schneider, which reported first quarter 2002 and 2003 net income (loss) of $(235) and $193, respectively, and first quarter 2002 and 2003 earnings (loss) per share of $(0.01) and $0.01, respectively. Due to the improper backdating of the stock options alleged herein, these financial statements and reports overstated Zoran's net income and earnings and understated Zoran's compensation expense for these periods.

242. The 2002 Proxy Statement also incorporated by reference Zoran's 2002 10-K, signed by Defendants Gerzberg, Schneider, Galil, Meindl, Stabenow, and Young. The 2002 10-K contained additional materially false and misleading statements, including overstated net income and earnings per share and understated compensation expenses due to the backdating alleged herein.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| | (in thousands, except per share data) | | | | |
| **Consolidated Statement of Operations Data:** | | | | | |
| Revenues: | | | | | |
| Product sales | $ 141,314 | $ 100,012 | $ 67,782 | $ 52,887 | $ 33,465 |
| Software, licensing and development | 7,803 | 7,697 | 11,889 | 8,787 | 10,760 |
| Total revenues | 149,117 | 107,709 | 79,671 | 61,674 | 44,225 |
| Costs and expenses: | | | | | |
| Cost of product sales | 86,904 | 64,740 | 37,993 | 28,523 | 19,036 |
| Research and development | 22,083 | 23,210 | 18,628 | 12,651 | 13,548 |
| Selling, general and administrative | 24,856 | 21,330 | 19,148 | 14,251 | 11,551 |
| Amortization of intangible assets | 8,443 | 9,697 | 1,982 | — | — |
| Amortization of goodwill and write-off of acquired in-process research & development | — | 33,536 | 29,787 | — | — |
| Total costs and expenses | 142,286 | 152,513 | 107,538 | 55,425 | 44,135 |
| Operating income (loss) | 6,831 | (44,804) | (27,867) | 6,249 | 90 |
| Interest income | 7,053 | 9,853 | 9,280 | 1,467 | 1,194 |
| Other income (loss)(1) | (6,614) | 151 | (51) | 118 | (123) |
| Income (loss) before income taxes | 7,270 | (34,800) | (18,638) | 7,834 | 1,161 |
| Provision for income taxes | 1,572 | 1,265 | 1,970 | 1,175 | 232 |
| Net income (loss) | $ 5,698 | $ (36,065) | $ (20,608) | $ 6,659 | $ 929 |
| Basic net income (loss) per share(2) | $ 0.21 | $ (1.38) | $ (0.91) | $ 0.41 | $ 0.06 |
| Diluted net income (loss) per share(2) | $ 0.20 | $ (1.38) | $ (0.91) | $ 0.36 | $ 0.06 |
| Shares used to compute basic net income (loss) per share(2) | 27,095 | 26,190 | 22,605 | 16,266 | 15,063 |
| Shares used to compute diluted net income (loss) per share(2) | 28,629 | 26,190 | 22,605 | 18,374 | 16,679 |

243.    On May 6, 2004, the Company filed with the SEC and disseminated to Zoran's shareholders the Company's revised 2003 Proxy Statement, on Form DEFR-14A, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 18, 2004.

244.    As of the date of the 2003 Proxy Statement, the 1993 Plan had expired. Shareholder Proposal No. 2 in the 2003 Proxy Statement was consideration of the adoption of the 2004 Equity Incentive Plan (the "2004 Plan"), which does not appear to have been adopted, but was virtually identical to the 2005 Plan that was adopted the following year.  This new Plan would increase the equity incentive options to include stock appreciation rights, restricted stock, restricted stock unit awards, performance share and performance unit awards, deferred compensation awards and other stock-based or cash-based awards, noting in particular the recent

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 103

FASB changes governing the accounting treatment of share-based payments. In the proxy materials recommending that shareholders approve the new plan, Zoran's Board of Directors acknowledged that it was "well aware of the criticism that has been leveled generally against the misuse of stock-based compensation by some companies. The Board believes that the 2004 Plan takes steps to address possible concerns of our stockholders." Under the 2004 Plan, stock options and stock appreciation rights could not be repriced without the approval of Zoran's stockholders, and no discount from fair market value was permitted in setting the exercise price of stock options and stock appreciation rights.

245. The 2003 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 4/29/2003 | Owens, James | $17.31 | 30,000 |
| 7/15/2003 | Gerzberg, Levy | $24.78 | 609,358 |
| 7/15/2003 | Martino, Camillo | $24.78 | 260,000 |
| 7/15/2003 | Schneider, Karl | $24.78 | 200,000 |
| 7/15/2003 | Shenberg, Isaac | $24.78 | 200,000 |
| 7/17/2003 | Meindl, James | $24.16 | 15,000 |
| 7/17/2003 | Stabenow, Arthur | $24.16 | 15,000 |
| 7/17/2003 | Uzia, Galil | $24.16 | 15,000 |
| 7/17/2003 | Young, Philip | $24.16 | 15,000 |
| 8/11/2003 | Rynne, David | $23.91 | 30,000 |
| **Total** | | | **1,389,358** |

246. The Compensation Committee's decision to grant Director Defendants Meindl, Stabenow, Uzia, and Young options under the 1993 Plan as opposed to the 1995 Directors Plan raises questions in its own right. The fact that the value of Zoran's stock rose nearly three dollars per share in the six trading days following the grant simply adds another layer to the suspicious financial circumstances underlying this grant.

247.   Among other things, the 2003 Proxy Statement continued to mislead shareholders concerning the option grants, stating, for example, that "The 2004 Plan is also designed to preserve Zoran's ability to deduct in full for federal income tax purposes the compensation recognized by its executive officers in connection with certain awards granted under the 2004 Plan." This statement was false and misleading due to the backdating alleged herein.

248.   The 2003 Proxy Statement identified option grants to the Individual Defendants and stated that "[a]ll options were granted at market value on the date of grant."

249.   Furthermore, while a review of the above chart indicates that there were four dates upon which options were purportedly granted in 2003, the 2003 Proxy Statement reveals that the Compensation Committee only met three times during that year.

250.   As noted above, the Proxy Statement for fiscal year 2004 disclosed that "[a]t the time of the 2003 annual meeting, the Directors Plan was suspended, and therefore, the other Outside Directors did not receive Annual Options under the Directors Plan. In place of the Annual Options that Directors James B. Meindl, Uzia Galil, Arthur B. Stabenow and Philip M. Young would have received under the Directors Plan, equivalent options were granted to these Directors under our 1993 Stock Option Plan." Proxy Statement, Form DEF-14A for fiscal year 2004 (filed June 1, 2005) (the "2004 Proxy Statement").

251.   The Compensation Committee's decision to grant the Directors stock options under the 1993 Plan cannot be considered an equivalent replacement when the dates of those grants are taken into account. As stated above, the 1995 Directors' Plan calls for shares to be paid under a formula-based system on the day after the annual meeting of the shareholders. That meeting took place on August 8, 2003. Instead of issuing Defendants Meindl, Stabenow, Uzia, and Young stock options on the day after the annual shareholders meeting, whether under the

1995 Directors Plan or the improperly utilized 1993 Plan, the Individual Defendants caused the Company to issue the Directors options *three weeks earlier*, purportedly on July 17, 2003.  As noted in paragraph 134 above, immediately after this grant, Zoran's stock price increased sharply.

252.    The Directors' Form 4 reports of changes in beneficial ownership are equally suspicious.  Section 16(a) of the Exchange Act requires that officers, Directors, and individuals who beneficially own more than 10% of a corporation's common stock to file a Form 4 with the SEC.  Pursuant to § 16(a)(2)(C), these Form 4s must be filed "before the end of the second business day following the day on which the subject transaction has been executed."

253.    However, Zoran's 2003 Proxy Statement discloses that the requisite Form 4 for *each and every one of the options grants issued in 2003* was delinquently filed by the Individual Defendants receiving those grants, violating the shareholder protection measure of the Sarbanes-Oxley Act and providing Individual Defendants with the ability to again manipulate the grant dates for stock options to officers and Directors of the Company.

254.    An analysis of the Form 4s filed by the Individual Defendants demonstrates that the Defendant Owens did not file a Form 4 for the purported April 29, 2003 grant until September 1, 2004, nearly eighteen months later; the Officer Defendants did not file Form 4s for the purported July 15, 2003 grant until July 25, 2003; the Director Defendants did not file Form 4s for the purported July 17, 2003 grant until July 22, 2003; and Form 4s for the August 11, 2003 grants were not filed until August 22, 2003.[14]

---

[14] The Company's 2003 Proxy Statement indicates that Defendant Owens received two options grants in 2003 and that Form 4s for both grants were delinquently filed.  However, a review of the Form 4s filed at www.sec.gov, reflect that only one Form 4, pertaining to the April 29, 2003 transaction, was ever filed regarding Owens.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 106

255.    On June 1, 2005, the Company filed with the SEC and disseminated to Zoran's shareholders the Company's 2004 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held July 13, 2005. Among the stated purposes for the 2005 annual meeting was the approval of the 2005 Equity Plan and the 2005 Directors Plan. In the proxy materials recommending that shareholders approve the new plan, Zoran's Board of Directors acknowledged that it was "well aware of the criticism that has been leveled generally against the misuse of stock-based compensation by some companies.  The Board believes that the 2005 Plan takes steps to address possible concerns of our stockholders." Under both of the 2005 Plans, stock options and stock appreciation rights could not be repriced without the approval of Zoran's stockholders, and no discount from fair market value was permitted in setting the exercise price of stock options and stock appreciation rights.

256.    The Company was precluded from offering options grants to the Officer Defendants in 2004 because the 1993 Plan had expired and the shareholders had not yet approved a replacement plan.  The Company did, however, issue options grants to the Directors, as identified below, which raises questions regarding the possible backdating of these options.

257.    The 2004 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

| Purported Date of Grant | Defendant | Exercise Price | Number of Options |
|---|---|---|---|
| 6/21/2004 | Meindl, James | $17.16 | 15,000 |
| 6/21/2004 | Owens, James | $17.16 | 15,000 |
| 6/21/2004 | Rynne, David | $17.16 | 15,000 |
| 6/21/2004 | Stabenow, Arthur | $17.16 | 15,000 |
| 6/21/2004 | Uzia, Galil | $17.16 | 15,000 |
| 6/21/2004 | Young, Philip | $17.16 | 15,000 |
| **Total** | | | **90,000** |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 107

258.   As illustrated in Section V.E above, in the seven days following this purported grant date, the value of Zoran's shares increased substantially.

259.   The 2004 Proxy Statement also continued to mislead shareholders concerning the option grants, stating, for example, that "The 2005 Plan is also designed to preserve Zoran's ability to deduct in full for federal income tax purposes the compensation recognized by its executive officers in connection with certain awards granted under the 2005 Plan." This statement was false and misleading in light of the backdating scheme alleged herein.

260.   On May 1, 2006, the Company filed with the SEC and disseminated to Zoran's shareholders the Company's 2005 Proxy Statement, which provided, among other things, notice of and information for Zoran's annual shareholders' meeting to be held June 22, 2006. Among the purposes laid out for the 2005 annual meeting was the approval of an increase in the maximum aggregate number of shares that could be awarded under the 2005 Equity Plan by 2,500,000 shares.

261.   The 2005 Proxy Statement reported the dates of stock option grants to the following Individual Defendants:

| Purported Date of Grant | Officer | Exercise Price | Number of Options |
|---|---|---|---|
| 4/26/2005 | Burgess, Raymond | $9.06 | 30,000 |
| 8/19/2005 | Gerzberg, Levy | $13.59 | 180,000 |
| 8/19/2005 | Schneider, Karl | $13.59 | 60,000 |
| 8/19/2005 | Shenberg, Isaac | $13.59 | 54,000 |
| 11/23/2005 | Meindl, James | $16.60 | 15,000 |
| 11/23/2005 | Owens, James | $16.60 | 15,000 |
| 11/23/2005 | Rynne, David | $16.60 | 15,000 |
| 11/23/2005 | Stabenow, Arthur | $16.60 | 15,000 |
| 11/23/2005 | Uzia, Galil | $16.60 | 15,000 |
| 11/23/2005 | Young, Philip | $16.60 | 15,000 |
| **Total** | | | **414,000** |

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 108

262.    As discussed in Section V.E above, Plaintiff's analysis of the Compensation Committee's 2005 grants demonstrates that the Individual Defendants' were still backdating options, particularly the purported April 26, 2005 grant to Burgess and the purported August 19, 2005 grants to Defendants Gerzberg, Schneider, and Shenberg, all of which occurred immediately before a substantial increase in the value of the Company's stock.

263.    Included in the 2005 Proxy Statement is the report of the Compensation Committee on Executive Compensation.  The Compensation Committee reported that "[s]tock options are granted at an exercise price equal to the market price of Zoran common stock on the date of grant and will provide value to the executive officers only when the market price of the common stock increases over the exercise price."  In light of the backdating alleged herein, this statement was materially false and misleading.  The Individual Defendants knew or reasonably should have known of these misstatements and failed to prevent or correct them.

264.    The 2005 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

265.    In addition, for those Director grants purportedly awarded on November 23, 2005, no Form 4s were filed within the required two business-day time period.  In fact, the first Form 4s regarding this transaction were not filed until December 1, 2005, more than a week late.  This is confirmed by the 2005 Proxy Statement, which admits as much.

266.    Reviewing the Company's stock for that time period, it is readily apparent that the November 23, 2005 date coincides suspiciously with a relatively low point in the Company's

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 109

stock price.   By December 1, 2005, the Company's stock had rebounded and increased significantly.   On information and belief, and in furtherance of the Individual Defendants' overarching scheme, the Individual Defendants backdated this option grant to take advantage of the November 23, 2005 low point in the stock price.

**N.**   **Insider Sales by Insider Selling Defendants.**

267.   Throughout the time period at issue in herein, and during their tenures with the Company, the Insider Selling Defendants, while in possession of material, non-public information about the Individual Defendants' misconduct, including the backdating of options and inadequate internal controls that led to the dissemination of materially false and misleading financial reports, nevertheless concealed this adverse information while selling millions of shares of Company's stock for personal gain.

268.   The Insider Sales Defendants have obtained approximately $47.5 million in unlawful insider trading proceeds by selling their own Zoran stock while it traded at prices artificially inflated by Individual Defendants' false statements about Zoran's financial results.

269.   These insider sales were undertaken during the same time period, from at least 1997 through 2005, in which Individual Defendants filed materially false financial statements concealing the Individual Defendants' backdating scheme.

270.   Defendant Aharon was Zoran's Senior Vice President and Chief Operating Officer from October 1998 to October 2001; Vice President of Engineering from August 1997 to October 1998; and Vice President, Engineering-Haifa Operations from February 1997 to August 1997.   As a result of his positions with the Company, Aharon had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 110

access to non-public documents and reports, and his relationships with corporate officers, Directors, and employees. As COO, Aharon was integral to the stock option approval process. Using his knowledge of material non-public information regarding the Company, from 1997 through the present, Aharon sold at least 130,886 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $4.9 million.

271. Defendant Gerzberg is Zoran's President and Chief Executive Officer, a position he has held since December 1988. As a result of his positions with the Company, Gerzberg had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees. As CEO, he was also intricately involved in the stock option approval process. Using his knowledge of material non-public information regarding the Company, from 1997 through the present, Gerzberg has sold at least 760,637 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $24 million.

272. Defendant Goldberg was Zoran's Vice President of Audio Products and Intellectual Properties from October 1998 to approximately January 2001 and Vice President, Systems Solutions from June 1996 to October 1998. As a result of his positions with the Company, Goldberg had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees. Using

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 111

this material non-public information, from 1997 through the present, Goldberg has sold at least 53,427 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $2 million.

273.    Defendant Martino was Zoran's Executive Vice President and Chief Operating Officer from August 2001 until July 2005.  As a result of his positions with the Company, Martino had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees.  As COO, he was integral to the stock option approval process.  Using this material non-public information, from 1997 through the present, Martino sold at least 32,601 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $840,000.

274.    Defendant Schneider is Zoran's Vice President, Finance and Chief Financial Officer, a position he has held since July 1998.  He was also the Company's Corporate Controller from January 1998 to July 1998.  As a result of his positions with the Company, Schneider had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees.  As CFO, he was integral to every aspect of the stock option approval process.  Using this material non-public information, from 1997 through the present, Schneider has sold at least 135,339 shares of Zoran

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 112

stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $4 million.

275.   Defendant Shenberg is Zoran's Senior Vice President, Business and Strategic Development, a position he has held since October 1998.  He was also the Company's Vice President, Sales and Marketing from January 1995 through October 1998 and Product Line Business Manager from August 1990 until January 1995. As a result of his positions with the Company, Shenberg had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees. Using this material non-public information, from 1997 through the present, Shenberg has sold at least 188,625 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $5 million.

276.   Defendant Alex Sinar was Zoran's Vice President of Operations from February 1997 to February 1999 and the Company's Director of Manufacturing from January 1995 to February 1997. As a result of his positions with the Company, Sinar had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow corporate officers, Directors, and employees. Using this material non-public information, from 1997 through the present, Sinar sold at least 23,625 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $1.2 million.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 113

277.    Defendant Meindl is a member of Zoran's Board of Directors, a position he has held since March 1986.  He was a member of the Audit Committee from at least 1996 until April 2005 when he was replaced by Defendant James B. Owens, Jr. Meindl has been a member of the Compensation Committee since April 2004, when he replaced Owens, and was a member of the Nominating and Corporate Governance Committee in 2001. As a result of his positions with the Company, Meindl had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow Directors, officers, and employees.  Using this material non-public information, from 1997 through the present, Meindl has sold at least 128,166 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $4.6 million.

278.    Defendant Stabenow is on Zoran's Board of Directors, a position he has held since November 1990. As a result of his positions with the Company, Stabenow had access to, and in fact knew, material adverse non-public information regarding the Company, including information about its finances, business strategy and forecasts, and past and future business prospects as a result of his access to non-public documents and reports, and his relationships with his fellow Directors, officers, and employees. Using this material non-public information, from 1997 through the present, Stabenow has sold at least 29,166 shares of Zoran stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $1.3 million.

279.   In order to realize the profit from their backdating scheme, Defendants Gerzberg and Schneider have engaged in insider trading of the Company's stock to the Company's detriment and financial loss.

280.   On March 1, 2006, Gerzberg exercised 70,000 of his 75,000 backdated options manipulated to benefit from the stock's temporary drop following September 11, 2001.

281.   On April 27, 2006, Gerzberg exercised 96,000 backdated options that were manipulated to the low closing price on August 9, 2002.

282.   On May 1, 2006, Schneider exercised 113,200 options, 25,000 of which were manipulated to benefit from the post 9/11 stock price drop.

283.   On May 19, 2006, Gerzberg exercised another 36,000 backdated options that had been manipulated to the low closing price on August 9, 2002.

284.   Each of these transactions is part of the ongoing scheme perpetrated by Defendants and results in the Individual Defendants' unjust enrichment.

285.   These damages to the Company will continue to increase with each exercise of the discounted backdated stock options until all of the backdated options are re-priced, canceled or expired.

## VI.   DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

286.   Plaintiff brings this action derivatively on behalf of and for the benefit of Zoran to redress injuries suffered, and yet to be suffered by Zoran, as a direct and proximate result of Individual Defendants' breaches of fiduciary duty, aiding and abetting the other Individual Defendants' breach of fiduciary duty, unjust enrichment, constructive fraud, abuse of control, waste of corporate assets, gross mismanagement and violation of federal securities law. Zoran is named as a nominal defendant solely in a derivative capacity.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 115

287.    Plaintiff was a Zoran shareholder during the relevant period described herein during which the alleged wrongdoing occurred; Plaintiff has held Zoran common stock during the relevant period, and intends to retain these shares of Zoran stock through the duration of this litigation.

288.    The Individual Defendants' fiduciary breaches are of a continuing nature.  By recommending, instituting and maintaining Stock Option Plans which they violated by authorizing the grant of impermissibly backdated options, the Individual Defendants commenced an overarching scheme or plan intended to benefit the Individual Defendants personally to the disadvantage of Zoran and its shareholders.  This scheme or plan was then furthered by the Individual Defendants' misrepresentations in financial statements, periodic reports, and proxy statements filed with the SEC and disseminated to the Company's shareholders.  The scheme or plan will not be complete until all of the outstanding options have been exercised or canceled, neither of which has yet occurred.

289.    Plaintiff acquired his shares in the Company before any revelations of backdating had been made public, in the midst of the undisclosed scheme and prior to the exercise of thousands of backdated options granted throughout the course of the Individual Defendants' backdating scheme.  As a result of the backdating scheme, the Company has repeatedly suffered financial losses due to the exercise of backdated options manipulated throughout the scheme.  Further, as a result of Individual Defendants' scheme, the Company has suffered significant financial damage relating to investigating and re-stating the Company's financial results for a period of ten years, which has subjected, and will continue to subject, the Company to significant liabilities relating to regulatory investigation and penalties, tax liabilities to non-insider

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 116

employees, and the losses reflected in the Company's announced restatements of financial statements dating back to 1997.

290.    Plaintiffs will adequately and fairly represent the interests of Zoran and its shareholders in enforcing and prosecuting Zoran's rights.

291.    This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

292.    Based on the facts set forth herein, Plaintiff has not made any demand on the Zoran Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act.  The Board of Directors is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  Furthermore, the Individual Defendants' misconduct served no legitimate business purpose and is of such a nature that it cannot be protected by the business judgment rule.  Indeed, the members of the Board upon whom the demand would be served either actively participated in, or acquiesced to, the complained of behavior.  All members of the Audit and/or Compensation Committee, including Defendants Gerzberg, Burgess, Galil, Meindl, and Owens, were directly responsible for authorizing the backdated options and/or approved the false financial statements.

293.    At the time this action was commenced, the Zoran Board of Directors consisted of Director Defendants Gerzberg, Burgess, Galil, Meindl, Owens, and Stabenow, and non-Defendant Directors Rynne and Young.

**A.    <u>Defendant Gerzberg</u>**

294.    Defendant Gerzberg is incapable of disinterestedly considering a demand for the following reasons:

(a)     As alleged herein, Defendant Gerzberg received at least 1,793,524 in stock option grants, a substantial percentage of which are alleged to have been backdated, and is thus directly interested in the subject matter of this litigation.  In fact, by filing a Form 4 on December 22, 2006 re-pricing the purported grants dated September 19, 2001 and August 9, 2002, Gerzberg admitted to having received stock option grants that were backdated;

(b)     Plaintiff has interviewed at least two former employees who are familiar with the administration of the stock options benefits during the relevant period (identified above as CW #1 and CW#2), and who would testify that, as CEO Gerzberg was intricately involved with and personally approved the granting of the stock option awards at issue here;

(c)     Gerzberg, as CEO, presumably was involved in the May 16-23, 2006 investigation by "company management" that found no wrongdoing and no backdating of grants to executives, despite the later revelation of the Individual Defendants' backdating scheme;

(d)     As a member of the Zoran Board in 2006, Defendant Gerzberg ratified the May 16-23, 2006 initial investigation, and failed to take any action against the Individual Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(e)     Defendant Gerzberg has demonstrated that he is unable or unwilling to act independently of the Individual Defendants, including through his participation, with the other Individual Defendants, in the options backdating alleged herein;

(f)     As the Company's Chief Executive Officer, President, a Director and a signatory of the 2005 Registration Statement, Defendant Gerzberg is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 118

that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme.

(g)     For the reasons set forth herein, Defendant Gerzberg is substantially likely to be held liable for breaching his fiduciary duties, violating the Exchange Act, and for other acts alleged against him as set forth herein;

**B.     Defendant Meindl**

295.     Defendant Meindl is incapable of disinterestedly considering a demand for the following reasons:

(a)     As alleged herein, Defendant Meindl received at least 76,800 in stock option grants, a substantial percentage of which are alleged to have been backdated, and is thus directly interested in the subject matter of this litigation;

(b)     As a member of the Audit Committee from 1996 through April 2005, Defendant Meindl directly participated in and approved the Company's violations of GAAP and IRC Section 162(m) and is responsible for approving the false financial statements that resulted from mischaracterization of the option grants as alleged herein.  Defendant Meindl was also responsible for, and participated in, both the May 16-23, 2006 investigation that found that the options grants for years 1998, 1999, and 2001 were proper and that the executives had received no backdated option grants, as well as the second Company investigation that purportedly exonerated the Individual Defendants, including himself, from having intentionally backdated any option grants;

(c)     As a member of the Compensation Committee from April 2004 through the present, Defendant Meindl was directly responsible for authorizing the impermissible grants

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 119

of backdated options to the Individual Defendants and misrepresenting the same in the Company's SEC filings from that period, as alleged herein;

(d)     As a member of the Zoran Board in 2006, Defendant Meindl ratified the May 16-23, 2006 initial investigation, and failed to take any action against the Individual Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(e)     Defendant Meindl has a decades-long professional and personal relationship with Defendant CEO Gerzberg, who was a PhD candidate studying under Meindl, and later a colleague at Stanford University, and therefore is not able to investigate these claims with an allegiance to the shareholders' interest;

(f)     By colluding with the Individual Defendants, as alleged herein, Defendant Meindl has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

(g)     As a Company Director and a signatory of the 2005 Registration Statement, Defendant Meindl is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme;

(h)     Defendant Meindl is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.

## C.     Defendant Stabenow

296.     Defendant Stabenow is incapable of disinterestedly considering a demand for the following reasons:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 120

(a)     As alleged herein, Defendant Stabenow received at least 79,300 in stock option grants, a substantial percentage of which are alleged to have been backdated, and is thus directly interested in the subject matter of this litigation; improperly backdated stock option grants and is thus directly interested;

(b)     As a member of the Audit Committee from 1996 through the present, and as Chairman of the Audit Committee since 2004, Defendant Stabenow directly participated in and approved the Company's violations of GAAP and IRC Section 162(m) and is responsible for approving the false financial statements that resulted from mischaracterization of the option grants as alleged herein  As one of the designated financial experts on the Audit Committee, Defendant Stabenow understood the GAAP accounting implications of backdating options and understood that the Company's representations about APB 25 in the public filings he approved and signed were false and misleading. Defendant Stabenow was also responsible for, and participated in, both the May 16-23, 2006 investigation that found that the options grants for years 1998, 1999, and 2001 were proper and that executives had received no backdated grants, as well as the second Company investigation that purportedly exonerated the Individual Defendants, including himself, from having intentionally backdated any option grants;

(c)     As a member of the Compensation Committee from 1996 through the present, Defendant Stabenow was directly responsible for authorizing the impermissible grants of backdated options to the Individual Defendants and misrepresenting the same in the Company's SEC filings from 1997 through the present, as alleged herein;

(d)     As a member of the Zoran Board in 2006, Defendant Stabenow ratified the May 16-23, 2006 initial investigation, and failed to take any action against the Individual

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 121

Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(e)     By colluding with the Individual Defendants, as alleged herein, Defendant Stabenow has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

(f)     As a Company Director and a signatory of the 2005 Registration Statement, Defendant Stabenow is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme;

(g)     On February 15, 2007, as a member of the Compensation Committee, Defendant Stabenow approved salary raises to Defendants Gerzberg, Schneider, and Shenberg, despite the Board's concurrent finding that the Company would have to re-state its financial results and recognize an estimated $12-$15 million charge in compensation expenses due to improper accounting practices that occurred under these executive officers' tenure, and despite the need to re-price the exercise prices for at least two sets of option grants backdated for the benefit of these Defendants, to September 26, 2001 and August 22, 2002;

(h)     Stabenow is also a member of the Board of Directors of Applied Micro Circuits Corporation ("AMCC"), where he sits on the Audit Committee, the Compensation Committee, and the Corporate Governance Committee. Like Zoran, AMCC has been the subject to protracted investigations regarding its stock option practices, including inquiries by the SEC and the U.S. Attorneys Office for the Northern District of California. As a consequence of

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 122

backdating, in January 2007, AMCC restated its financial statements from the years 1999 through Q1 2004, recording an additional $95.2 million in compensation charges;[15] and

(i)      Defendant Stabenow is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.

**D.    Defendant Galil**

297.    Defendant Galil is incapable of disinterestedly considering a demand for the following reasons:

(a)      As alleged herein, he received at least 76,800 in stock option grants, a substantial percentage of which are alleged to have been backdated, and is thus directly interested in the subject matter of this litigation;

(b)      As a member of the Audit Committee from 1996 through 2006, Defendant Galil directly participated in and approved the Company's violations of GAAP and IRC Section 162(m) and is responsible for approving the false financial statements that resulted from mischaracterization of the option grants as alleged herein  As one of the designated financial experts on the Audit Committee, Defendant Galil understood the accounting implications of backdating options and understood that the Company's representations about APB 25 in the public filings he signed were false and misleading

---

[15] In addition to potential conflict, empirical studies suggest an increased likelihood of backdating among companies with interlocking boards (companies whose board members sit on boards of other companies that have backdated stock).  Mark Hulbert, *Why Backdated Options Might Be Contagious*, N.Y. Times, Jan. 21, 2007, at 3.5 (citing John M. Bizjak, Michael L. Lemmon & Ryan J. Whitby, "Option Backdating and Board Interlocks," available at http://papers.ssm.com/sol3/papers.cfm?abstract-id=946787

(c)    As a member of the Compensation Committee from 1996 through the present, and Chairman of the Committee since 2004, Defendant Galil was directly responsible for authorizing the impermissible grants of backdated options to the Individual Defendants and misrepresenting the same in the Company's SEC filings from 1997 through the present, as alleged herein;

(d)    As a member of the Zoran Board in 2006 and Chairman of the Board since 1983, Defendant Galil ratified the May 16-23, 2006 initial investigation, and failed to take any action against the Individual Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(e)    By colluding with the Individual Defendants, as alleged herein, Defendant Galil has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

(f)    In addition to being Chairman of the Board, Defendant Galil has a vested interest in protecting his friend and colleague, Defendant CEO Gerzberg, with whom he has worked for over twenty years and with whom he has additional commercial interests, including their membership on the prestigious Advisory Board of the California Israel Chamber of Commerce, where they sit along with Kenneth Levy, the founder and former head of KLA – Tencor who retired last October on the same day that KLA – Tencor announced a $400 million restatement due to option backdating dating to 1997 and an agreement with Levy to re-price all of his retroactively dated stock options;

(g)    As a Company Director and a signatory of the 2005 Registration Statement, Defendant Galil is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 124

and financial reporting were in fact materially false and misleading due to the backdating scheme;

(h)    On February 15, 2007, as a member of the Compensation Committee, Defendant Galil approved salary raises to Gerzberg, Schneider, and Shenberg, despite the Board's concurrent finding that the Company would have to restate its financial results and recognize an estimated $12-$15 million charge in compensation expenses due to improper accounting practices that occurred under these executive officers' tenure, and despite the need to re-price the exercise prices for at least two sets of option grants backdated for the benefit of these Defendants, to September 26, 2001 and August 22, 2002;

(i)    Defendant Galil is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.

E.    **Defendant Owens**

298.    Defendant Owens is incapable of disinterestedly considering a demand for the following reasons:

(a)    As alleged herein, Defendant Owens received at least 60,000 in stock option grants, a substantial percentage of which are alleged to have been backdated, and is thus directly interested in the subject matter of this litigation;

(b)    As a member of the Audit Committee from 2005 through the present, Defendant Owens directly participated in and approved the Company's violations of GAAP and IRC Section 162(m) and is responsible for approving the false financial statements that resulted from mischaracterization of the option grants as alleged herein.  Defendant Owens was also responsible for, and participated in, both the May 16-23, 2006 investigation that found that the options grants for years 1998, 1999, and 2001 were proper and that no executives received

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 125

backdated grants, as well as the second Company investigation that purportedly exonerated the Individual Defendants, including himself, from having intentionally backdated any option grants;

(c)     As a member of the Compensation Committee from 2003 through April 2004, Defendant Owens was directly responsible for authorizing the impermissible grants of backdated options to the Individual Defendants and misrepresenting the same in the Company's SEC filings for that period, as alleged herein;

(d)     As a member of the Zoran Board in 2006, Defendant Owens ratified the May 16-23, 2006 initial investigation, and failed to take any action against the Individual Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(e)     By colluding with the Individual Defendants, as alleged herein, Defendant Owens has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

(f)     As a Company Director and a signatory of the 2005 Registration Statement, Defendant Owens is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme.

(g)     Defendant Owens is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.

**F.      Defendant Burgess**

299.     Defendant Burgess is incapable of disinterestedly considering a demand for the following reasons:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 126

(a)      As alleged herein, he received at least 30,000 option grants purportedly authorized by the Compensation Committee on April 26, 2005.  The Form 4 for this option grant was not timely filed with the SEC, making it susceptible to having been backdated.  Any investigation into backdating by the Compensation Committee and Individual Defendants will likely result in these options being subject to cancellation.  Thus, he has an interest in ensuring that his stock options, and those of his fellow Directors and officers, remain in place.

(b)      As a member of the Audit Committee from 2005 through the present, Defendant Stabenow directly participated in and approved the Company's violations of GAAP and IRC Section 162(m) and is responsible for approving the false financial statements that resulted from mischaracterization of the option grants as alleged herein.  Defendant Stabenow was also responsible for, and participated in, both the May 16-23, 2006 investigation that found that the options grants for years 1998, 1999, and 2001 were proper and that no executives received backdated grants, as well as the second Company investigation that purportedly exonerated the Individual Defendants, including himself, from having intentionally backdated any option grants;

(c)      As a member of the Zoran Board in 2006, Defendant Stabenow failed to question the May 16-23, 2006 initial investigation, and participated in the second investigation, at the conclusion of which, the Board failed to take any action against the Individual Defendants despite the acknowledgement of the Board that option grants from 1997 forward had been improperly backdated;

(d)      By colluding with the Individual Defendants, as alleged herein, Burgess has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 127

(e) As a Company Director and a signatory of the 2005 Registration Statement, Defendant Burgess is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme.

(f) On February 15, 2007, as a member of the Compensation Committee, Defendant Burgess approved salary raises to Gerzberg, Schneider, and Shenberg, despite the Board's concurrent finding that the Company would have to restate its financial results and recognize an estimated $12-$15 million charge in compensation expenses due to improper accounting practices that occurred under these executive officers' tenure, and despite the need to re-price the exercise prices for at least two sets of option grants backdated for the benefit of these Defendants, to September 26, 2001 and August 22, 2002;

(g) Defendant Burgess was one of the two Directors appointed by the Board to the Special Committee tasked with investigating the allegations of backdating at the Company from 1997 through the present. The Special Committee has already shown an unwillingness to seek remedial relief against the Individual Defendants on behalf of the Company. Furthermore, the investigative period included 2005, when Burgess was a member of the Audit Committee, and engaged in the misconduct set forth in subsection (b) above. Thus, the Special Committee's investigation cannot have been undertaken independently and disinterestedly because any findings of misconduct related to FY 2005 forward would have rendered Burgess susceptible to liability. As a result of this insurmountable conflict on Burgess' behalf, and because he constituted 1/2 of the Special Committee, the Special Committee's investigation and conclusions regarding the Individual Defendants' misconduct were irreparably flawed; and

1      (h)    Defendant Burgess is substantially likely to be held liable for breaching

2 his fiduciary duties, as alleged herein.

3 **G.    Director Rynne**

4      300.   Director Rynne is incapable of disinterestedly considering a demand for the

5 following reasons:

6      (a)    As alleged herein, he received at least three sets of option grants totaling

7

8 86,733 options, which were purportedly granted in 2003, 2004, and 2005.  Form 4s for the 2003

9 and 2005 grants were not timely filed with the SEC, making them susceptible to having been

10 backdated.   Likewise, the 2004 grant is suspicious in its timing for the reasons set forth in

11 paragraph 135, above.  Any investigation into backdating by the Compensation Committee and

12 Individual Defendants will likely result in the cancellation of these options.  Thus, he has an

13 interest in ensuring that his stock options, and those of his fellow Directors and officers, remain

14 in place;

15      (b)    As a member of the Zoran Board in 2006, Rynne ratified the May 16-23,

16

17 2006 initial investigation, and participated in the second investigation, at the conclusion of

18 which, the Board failed to take any action against the Individual Defendants despite the

19 acknowledgement of the Board that option grants from 1997 forward had been improperly

20 backdated;

21      (c)    By colluding with the Individual Defendants, as alleged herein, Rynne has

22

23 demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

24      (d)    As a Company Director and a signatory of the 2005 Registration

25 Statement, Rynne is strictly liable for any material misstatements published therein and therefore

26

27

28 CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 129

cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme;

(e)   On February 15, 2007, as a member of the Compensation Committee, Rynne approved salary raises to Gerzberg, Schneider, and Shenberg, despite the Board's concurrent finding that the Company would have to restate its financial results and recognize an estimated $12 - $15 million charge in compensation expenses due to improper accounting practices that occurred under these executive officers' tenure, and despite the need to re-price the exercise prices for at least two sets of option grants backdated for the benefit of these Defendants, to September 26, 2001 and August 22, 2002; and

(f)   Rynne was one of the two Directors appointed by the Board to the Special Committee tasked with investigating the allegations of backdating at the Company from 1997 through the present.  The Special Committee has already shown an unwillingness to seek remedial relief against the Individual Defendants on behalf of the Company.  The Special Committee was comprised of two Directors, Rynne and Defendant Burgess.  As a result of the insurmountable conflict between Burgess' role as Individual Defendant and 1/2 of the Special Committee, the Special Committee's investigation and conclusions regarding the Individual Defendants' misconduct were irreparably flawed.

## H.   Director Young

301.   Director Young is incapable of disinterestedly considering a demand for the following reasons:

(a)   As alleged herein, Young received at least 76,800 option grants, many of which are suspect for having been backdated for the reasons set forth in Section V.E above. Form 4s for these grants were not timely filed with the SEC, making them prime candidates for

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 130

having been backdated.  Any investigation into backdating by the Compensation Committee and Individual Defendants will likely result in Young having these options canceled.  Thus, he has an interest in ensuring that his stock options, and those of his fellow Directors and officers, remain in place at the backdated pricing;

(b)     As a member of the Zoran Board in 2006, Young failed to question the May 16-23, 2006 initial investigation, and participated in the second investigation, at the conclusion of which, the Board failed to take any action against the Individual Defendants despite the acknowledgement of the Director Defendants that option grants from 1997 forward had been improperly backdated;

(c)     By colluding with the Individual Defendants, as alleged herein, Young has demonstrated that he is unable or unwilling to act independently of the Individual Defendants;

(d)     As a Company Director and a signatory of the 2005 Registration Statement, Young is strictly liable for any material misstatements published therein and therefore cannot disinterestedly investigate claims that the Company's accounting disclosures and financial reporting were in fact materially false and misleading due to the backdating scheme.

302.     Thus, demanding that the Directors investigate the Individual Defendants' alleged wrongdoing would be futile.  All eight Directors were actively engaged in the wrongdoing alleged herein through either (a) their receipt of backdated option grants, (b) their active participation in the authorization and concealment of the backdated option grants as members of the Compensation and Audit Committees from 1997 through 2005, or (c) their unreasonable and intentional approval of this scheme by their failure to take remedial action against the Individual Defendants, despite their admission of having backdated certain option grants.  For the reasons stated above, at the time of the filing of this Complaint, there is, at minimum, a reasonable doubt

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 131

that the Board of Directors could have properly exercised its independent and disinterested

business had Plaintiff made a demand upon the Board.

303.    The Director Defendants' conduct since the alleged backdating came to light in the spring of 2006 further demonstrates that demand would be futile.  As noted above, in response to the initial CFRA report documenting the potential for backdating, the Director Defendants, at the behest of the Audit Committee, appointed *the same* Company management that was receiving the backdated option grants to conduct the Company's investigation into the same.  Unremarkably, the Individual Defendants found that they had done nothing wrong.

304.    A second investigation, announced July 3, 2006, produced more of the same.  That investigation was conducted by certain Director Defendants deemed by the Board to be "independent."  The Board did not, however, identify who these "independent" Directors might be.  Since most, if not all, of the Directors have received options that are suspect, any findings by the investigating Directors would likely lead to that same investigating Director being held liable to the Company.

305.    At the conclusion of the second investigation, the Directors acknowledged that option grants from 1997 forward had been impermissibly backdated.  However, the Directors claimed that *no one* in the Company had committed misconduct and did not bring suit against the Individual Defendants for their part in this backdating scheme.

306.    Demand is also deemed futile where there is a reason to doubt whether the challenged transactions were a valid exercise of business judgment.  Backdating options is the type of transaction that is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of Director liability therefore exists.  Thus, there is no rational business purpose that can be served by the Directors' failure to bring suit to recoup

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 132

the losses the Company suffered as a result of the Individual Defendants' misconduct, or to cancel the currently outstanding options that were granted as part of this scheme or plan.

307.     As confirmed by the Form 4s filed in December 2006 by Defendants Gerzberg and by the Company's February 20, 2007 press release, the Company has admitted to at least three occasions on which (collectively) hundreds of thousands of stock options were backdated. Despite the acknowledged fact that both senior executives and non-executive employees received backdated stock options, the Board of Directors has failed to take action to recoup the Company's financial losses stemming from the past exercise of backdated options and to protect the Company from future loss by either re-pricing or canceling all of the unexercised backdated options. The Board's continuing failure to act on the Company's behalf underscores the futility of demanding that it institute and vigorously prosecute this action on behalf of the Plaintiff and his fellow shareholders.

308.     As pled herein, the terms of the Plans required that the exercise prices for options grants not be less than the fair market value of the stock subject to the option on the date the option is granted. Neither the Compensation Committee nor the Board was given the authority to contravene the terms of the Plans. The Compensation Committee nevertheless altered, or consented to the alteration of, the actual dates of the grants to reflect lower exercise prices for the shares. Knowing and intentional violations of stock options plans in this manner do not constitute a valid exercise of business judgment.

309.     The misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. The backdating of options constitutes self-dealing. The Individual Defendants participated in or benefited from backdating options and have the opportunity to further benefit from these options grants, which have not yet expired, and all

members of the Audit and/or Compensation Committee were directly responsible for authorizing the backdated options and/or approved the false financial statements. By granting options with backdated exercise prices, Individual Defendants undermined the purpose of the Stock Option Plans by awarding employees incentive compensation that was not tied to Zoran's stock performance as intended under the Plans. These acts served no legitimate purpose and were not the product of good faith business judgment. Such acts were unlawful and are therefore incapable of ratification. As a result, neither the business judgment rule, nor any pre-suit demand requirement is applicable here.

310. The Board of Directors is incapable of disinterestedly considering a demand in this instance because it would require the Board to investigate and sue its own members, who, over the course of the past ten years, have approved generous compensation packages for one another. From fiscal 1997 to present, the Directors, including those named as Defendants herein, have received at least $1,369,250 in cash and over 711,800 Zoran stock options.

### VII. TOLLING OF THE STATUTE OF LIMITATIONS

311. The Counts alleged herein are timely. As an initial matter, the Individual Defendants wrongfully concealed their manipulation of Zoran's stock option plans through strategic timing and backdating, by issuing false and misleading SEC filings, including proxy statements and quarterly and annual reports, by falsely reassuring Zoran's investors that Zoran's option grants were being administered by a committee of independent Directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based upon the manipulation of insider information, which ensured that the fair market value of the option as issued was higher than the exercise price on the actual date of the option grant.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 134

312. Zoran's public investors had no reason to know of the Individual Defendants' breaches of their fiduciary duties until July 3, 2006, when Zoran disclosed that its internal investigation had discovered irregularities related to the issuance of certain stock option grants made between 1997 and 2005. The full extent of the Individual Defendants' breaches, and the damages caused as a result, is not known and cannot be known at this time.

313. Finally, as fiduciaries of Zoran and its public shareholders, the Individual Defendants cannot rely on any limitations defense when they withheld from Zoran's public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the Individual Defendants its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates were manipulated so as to maximize the profit for the option grant recipients and, accordingly, to maximize the Company's costs.

## VIII.   CAUSES OF ACTION

### A.   COUNT I:  BREACH OF FIDUCIARY DUTY – OPTIONS BACKDATING
### (Against the Individual Defendants)

314. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

315. By reason of their positions as executive officers and/or Directors of Zoran and because of their ability to control the business and corporate affairs of the Corporation, the Individual Defendants owe Zoran and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and are required to use their utmost ability to control and manage Zoran in a fair, just, honest, and equitable manner. The Individual Defendants are required to act in furtherance of the best interests of Zoran and its shareholders equally and not in furtherance of their or other fiduciaries' personal interests or benefit. Each officer and Director owes to the

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 135

Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

316.    The Individual Defendants violated and breached these duties by their actions described herein.  The Officer Defendants received backdated options.  The Directors, including those Directors named as Defendants herein, approved, administered, and ratified or permitted the backdated options to be granted to the Officer Defendants.  These Defendants knew or, with exercise of reasonable care, should have known, that Zoran's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that the practice of backdating options was not an exercise of sound business judgment.  The Audit and Compensation Committee Defendants nevertheless continued to approve such options or to acquiesce in their approval.

317.    The Audit and Compensation Committee Defendants' intentional violation of the shareholder approved stock option plans, coupled with materially false and misleading disclosures regarding their compliance with those plans constitutes conduct that is disloyal to the Company, taken in bad faith and with disregard to the duties owed by these individuals to the Company.

318.    By reason of the foregoing, Zoran has sustained and will continue to sustain damages and injuries, including but not limited to additional compensation expenses and tax liabilities Zoran was required to incur and the loss of funds paid to Zoran upon exercise of options.  Plaintiff, on behalf of Zoran, has no adequate remedy at law.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 136

319.    In addition, the acts of Defendants Gerzberg and Schneider, if not the other Individual Defendants, were done maliciously, oppressively, and with intent to defraud. Thus, Plaintiff, on behalf of Zoran, is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**B.    COUNT II:  BREACH OF FIDUCIARY DUTY – INSIDER SELLING**
     **(Against the Insider Selling Defendants)**

320.    Plaintiff incorporates by reference the allegations set forth above as though fully set forth herein.

321.    At the time of the Insider Selling Defendants' stock sales alleged herein, these Defendants knew or, with exercise of reasonable care, should have known, that Zoran's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that the practice of backdating options was not an exercise of sound business judgment.

322.    Additionally, at the time of the Insider Selling Defendants' stock sales alleged herein, these Defendants knew, or with the exercise of reasonable care should have known, that due to the backdating and other improprieties alleged herein, the Company's financial statements were materially false and misleading, its revenues were overstated, and its expenses were understated.

323.    These Defendants further knew or should have known that these facts were material, had not been publicly disclosed, had caused Zoran to sustain damages, and would continue to do so.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 137

324.    These Defendants nevertheless sold shares of Zoran stock while in possession of adverse, non-public information, in breach of their fiduciary duties described herein.

325.    As a result of this conduct, the Insider Selling Defendants are liable to the Company for damages and/or the imposition of a constructive trust on these Defendants' illegal stock sales.

## C.    COUNT III:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
   (Against the Audit and Compensation Committee Defendants)

326.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

327.    As a result of the foregoing conduct, including their approval of the backdated stock options, the Audit and Compensation Committee Defendants participated in and facilitated the breach of fiduciary duties described herein.

328.    By virtue of their role in creating and administering the Corporation's stock option Plans, and their approval and authorization of the stock options that were backdated as alleged herein, the Audit and Compensation Committee Defendants were able to, and in fact did, render aid and assistance to the Officer and Insider Selling Defendants in their breach of fiduciary duties.  These Defendants did so when they knew or should have known that the practice of backdating was illegal, harmful to the company, inconsistent with GAAP and a breach of fiduciary duty.

329.    By reason of the foregoing, Zoran has sustained and will continue to sustain damages and injuries, including but not limited to additional compensation expenses and tax liabilities Zoran was required to incur and the loss of funds paid to Zoran upon exercise of options.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 138

330.    In addition, Plaintiff alleges that the acts of Defendants Gerzberg and Schneider, if not the other Individual Defendants, were done maliciously, oppressively, and with intent to defraud.  Plaintiff, on behalf of Zoran, is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**D.    COUNT IV:  UNJUST ENRICHMENT**
**(Against the Officer Defendants and Insider Selling Defendants)**

331.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

332.    As a result of the foregoing conduct, including millions of dollars in excess compensation awarded to the Officer Defendants and Insider Selling Defendants through backdated stock options, the Officer Defendants and Insider Selling Defendants have been unjustly enriched at the expense of the Company and its shareholders.

333.    The Company has been injured by reason of this unjust enrichment.  Plaintiff, derivatively on behalf of Zoran, seeks disgorgement to the Company of all of the backdated stock options received by the Individual Defendants, as well as the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.  Plaintiff, on behalf of Zoran, has no adequate remedy at law.

334.    The benefit was accepted by these Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, these Defendants breached their fiduciary duties and/or abused their positions of control and therefore, these Defendants are not justified in retaining the benefits conferred upon them.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 139

**E.   COUNT V:  CONSTRUCTIVE FRAUD**
   **(Against the Individual Defendants)**

335.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

336.   As fiduciaries to Zoran, the Individual Defendants owed Zoran and its shareholders a duty of candor and full accurate disclosure regarding the true state of Zoran's business and assets and their conduct with regard thereto.

337.   As described above, the Individual Defendants made, or aided and abetted the making of, misrepresentations and concealments of material facts despite their duties to, *inter alia*, disclose the true facts regarding Zoran.

338.   As a result of the Individual Defendants' constructive fraud, Zoran has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

339.   In addition, the acts of Defendants Gerzberg and Schneider, if not the other Individual Defendants, were done maliciously, oppressively, and with intent to defraud; and Plaintiff on behalf of Zoran is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**F.   COUNT VI:  ABUSE OF CONTROL**
   **(Against the Individual Defendants)**

340.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

341.   By virtue of their positions and financial holdings in Zoran, the Individual Defendants exercised control over Zoran and its operations, and owed duties as controlling persons not to use their positions of control within the Company for their own personal interests and contrary to the interests of Zoran.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 140

342.    The Individual Defendants' conduct amounts to an abuse of their control in violation of their obligations to Zoran.  The Individual Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in their abuse of control.

343.    As a result of the Individual Defendants' abuse of control, Zoran has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

344.    In addition, the acts of Defendants Gerzberg and Schneider, if not the other Individual Defendants, were done maliciously, oppressively, and with intent to defraud. Plaintiff, on behalf of Zoran, is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## G.    COUNT VII:  CORPORATE WASTE AND GIFT (Against the Individual Defendants)

345.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

346.    By failing to properly consider the interests of the Company and its public shareholders and by failing to conduct proper supervision, the Individual Defendants, without any valid corporate purpose, have caused Zoran to waste valuable corporate assets solely for the financial gain of the Officer and Insider Selling Defendants.

347.    In return for such wrongful diversion of corporate assets, Zoran received no consideration, or consideration so disproportionately small, as to lie beyond the range at which any reasonable person might be willing to accept, rendering the transactions in effect a gift to the Individual Defendants.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 141

348.    The conduct of the Individual Defendants, and each of them, was not in good faith, nor did the Individual Defendants make any judgment, in the exercise of good faith, that based on the circumstances of which they were fully aware the transactions were worthwhile to Zoran.  Rather the Individual Defendants intentionally and directly diverted Zoran's assets to their own use or benefit.

349.    As a result of the Individual Defendants' wrongful conduct, and the wrongful conduct of each of them, Zoran has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.  Zoran is also entitled to disgorgement of the compensation obtained by the Individual Defendants as stock, options, salaries, bonuses, and other economic and non-economic compensation which would not have been paid but for their wrongful conduct.

**H.    COUNT VIII:  GROSS MISMANAGEMENT**
        **(Against the Individual Defendants)**

350.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

351.    By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zoran in a manner consistent with the operations of a publicly held corporation.

352.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zoran has sustained and will continue to sustain significant damages in the millions of dollars.

353.    In addition, the acts of Defendants Gerzberg and Schneider, if not the other Individual Defendants, were done maliciously, oppressively, and with intent to defraud.  Thus,

Plaintiff, on behalf of Zoran, is entitled to punitive and exemplary damages in an amount to be shown according to the proof at the time of trial.

**I.   COUNT IX:  RESCISSION**
**(Against the Officer Defendants)**

354.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

355.   As a result of the acts alleged herein, a number of stock option contracts between the Officer Defendants and the Company entered into between at least fiscal years 1997 and 2005 were obtained through the Officer Defendants' deceit and abuse of control.  Moreover, the backdated stock options and the shares underlying these options were not duly authorized by the Board, as was legally required, because they were not authorized in accordance with the terms of the publicly filed contracts—including the 1993 Plan, the 2005 Plan, and the 2005 Directors Plan, as well as corresponding stock option agreements and/or employment agreements—approved by the Company shareholders and filed with the SEC.

356.   These stock option contracts between the Officer Defendants and the Company should, therefore, be rescinded, with sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

**J.   COUNT X:  VIOLATION OF § 14(a) OF THE EXCHANGE ACT**
**(Against the Audit and Compensation Committee Defendants)**

357.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

358.   This claim is brought under Section 14 of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, promulgated thereunder, 17 C.F.R. § 240.14a-9.

359.    Section 14 of the Exchange Act prohibits the solicitation of any proxy in contravention to the rules promulgated thereunder.

360.    Rule 14a-9 provides that no proxy solicitation shall be made by means of any proxy statement or other communication containing "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading."

361.    The Compensation and Audit Committee Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the Company's 1997 through 2005 Proxy Statements, which, in the respective sections disclosing executive compensation, misrepresented or failed to disclose the facts set forth above.  By reason of the conduct alleged herein, therefore, each Compensation and Audit Committee Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  The correct information would have been material to the Company's shareholders in determining whether to elect Directors to manage the Company.  The Proxy Statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful backdating scheme and revelation of the truth would have ended immediately any endorsement of the Directors' position, the executive officers' compensation, and Zoran's compensation policies.

362.    The Company has been damaged as a result of the material misrepresentations and omissions contained in the Proxy Statements.

363.    By virtue of the foregoing, the Individual Defendants violated Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

**K.     COUNT XI:  VIOLATION OF § 10(b) OF THE EXCHANGE ACT**
**(Against Defendants Gerzberg and Schneider)**

364.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

365.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240, 10b-5, against Defendants Gerzberg and Schneider.

366.    Defendants Gerzberg and Schneider carried out a plan, scheme and course of conduct which was intended to and did deceive Zoran and the investing public, as alleged herein. In addition, in connection with the improper scheme described above, Zoran suffered damages from, among other things, the issuance of stock and options, resulting liabilities, investigations and restatement work.  In furtherance of this improper scheme, plan and course of conduct, Defendants Gerzberg and Schneider, and each of them, took the actions set forth herein.

367.    Defendants Gerzberg and Schneider: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Zoran and the public market, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully appropriated Zoran options and other compensation in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

368.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 145

1   in a continuous course of conduct to conceal adverse material information about Zoran's controls

2   and operations, as specified herein.

3          369.   These Defendants employed devices, schemes and artifices to defraud and a

4   course of conduct and scheme as alleged herein to improperly manipulate and profit from the

5   backdating scheme and thereby engaged in transactions, practices and a course of business which

6   operated as a fraud and deceit upon Zoran and the public market.

7          370.   These Defendants had actual knowledge of the misrepresentation and omissions

8   of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

9   to ascertain and to disclose such facts, even thought such facts were available to them.  These

10  Defendants' material misrepresentation and/or omissions were done knowingly or recklessly and

11  for the purpose and effect of concealing the truth.

12         371.   In connection with the unlawful conduct and scheme, as alleged herein, Zoran

13  suffered damages.

14         372.   By virtue of the foregoing, Defendants Gerzberg and Schneider violated Section

15  10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

16  **L.   COUNT XII:   VIOLATION OF § 20(a) OF THE EXCHANGE ACT**
    **(Against Defendants Gerzberg and Schneider)**

17         373.   Plaintiff incorporates by reference and realleges each and every allegation

18  contained above, as though fully set forth herein.

19         374.   This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C.

20  § 78t(a).

21         375.   By virtue of their positions as CEO and CFO of Zoran, respectively, and their

22  operational and management control of Zoran's business and systematic involvement in the

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 146

fraudulent scheme alleged herein, Defendants Gerzberg and Schneider each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of Zoran, and its employees, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  In exercise of this control, Gerzberg and Schneider actively participated in the backdating scheme as alleged herein, which included overseeing the manipulation of option grant dates in connection with the Company's distribution of these securities to employees, including Gerzberg and Schneider themselves, and the subsequent exercise of the backdated options in violation of Section 10(b) and Rule 10b-5. Defendants Gerzberg and Schneider had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

376.    It is appropriate to treat the Individual Defendants, Defendants Gerzberg and Schneider, and other employees at Zoran as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in Zoran's public filings, press releases and other publications are the collective actions of the Individual Defendants, Defendants Gerzberg and Schneider, and those over whom they had control.

377.    As a direct and proximate result of these Defendants Gerzberg and Schneider's wrongful conduct, and the conduct of others at Zoran whom they controlled, Zoran suffered damages.

378.    By virtue of their positions as controlling persons, Defendants Gerzberg and Schneider each violated, and is liable pursuant to, Section 20(a) of the Exchange Act.

### IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment, as follows:

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 147

A.     Against all of the Individual Defendants for the damages sustained by the Company as a result of their breaches of fiduciary duty;

B.     Against the Officer Defendants in an amount equal to the amount by which they have been unjustly enriched;

C.     Imposing on the Officer Defendants a constructive trust on their options contracts, and on all proceeds that have been received or will in the future be received by them in respect of such interests or otherwise as the result of their backdated stock option grants;

D.     Awarding restitution, disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein, and punitive damages;

E.     Ordering the Individual Defendants to transfer to the Company all proceeds, directly or indirectly obtained by them as a result of the backdated stock option grants;

F.     Awarding Plaintiff his costs and expenses incurred in this action, including reasonable attorney, accountant, and expert fees, as well as pre-judgment interest; and

G.     Such other and further relief as may be just and proper.

## X.     **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

## **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

CONSOLIDATED VERIFIED
DERIVATIVE COMPLAINT
(Cause No. 06-05503-WHA) - Page 148

1    DATED this 14th day of March, 2007.

2

3

4                                    ____/s/Juli E. Farris_____
                                     Lynn Lincoln Sarko
5                                    lsarko@kellerrohrback.com
                                     Juli E. Farris, CA Bar No. 141716
6                                    jfarris@kellerrohrback.com
                                     Elizabeth A. Leland
7                                    bleland@kellerrohrback.com
                                     Tyler L. Farmer, CA Bar No. 212038
8                                    tfarmer@kellerrohrback.com
                                     Keller Rohrback L.L.P.
9                                    1201 Third Avenue, Suite 3200
                                     Seattle, WA  98101-3052
10                                   (206) 623-1900 (phone); (206) 623-3384 (fax)
11
                                     Gary A. Gotto
12                                   ggotto@kellerrohrback.com
                                     Shane P. Cramer
13                                   scramer@kellerrohrback.com
                                     Keller Rohrback P.L.C.
14                                   National Bank Plaza
                                     3101 North Central Avenue, Suite 900
15                                   Phoenix, AZ  85012
                                     (602) 248-0088 (phone); (602) 248-2822 (fax)
16
17
                                     *Attorneys for Lead Plaintiff*
18                                   *Gerald del Rosario*

19

20

21

22

23

24

25

26

27

28   CONSOLIDATED VERIFIED
     DERIVATIVE COMPLAINT
     (Cause No. 06-05503-WHA) - Page 149

## VERIFICATION

I, Gerald del Rosario, hereby verify that I have reviewed the foregoing

Consolidated Verified Derivative Complaint and authorized its filing and that the

foregoing is true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2007.

Gerald Del Rosario