IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE ZORAN CORPORATION
DERIVATIVE LITIGATION

No. C 06-05503 WHA

This document relates to:

All Actions

**ORDER DENYING
PRELIMINARY APPROVAL
OF PROPOSED SETTLEMENT
OF DERIVATIVE ACTION**

## INTRODUCTION

This order denies a motion for preliminary approval of a proposed settlement of a backdated-options case under Rule 23.1. The essence of the problem is that the proposed consideration for the settlement falls short of even its purported value and, indeed, some of the supposed consideration is not consideration at all, but merely a concession made by certain defendants *before* the operative complaint was even filed. The proposed settlement would confer so little value on the corporation that it could only be approved upon by showing that the suit is virtually worthless. No such showing has been made.

## STATEMENT

This derivative action arises out of backdating of employee stock options. The background is as follows. On May 16, 2006, the Center for Financial Research and Analysis issued a report titled "Options Backdating — Which Companies are at Risk?" The report

identified a number of companies concentrated in the high-technology sector at risk for having issued backdated stock options. Zoran Corporation was among them. The report identified three specific suspect Zoran grants. These were purportedly made on August 4, 1998, August 4, 1999, and September 19, 2001. Zoran responded in a press release dated May 23, 2006, stating that the company had conducted an internal investigation concluding that no grants had been backdated (Cons. Compl. ¶ 71).

Nonetheless, Zoran formed a special committee of outside directors in mid-2006 to investigate the company's historical options-granting practices (*id*. at ¶¶ 299–300). The company also announced that it had received inquiries from the SEC and the United States Attorney's Office regarding its options-granting practices (*id*. at ¶ 73). Zoran delayed in issuing its financial reports. The company faced possible delisting by NASDAQ.

As a result of the internal investigation, the SEC inquiries, and increased publicity in the media, Zoran's financial statements and public disclosures were placed under intense scrutiny. Even before Zoran restated its financials and before the special committee issued its findings, Zoran's CEO Levy Gerzberg and CFO Karl Schneider made Form 4 filings on December 22, 2006, with the SEC suggesting that they had received backdated options. Specifically, Gerzberg's Form 4 filing disclosed that a portion of a grant purportedly made to him on August 9, 2002, had been cancelled and replaced with a grant of the same number of shares but at a higher exercise price, matching the market-closing price of the stock on August 22, 2002. Similarly, Schneider's Form 4 filing disclosed the same transaction for a portion of shares he received on August 9, 2002 (*id*. at ¶ 80). (These so called "repriced" options are those "repriced" in purported consideration of the proposed settlement, as explained below.)

The final results of Zoran's special committee internal investigation were announced on February 20, 2007. A press release stated that there was no evidence of wrongdoing by any member of the company's senior management. Contrary to the earlier statement, however, the press release revealed that "the dates of a small number of stock options grants to non-executives were established retroactively," meaning they were backdated. Some grant dates were "remeasured" to reflect the correct grant date, meaning that Zoran eventually

1  restated a number of its financial statements to take a "hit to earnings" based on the difference
2  between what the option price should have been versus what it had been, the difference being a
3  compensation expense to the company.  The company took a charge of between $12 million and
4  $15 million against its earnings for the relevant time period.  No cash was paid by anyone to the
5  company.

                              *               *               *

7  The first complaint in this action was filed on September 7, 2006, by plaintiff Milton
8  Pfeiffer, soon after the independent committee was formed.  Del Rosario filed his complaint
9  shortly thereafter, and the actions were consolidated.  An investor-class securities action was
10 also filed around the same time but was voluntarily dismissed before the first round of motions
11 to dismiss was heard.  Del Rosario was appointed lead plaintiff and Keller Rohrback was
12 approved as counsel.  An amended consolidated verified derivative complaint was filed
13 on March 14, 2007.  It survived a Rule 12 motion to dismiss.

14 The instant motion for preliminary approval of a stipulation of settlement was filed
15 on February 26, 2008.  The stipulation of settlement itself was executed the same day.
16 A hearing on the motion was held on a shortened schedule on March 3.  During the hearing, the
17 Court asked for a further supplement to the record to clarify some of the terms of the settlement
18 and a four-week stay was entered to consider the pending motion.  After the hearing, four more
19 supplemental submissions were solicited for further clarification, all leading to the instant order.

**ANALYSIS**

21 Class actions are ideally suited to the efficient resolution of numerous parallel claims
22 in a single proceeding and to encourage the pooling of small claims against a common target.
23 A derivative action is much the same.  Individual shareholders will not have the sufficient
24 incentive to independently engage in litigation over harm caused by officers, directors, and
25 employees to the corporation.  In such circumstances, a derivative action efficiently serves the
26 interests of the shareholders.  It is an engine of justice in our courts.

27 But it can also lend itself to abuse.  One form of abuse is a collusive settlement.  These
28 usually come as a cash award to counsel, a broad release of claims, and a cosmetic non-cash

1   recovery for the absent shareholders. We must always remember that once both sides reach a
2   settlement in a derivative or class action, they are always solidly in favor of their own proposal.
3   There is no advocate to critique the proposal on behalf of absent shareholders. Yet the rights of
4   absent shareholders hang in the balance. That is one reason that Rule 23.1 insists that the
5   district court vet all such settlements. While always giving deference to counsel's views of the
6   advisability of a settlement, a district court may not simply rubber stamp stipulated settlements.
7   District judges must take care that absent shareholders will be treated fairly. *Staton v. Boeing
8   Co.*, 327 F.3d 938, 959–60 (9th Cir. 2003) (assess for "actual fraud, overreaching or
9   collusion").[1]

10   Here, the settlement presented by the parties for preliminary approval falls short of
11   deserving preliminary endorsement. After soliciting additional information beyond what was
12   originally submitted in the parties' motion for preliminary approval, several submerged issues
13   have surfaced, in addition to those inquired about at the hearing. For the reasons set forth
14   below, the stipulated settlement agreement cannot be approved.

15   **1.    SCOPE OF ALLEGED WRONGDOING AND VALUE OF THE CASE.**

16   It is necessary to remind ourselves about the backdating challenged herein.
17   The consolidated amended complaint alleges securities claims (on behalf of the company)
18   for violations of Section 10(b), Section 14(a) and Section 20(a) of the Securities Exchange Act
19   of 1934. Also, it alleged Delaware state-law claims of (1) breach of fiduciary duty for granting
20   backdated stock options; (2) breach of fiduciary duty for insider selling; (3) aiding and abetting
21   breach of fiduciary duty; (4) unjust enrichment; (5) constructive fraud; (6) abuse of control;
22   (7) corporate waste; (8) gross mismanagement; and (9) rescission.

23   All of the individual defendants are current and former officers and directors of Zoran.
24   The board-member defendants are alleged to have knowingly ratified or participated in granting

---

[1] The Third Circuit has described the potential for class action lawsuits to be "a vehicle for collusive settlements that primarily serve the interests of defendants — by granting expansive protection from lawsuits — and of plaintiffs' counsel — by generating large fees gladly paid by defendants as a quid pro quo for finally disposing of many troublesome claims." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995). The Ninth Circuit, in *Staton v. Boeing Co.*, 327 F.3d 938, 959–60 (2003), said similarly that without "careful district court review of the resulting settlement, [the rights of class members] may not be given due regard by the negotiating parties."

4

1 backdated stock options to both individual defendants as well as other rank-and-file employees.
2 Additionally, all defendants are alleged to have contributed to the dissemination of false
3 statements in financial statements, proxy statements, and other SEC filings during their tenures
4 at Zoran. *Notably, these allegations were made even after Zoran had restated its financials to*
5 *reflect the findings of the special committee, i.e., the operative pleading built on and followed*
6 *the special committee report. The claim herein has been all along that the special committee*
7 *failed to flush out all wrongdoing.*

Defendants Levy Gerzberg, Uzia Galil, James A. Meindl, Philip Young, Arthur B. Stabenow, James B. Owens, Jr., David Rynne and Raymond A. Burgess were members of Zoran's board at the time the original complaint was filed. All board members except David Rynne and Philip Young were named as defendants in this action.

Defendant Levy Gerzberg co-founded Zoran. He has been Zoran's president and chief executive officer since December 1988 and has served on the board of directors since 1981. Allegedly, he has exercised at least 698,057 stock options, an undisclosed amount of which were granted while backdating occurred at Zoran. He has sold at least 760,637 shares for proceeds exceeding $24 million between 1997 and 2006, a period during which plaintiff alleges that backdating occurred at Zoran (*id.* at ¶ 23).

Defendant Arthur B. Stabenow has been a member of the board of directors since November 1990. He has also allegedly served on the audit committee since 1994 and has acted as its chairman since at least 2004. He has served on the compensation committee since at least 1996. Allegedly, he has sold at least 29,166 shares, including shares granted to him by the company as stock options, for proceeds exceeding $1.3 million (*id.* at ¶ 32).

Defendant Karl Schneider has been Zoran's chief financial officer since July 1998. In this capacity, he reviewed and signed financial statements pursuant to the Sarbanes-Oxley Act of 2002. He has exercised at least 113,200 stock options and has sold at least 135,339 shares since 1997 for proceeds of more than four million dollars (*id.* at ¶ 26). Plaintiff alleges that Schneider has violated Section 10(b) of the 1934 Act together with Gerzberg.

Defendant Isaac Shenberg currently serves as a senior vice president, a position he has held since October 1998. He has been with the company since at least August 1990 and has been an executive since January 1995. He allegedly exercised at least 188,625 stock options and has sold at least 195,625 shares yielding proceeds of more than five million dollars (*id*. at ¶ 27).

Defendant Aharon Aharon served as a vice president and senior vice president at Zoran in various capacities from February 1997 through October 2001. From October 1998 to October 2001, he was Zoran's senior vice president and chief operating officer. He sold at least 130,886 shares, including shares obtained by exercising options, for proceeds exceeding $4.9 million (*id*. at ¶ 22).

Defendant Paul R. Goldberg served as a vice president in various capacities from approximately June 1996 through January 2001. Since 1997, he has sold at least 53,427 shares for proceeds exceeding two million dollars (*id*. at ¶ 24).

Defendant Alex Sinar joined Zoran in 1990 and served as its vice president of operations from February 1997 to February 1999. He is alleged to have exercised at least 24,000 stock options during that time. He is alleged to have sold 23,625 shares of Zoran stock for at least $1.2 million (*id*. at ¶ 28).

Defendant Camillo Martino was Zoran's executive vice president and chief operating officer from August 2001 through July 2005. During that time, he exercised at least 65,022 stock options. He has sold at least 32,601 Zoran shares since 1997, including shares obtained by exercising stock options, for proceeds exceeding $840,000 (*id*. at ¶ 25).

Many claims are asserted against only some of the individual defendants. The complaint groups the defendants according to their roles at the company. The "compensation committee defendants" are Galil, Meindl, Stabenow and Owens. The "audit committee defendants" are Galil, Meindl, Stabenow, Owens and Burgess. Galil, Meindl, Stabenow, Owens and Burgess are also referred to as "director defendants." Aharon, Gerzberg, Goldberg, Schneider, Shenberg, Sinar, Meindl and Stabenow are called the "insider-selling defendants."

6

Portions of the consolidated complaint, filed on March 14, 2007, were sustained against a Rule 12 challenge. Specifically, an order dated June 5, 2007, found that plaintiff had successfully pled that six of the eight board members had received backdated stock options during the time that plaintiff held stock, thereby excusing plaintiff's failure to make a demand on the board (Dkt. 106). The order found that plaintiff's allegations surrounding eleven grants made under a 1993 discretionary plan established a predisposition on the part of management to engage in backdating. The order went on to find that plaintiff properly pled that a grant made to individual defendants Galil, Stabenow, Owens, Rynne, and Young on November 23, 2005, had been backdated. As part of the grant, each of these defendants had received 15,000 shares. The order also found that plaintiff properly pled that defendants Gerzberg and Schneider violated Section 10(b) of the 1934 Act and that the audit-committee and compensation-committee defendants violated Section 14(a). Plaintiff's Delaware state-law claims for breach of fiduciary duty, insider trading, unjust enrichment, and corporate waste also survived the Rule 12 motion. Suffice to say that the operative pleading alleged a widespread pattern of backdating, all at the expense of the company.

\*            \*            \*

To assess the scope of recoverable damages so as to be able to compare it against the proposed settlement, plaintiff's expert damage report was requested at the hearing on preliminary approval. The report calculates maximum damages in the amount of almost $16 million (including prejudgment interest). This includes the total harm to Zoran caused by all alleged backdated options granted to the individual defendants (and other rank-and-file employees) and the costs of Zoran's internal investigation and restatement. The total damages caused by alleged backdated grants to Zoran by four of the individual defendants (Gerzberg, Martino, Schneider, and Stabenow) was $1,357,819 (with prejudgment interest). These damages resulted from having to make good on options priced lower than they should have been. Damages caused by all the allegedly backdated grants (including the individual defendants and rank-and-file employees) was $9,046,890 (with prejudgment interest). Total trading profits realized upon sale of alleged backdated options for five of the individual

7

defendants (Gerzberg, Martino, Schneider, Stabenow, and Meindl) was asserted to be $3,569,306, which is the difference between the sale price of the shares and the acquisition cost of those shares, *i.e.*, the alleged backdated price.  We must now compare the $16 million in potential recovery against the proposed settlement, keeping in mind of course that settlements rarely achieve complete recovery.

### 2. THE PROPOSED SETTLEMENT.

The stipulated settlement (executed on February 26, 2008) provides that no cash would go to Zoran.  Instead, certain options owned by three of the individual defendants (Gerzberg, Schneider, and Stabenow) would be cancelled.  Other options held by defendants were said to have been "repriced."  It was claimed at the hearing that these combined concessions are worth $1.65 million, as follows:

**CANCELLED OPTIONS**

| | Grant Date | Exercise Price | No. of Options |
|---|---|---|---|
| **Gerzberg** | 7/15/03 | $24.78 | 18,217 |
| **Gerzberg** | 7/28/00 | $27.33 | 135,000 |
| **Schneider** | 7/15/03 | $24.78 | 2,111 |
| **Schneider** | 7/28/00 | $27.33 | 45,000 |
| **Schneider** | 7/19/00 | $38.74 | 3,556 |

**REPRICED OPTIONS**

| | Grant Date | Exercise Price | No. of Options | Adjusted Price |
|---|---|---|---|---|
| **Gerzberg** | 8/09/02 | $12.36 | 178,125 | $14.69 |
| **Schneider** | 9/19/01 | $11.52 | 8,437 | $15.47 |
| **Schneider** | 8/09/02 | $12.36 | 31,250 | $14.69 |

Under the stipulation, plaintiff's counsel would receive up to $1.2 million in fees and costs. Put differently, the only cash involved in the settlement would go to counsel.

8

Again, counsel represented that the foregoing totaled $1.65 million in value to the company.[2]

In addition to the repriced and cancelled options made in exchange for a broad release of all claims, Zoran's board would follow a variety of corporate-governance reforms as part of the settlement, many of which the company had already committed to follow anyway. As plaintiff maintained (Br. 7):

> These corporate governance reforms include, among other things, a more structured stock option grant process, with grants being made only at meetings of the Compensation Committee or the Board, neither of whom will have the ability to delegate their authority to grant stock options; prompt recording of all option grants in the Company's electronic database; the prompt preparation and circulation of meeting minutes reflecting all option grants; the appointment of a new independent director; at least four annual meetings of the Compensation and Audit Committees; an independent evaluation of Zoran's executive compensation policies, practices, and procedures, compared to those of comparable public companies every three years; increased officer and director education; and annual education for appropriate members of the Finance Department.

The measures would be in place for a period of at least three years.

The key features of the proposal will now be evaluated in turn. One key conclusion is that the economic benefits to the corporation are nowhere close to the $1.65 million claimed.

---

[2] Initially, counsel informed the Court that the $1.65 million figure corresponded to the difference between the grant price for all the alleged backdated options *exercised* by the individual defendants and the remeasured price as determined by the special committee. This figure was thus represented to be the amount gained by the individual defendants as a direct result of the backdating. In response to post-hearing supplemental questions, however, plaintiff's counsel stated that this had been incorrect. The $1.65 million instead corresponded only to the difference between the alleged backdated price and the remeasured price for *all* of the alleged backdated options owned by the individual defendants, whether or not they were actually exercised (Farris Decl. ¶ 18). In yet another version, plaintiff's damage expert, Dr. James Bohn, found that the maximum amount the individual defendants benefitted was $1,095,539 despite using the same remeasured price defined by the special committee. The discrepancy between Dr. Bohn's damage report and the $1.65 million is purportedly due to different valuation methods being used by the two assessments. It is important to note that this valuation discrepancy is different from that which is discussed below. Here, the discrepancy deals with what was the actual benefit derived by the individual defendants. The valuation problems detailed below deal with whether or not the repricing and cancellation of the stock options actually comes out to $1.65 million as initially held out by the parties.

9

### 3. THE CANCELLED OPTIONS.

The individual defendants received a genuine cash benefit when they exercised the backdated options and sold the stock. They do not want, however, to now pay cash back to the company. Rather they want, as stated, to cancel *other* as-yet-unexercised stock options and treat the cancellation as a benefit to the corporation.

A main problem is that the options to be cancelled are so far under water that it is highly improbable they would ever be exercised. The options being cancelled have exercise prices ranging from $24.78 to $38.74. The closing-market price of the stock on March 3, 2008 (the date of the hearing on the motion for preliminary approval) was $21.99. It is thus dubious that cancelling these options would result in actual benefit to Zoran. In theory, these options have some value because there is always a chance that the stock price will rebound later and exceed the exercise prices.

Defendants suggest the Black-Scholes method as a way to value the under-water options. Essentially, the Black-Scholes method is a mathematical algorithm that requires five input variables for evaluation: (1) the exercise price of the option; (2) the current market price for the underlying asset (in this case, the stock price); (3) the time to expiration of the option; (4) the underlying asset's volatility; and (5) the risk-free interest rate. Ideally, the only one of these inputs that is not known is the stock volatility, which can vary depending on how the term is defined.[3] In practice, however, the input variables for the time to expiration and the risk-free interest rate are subject to manipulation, depending on who is doing the calculation. *See* SIMON BENNINGA & ODED SARIG, CORPORATE FINANCE: A VALUATION APPROACH Ch. 12 (1997).

No backup was given showing the calculation used to arrive at any values, so counsel were asked to supply the details after the hearing. Significantly, the responses revealed a sharp disagreement. Plaintiff's expert, Chris Johnson, and defendants both used the Black-Scholes

---

[3] The Black-Scholes method of valuation is highly dependent upon volatility and sensitive to variations thereof. There are two accepted methods for defining volatility: implied volatility and historical volatility. Historical volatility uses the past fluctuations of a stock price to arrive at volatility over a given time period. Implied volatility uses the trading prices of actual options (as opposed to the underlying stock) to arrive at a result. Implied volatility thus takes into account the current market view of the future volatility of the underlying stock while historical volatility uses historical fluctuations.

10

1  method, but their results materially differed. For instance, using a valuation date of
2  December 3, 2008, defendants valued the cancelled options at $1,056,544 (Response of
3  Nominal Def. Corr. Exh. A). Plaintiff, using the same valuation date, valued the cancelled
4  options at $1,570,674 (Johnson Supp. Aff. at Exh. A).

5  The discrepancy is primarily due to different input variables being used for the time to
6  expiration, the risk-free interest rate, and volatility. For the time to expiration, Expert Johnson
7  used the difference between the expiration date and the respective valuation date for each grant
8  whereas defendants used 1.5 years for each option, which represents the difference between the
9  expected life of options issued in 2007 (5.5 years) and the vesting rate of the options (four
10 years). For the interest rate, Expert Johnson used the continuously compounded risk-free rate
11 for a United States Treasury bond for the specific date of valuation whereas defendants used the
12 discrete risk-free rate (not continuously compounded) for a United States Treasury zero-coupon
13 bond. Lastly, for the volatility, Expert Johnson used 60%, a value provided by Zoran's public
14 filings last year, and defendants used 55.5%, the expected volatility for the stock as determined
15 by Zoran's internal software. All in all, the only consistent numbers that were used by both
16 sides were the exercise price of the options and the stock price on the valuation date, which
17 were clearly predefined.[4]

18 Of fundamental importance is the *date* of valuation. The parties chose December 3,
19 2007, as the valuation date when presenting the proposed settlement to the Court. This ignored
20 the large downturn in the stock price since December. At the hearing, counsel gave the
21 impression that this date had been chosen because it marked the date the parties had signed a
22 memorandum of understanding. After requesting a copy of the MOU, however, the story
23 changed. To start, the MOU made no mention of the December 3 date or any date for
24 that matter for valuation purposes. The MOU was not even signed as of December 3. It was
25 signed on December 21. The parties now maintain the December 3 date was selected as the day

---

[4] Significantly, despite these vast differences in valuation assessments, *this analysis was not checked by plaintiff's counsel or expert before the hearing on the motion for preliminary approval was held.* At the hearing, plaintiff's counsel, Attorney Farris, admitted that her experts had yet to verify defendant's Black-Scholes analysis. Attorney Farris only conducted her own Black-Scholes analysis after the Court specifically requested supplemental information regarding defendants' valuation assessments.

11

before the settlement was submitted to Zoran's insurance provider. Why this should matter is a mystery. Worse, the MOU was not a final agreement in any respect and specifically provided that "the settlement will be subject to a Stipulation of Settlement to be negotiated between the Parties and containing full and complete mutual releases and dismissals." The stipulation of settlement was filed on February 26 and the hearing on the motion was held on March 3. A strong impression has been left that counsel simply went back and selected a favorable date in order to make the proposal look better than it really is and then were not entirely forthcoming in disclosing the full timeline.

Here is why the choice of the valuation date is critical. The table below summarizes the valuations for dates requested to be run by the Court:

|            | Stock Price | Plaintiff's Valuation | Defendants' Valuation |
|------------|-------------|-----------------------|------------------------|
| **12/3/2007** | $21.99   | $1,570,674            | $1,056,544             |
| **2/26/2007** | $14.30   | $607,612              | $280,809               |
| **3/3/2008**  | $13.19   | $498,137              | $216,955               |

As stated, the December 3 valuation date does not reflect today's reality. Today's market prices are drastically lower (as shown in the table). This cuts well over half the value of the cancellation of options, even if the Black-Scholes calculations are otherwise fully embraced. This order will take the prudent course for the benefit of the absent shareholders and credit the lowest of the variations — $216,955.

### 4. THE REPRICED OPTIONS.

#### A. The Repriced Options Cannot Count As Consideration.

At the hearing, the individual defendants were said to have agreed to reprice certain other options that had a more meaningful chance of exercise. In theory, this would be a possible benefit to the company. The Court was led to believe that the repricing would occur as

12

1  part of the negotiations leading to the proposal.[5] It was eventually discovered, however, that
2  they were actually repriced in December 2006, over a year before the settlement was presented
3  to the Court. *Indeed — the options in question had already been repriced even before plaintiff*
4  *filed the consolidated complaint.*

5  By Zoran's own eventual admission, the repricing of these particular options — back in
6  December 2006 — was a result of multiple factors, including "market and media attention,"
7  the special committee investigation, and an SEC investigation, some of which would "have
8  occurred without the litigation" (Supp. Response of Nominal Def. 2). Although it is now
9  maintained that the options were repriced as "a result of the litigation," the fact is that they
10 were repriced when Zoran was under intense financial scrutiny from the media, shareholders,
11 public, and the SEC. The consolidated complaint specifically called out the repriced options
12 as evidence of guilt and went on to challenge a broad panoply of other wrongs (Compl. ¶ 81).
13 The broader panoply of other wrongs cannot be set right by a concession already in place when
14 the operative complaint was filed.

15 The Court only discovered the true date of the repricing upon review of supplemental
16 information. None of the briefing filed before the hearing on the motion for preliminary
17 approval ever indicated the true date the options were repriced. Plaintiff's motion for
18 preliminary approval simply stated (Br. 6):

> In exchange for Plaintiff's dismissal of this action with prejudice and a release of all claims, Defendants have agreed to the following terms. First, while they maintain that they are under no obligation to do so, each of the Defendants who received options that were ultimately re-measured . . . has voluntarily agreed to cancel or re-price certain option grants to eliminate any alleged benefit previously received from the re-measured options. Specifically, defendants have re-priced the following options.

The briefing let it go at that. Nor was any clarification made at the hearing. Although no outright misrepresentations were made, the actual date of the repricing was obfuscated.

---

[5] This initial impression was based on the parties' submission and is discussed in more detail below.

13

It should have been plainly disclosed that defendants were proposing to settle based on an old concession rather than on new consideration.[6]

Despite explicit opportunity, counsel have provided no caselaw holding that old concessions may be resurrected as new consideration for post-concession claims. (The caselaw on a catalyst theory of *attorney's fees* is inapposite.) Consequently, this order holds that the "repricing" in question is not and should not be consideration for a release of the claims herein.

### B.  The Value of the Repriced Options Has Been Exaggerated.

As stated, the "repriced" options cannot serve as new consideration for settling this case. This is dispositive as to the repriced options. Even if that flaw could somehow be ignored, however, there is a fundamental problem in how to value the repricing. The supplemental briefing revealed a disagreement as to the proper valuation method to be used in regards to the options that were repriced as "consideration" for the settlement.[7] Whereas Expert Chris Johnson chose to use the Black-Scholes method to value the repricing, defendants used a so-called "intrinsic-value" method. Originally, both sides implied that only one method had been used for everything, namely the Black-Scholes method. No mention was made of any intrinsic value in the initial briefing.

Under plaintiff's analysis, the value gained by repricing was determined by finding the difference between the value of the options before repricing (using the Black-Scholes method) and the value of the options after repricing (using the Black-Scholes method). For a valuation date of December 3, 2007, plaintiff values the repriced options at $117,506 (Johnson Supp. Aff. at Exh. A).

---

[6] Interestingly, the MOU provided the individual defendants "*will* return, cancel, or reprice options," not that they had already done so (Farris Decl. Exh. D) (emphasis added). After the MOU, the parties seem to have chosen to pass off the 2006 repricing as part of this undertaking.

[7] A further problem is that the repricing involves options that, at least in part, were backdated themselves and thus should have been repriced anyway. It would be a form of double counting to reprice backdated options that deserve to be repriced anyway *and* to count it as consideration for other backdated options already exercised. How much of a problem this is has not been revealed but it is unnecessary to reach the question, given the multitude of other flaws. The point is raised, however, for the benefit of counsel should any other proposals be made. An analogous double-counting problem would have to be combed out of the cancelled options (to the extent any of the cancelled options had themselves been backdated).

14

Under defendants' intrinsic-value method, the difference between the alleged backdated price and the remeasured price for the grant is multiplied by the total number of shares in the grant to arrive at a valuation, arriving at $521,170 (Response of Nominal Def. Corr. Exh. A).

If any value were to be accorded to the repriced options, then prudence and caution would favor using the lower of the two figures ($117,506). And, as with the canceled options, it would be necessary to reduce this further via a valuation date that is meaningful. For the main reason stated, the actual value is zero.

### 5. THE SCOPE OF RELEASE.

The stipulation of settlement provides that Zoran and the individual defendants (including those no longer named in this action) would be released from all claims and rights:

> Asserted by Zoran or by shareholders suing derivatively on behalf of Zoran . . . (a) in the derivative litigation; or (b) based on or related to the facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act relating to the grant, award, accounting, receipt, or exercise of *any and all Zoran stock options granted or issued up to and through the date of this stipulation*, including all matters alleged in, or which could have been alleged in, any of the complaints filed" (emphasis added).

The proposed release would be overbroad. *First*, the release would tack on all claims leading up to the filing of the stipulation of settlement. The consolidated complaint was filed on March 14, 2007. The release would thus include claims for roughly a year that have not been asserted in this action. *Second*, the release would encompass all claims relating to all stock options granted and issued regardless of whether they are alleged to be backdated when there could be many alternative causes of action relating to Zoran's stock options. The released claims should only be those made in the consolidated complaint and those closely related thereto.

### 6. CORPORATE-GOVERNANCE REFORMS.

As stated, the proposed settlement also provides that Zoran would adopt several corporate-governance reforms relating to Zoran's stock option practices. As plaintiff's motion for preliminary approval stated (Br. 7):

> In addition, Zoran's Board of Directors will enact a variety of corporate governance reforms, which are set forth in Exhibit A to the Stipulation. These measures, which total more than thirty separate provisions, will enhance Zoran's stock option granting process and its general corporate governance procedures.

15

Many of the reforms are purely cosmetic. For example, one reform provides (Stip. of Sett. Exh. A):

> Board and Committee minutes must be drafted and circulated to directors as soon as reasonably possible (for example, within one week of the meeting). Directors will have two weeks to comment on minutes. Minutes will be approved at the next scheduled board or committee meeting.

Another provides that the compensation committee charter "shall include a statement noting that it is the intention of the committee to award options priced on the grant date and not at a discount, or other language signifying the commitment to transparency and consistency in the approval of equity compensation (*ibid.*).

Also troubling, however, is the fact that five of the reforms listed in the proposed settlement were already adopted by Zoran's board well before the parties even sat down to discuss settlement terms (Farris Decl. ¶ 17). This too was not mentioned until after a post-hearing inquiry. The parties' submissions earlier spoke in terms of what "will be" done, not in terms of what had already been done.[8]

These "reforms" do not compensate the company for the damages suffered by the company as a result of defendants' backdating. The "reforms" may do some good for a discrete three-year period in the future but they are hard to accept in lieu of some substantial portion of the $16 million in damages asserted by plaintiff's expert.

### 7. STRONG ALLEGATIONS OF BACKDATING VERSUS THE PROPOSED SETTLEMENT.

For the foregoing reasons, the proposed settlement is far too modest. The corporation would recover no cash, all the cash going to counsel. The cancellation of under-water options is the only concession of any monetary value and even that is small.

---

[8] For example, in a supplemental submission, the individual defendants stated, "[i]n addition, the adoption of enhanced corporate governance procedures, which puts the Company on the cutting-edge of best practices, provides the nonpecuniary yet valuable benefits of fortifying the Company's relationship with regulators and institutional investors, higher ratings from ISS and other shareholder services, improved employee morale, and other tangible and intangible benefits that increase shareholder value" (Resp. of Ind. Def. 4).

16

Ordinarily, a district judge should give considerable deference to plaintiff counsel's views and opinions regarding whether a settlement is satisfactory given the risks of continued litigation. Attorney Farris, however, has not justified why such a low-end settlement should be approved — especially given the strong allegations of doing wrong in the consolidated complaint. In this regard, she has not shown difficult proof problems on the issue of liability. Attorney Farris' failure to verify the proposed settlement until after Court inquiry puts into question how much deference her assessment of the proposed settlement should be given.

Attorney Farris responded at the hearing that a more significant settlement could not be achieved because the special committee already "remeasured" many of the alleged backdated options. But "remeasuring" is not "repricing." This is an important difference. Remeasuring allows the recipients to keep the benefit of the backdated price at the expense of the company which must then take a "hit to earnings." On the other hand, repricing at least reduces the wrongful benefit conferred on the option holders and benefits the company. But even repricing of the options would not immediately restore to the company the cash lost due to backdated options already exercised. Only cash would do so.

Plaintiff's damage report alleges a maximum damage award of nearly $16 million. If successful, all of this would be received in cash rather than non-cash consideration. To justify the instant proposal, the record would have to show that plaintiff has virtually no chance of success at trial. That has not been shown. The shareholders would be far better off to take their chances at trial — even at the risk of total loss — than to accept the proposal. This certainly does not mean that only full-recovery settlements are acceptable. Hardly. Settlements must be discounted by risks of litigation. Here, however, it has not been shown that the risks of litigation are so severe as to compel this poor settlement. Even the supposed value of $1.65 million is illusory. In sum, in light of the strong allegations in the consolidated complaint, the proposed low-end settlement does not deserve preliminary approval.

8. **DUTY OF CANDOR.**

One reason why Rule 23 and Rule 23.1 require the district judge to approve settlements is because of the risk of collusive settlements at the expense of the absent shareholders.

When counsel reach an agreement to settle a class action or a derivative action, the adversarial system can break down, for there is no one to argue against and to expose a collusive settlement. Precisely because the adversarial system recedes, counsel have an enhanced duty of candor to lay out the weaknesses as well as the strengths. It is unfair to try to slip a weak or collusive settlement past the judge, hoping he or she will simply sign off or will not stumble upon the right questions.

"An attorney does not simply act as an advocate for his client; he is also an officer of the court. As such, an attorney has a duty of good faith and candor in dealing with the judiciary." *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985). In regards to at least the following issues, counsel have let the Court down:

- Failure to affirmatively disclose that the options that were repriced as part of the settlement were actually repriced in December 2006, well before the consolidated complaint was filed.

- Claiming that the five corporate-governance reforms enacted well before the parties began settlement discussions were enacted in consideration of the settlement.

- Inaccurately representing the dates surrounding the execution of the memorandum of understanding, including when the terms were finalized and when the document was actually signed.

- Failure to affirmatively disclose in the opening briefs on this motion that only the cancelled options were valued using the Black-Scholes method of valuation rather than both the cancelled and repriced options.

Counsel are excellent lawyers. The Court needs their help. They must try harder to meet their obligations as officers of the court.

The main vice is that the proposal does not come even close to the $1.65 million settlement it was advertised to be. A $1.65 million settlement itself would be a low-end compromise, one that might not be acceptable depending on the facts. But the proposal in questions falls considerably short of anything that could be blessed.

## CONCLUSION

While the motion was under submission, plaintiff's counsel wrote that she would be willing to split her fee with the corporation so that there would be cash going to the corporation. She also acknowledged, once her expert had actually run the numbers, that the settlement

18

seemed low to her. This order, however, only evaluates the original proposal. If another firm proposal is made, the Court will evaluate it. It should, if made, however, address all of the shortfalls listed above. No more stays are likely to be allowed to consider preliminary approval of any further proposals. Counsel must prepare this case for trial until, if ever, preliminary approval is allowed of a new and better proposal, at which time a stay will be entered pending final approval.

Finally, although this has not been requested, the Court will further adjust the discovery deadlines and trial date in order to allow for full and thorough trial preparation but only if counsel will actually use the extra time to develop the case for trial; any motion to adjust the schedule should be made within ten calender days.

**IT IS SO ORDERED.**

Dated: April 7, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE